# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| Drake Plastics Ltd. Co.; Drake Insurance Co.; and Strategic Risk Alternatives, LLC d/b/a SRA 831(b) Admin, | |
| *Plaintiffs,* | |
| v. | |
| Internal Revenue Service; the Hon. Michael Faulkender, Acting Commissioner of the Internal Revenue Service, in his official capacity; Department of the Treasury; and Scott Bessent, Secretary of the Treasury, in his official capacity, | Civil Action No. 4:25-cv-02570 |
| *Defendants.* | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT ................................................................................ 1

NATURE AND STAGE OF PROCEEDINGS.................................................... 3

    A. Congress Provides Tax Benefits To Make Captive Insurance
       Economically Viable For Small Businesses................................................. 3

    B. The IRS Issues Notice 2016-66 To Attack Micro-Captives, But A
       Federal Court Strikes Down That Notice ................................................ 5

    C. The IRS Promulgates The Final Rule, Which Continues The Agency's
       Campaign Against Small Captives............................................................. 6

    D. Plaintiffs File This Lawsuit Challenging The Final Rule And Now
       Seek Preliminary Injunctive Relief............................................................ 9

STATEMENT OF THE ISSUE ........................................................................... 10

ARGUMENT .......................................................................................................... 10

   I. The Court Should Preliminarily Enjoin Defendants From Enforcing The
     Final Rule Against Plaintiffs, Their Clients, And Their Affiliates ................. 10

    A. Plaintiffs Have Shown That The Final Rule Is Likely Unlawful ............ 10

       1. The Final Rule Exceeds The IRS's Statutory Authority...................... 11

       2. The Final Rule Is Arbitrary And Capricious....................................... 15

    B. Plaintiffs Will Be Irreparably Harmed Without A Preliminary
       Injunction Against The Enforcement Of The Final Rule......................... 21

    C. The Public Interest And The Equities Strongly Favor A Preliminary
       Injunction ................................................................................................ 24

CONCLUSION...................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Ala. Ass'n of Realtors v. HHS,*
   594 U.S. 758 (2021) (per curiam) ............................................................. 22

*Allen v. Vertafore, Inc.,*
   28 F.4th 613 (5th Cir. 2022) ................................................................... 11

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,*
   878 F.2d 806 (5th Cir. 1989). .................................................................. 22

*Book People, Inc. v. Wong,*
   91 F.4th 318 (5th Cir. 2024) ................................................................... 24

*BST Holdings, LLC v. Occupational Safety & Health Admin.,*
   17 F.4th 604 (5th Cir. 2021) ............................................................. 24, 25

*CIC Servs. LLC v. IRS,*
   592 F. Supp. 3d 677 (E.D. Tenn. 2022) ......................................... 6, 16, 17

*Clarke v. Commodity Futures Trading Comm'n,*
   74 F.4th 627 (5th Cir. 2023) ................................................................... 22

*Columbia Broad. Sys. v. United States,*
   316 U.S. 407 (1942) ................................................................................ 22

*Dep't of Comm. v. New York,*
   588 U.S. 752 (2019) ................................................................................ 15

*Enrique Bernat F., S.A. v. Guadalajara, Inc.,*
   210 F.3d 439 (5th Cir. 2000) ............................................................. 10, 12

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ........................................................................... 15, 17

*Friends of Animals v. Haaland,*
   997 F.3d 1010 (9th Cir. 2021) ............................................... 11, 12, 13, 15

*Latiolais v. Huntington Ingalls, Inc.,*
   951 F.3d 286 (5th Cir. 2020) ................................................................... 11

*League of Women Voters v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016) .................................................................... 25

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ................................................................ 11

*Miss. Poultry Ass'n, Inc. v. Madigan,*
992 F.2d 1359 (5th Cir. 1993) .................................... 11, 12, 15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ............................................................ 15, 21

*Nat'l Life & Accident Ins. Co. v. United States,*
524 F.2d 559 (6th Cir. 1970) ................................................. 15

*Nat'l Tour Brokers Ass'n v. ICC,*
671 F.2d 528 (D.C. Cir. 1982) ............................................... 20

*Nken v. Holder,*
556 U.S. 418 (2009) ........................................................ 10, 24

*Oglala Sioux Tribe of Indians v. Andrus,*
603 F.2d 707 (8th Cir. 1979) ...................................... 11, 12, 15

*Planned Parenthood Fed'n of Am., Inc. v. Heckler,*
712 F.2d 650 (D.C. Cir. 1983) .................................... 11, 12, 15

*Swift v. Comm'r of Internal Revenue,*
__ F.4th ___, 2025 WL 1949147 (5th Cir. July 16, 2025) ........................................ 21

*Tex. A&M Queer Empowerment Council v. Mahomes,*
772 F. Supp. 3d 792 (S.D. Tex. 2025) .................................... 24

*Valentine v. Collier,*
956 F.3d 797 (5th Cir. 2020) ................................................. 10

**Statutes And Rules**

5 U.S.C. § 706 ........................................................................ 10

26 U.S.C. § 816 ........................................................................ 4

26 U.S.C. § 831 ................................................................ *passim*

26 U.S.C. § 6011 ...................................................................... 5

26 U.S.C. § 6103 .................................................................... 17

26 U.S.C. § 6707A .............................................................. 5, 14

Protecting Americans from Tax Hikes Act,
    Pub. L. 114-113, 129 Stat. 2242 (2015) ................................................. 4

Tax Reform Act of 1986,
    Pub. L. No.99-514, 100 Stat. 2085 (1986)............................................. 4

Tex. Ins. Code § 964.056............................................................................ 21

## Regulations

26 C.F.R. § 1.6011-10............................................................................. 7, 8

26 C.F.R. § 1.6011-4............................................................................... 5, 7

90 Fed. Reg. 3,534 (Jan. 14, 2025) ................................................... *passim*

## Other Authorities

Ala. Captive Ins. Ass'n Comment Letter on the Final Rule (June 13, 2023) ............. 3

Am. Acad. of Actuaries Comment Letter on the Final Rule (June 13, 2023)............ 19

Captive Ins. Cos. Ass'n Comment Letter on the Final Rule (June 13, 2023)............ 18

Del. Captive Ins. Ass'n Comment Letter on the Final Rule (June 13, 2023).... *passim*

Drew Estes, *Captive Insurance Companies: Why Policymakers Have It
    All Wrong*, 44 Cap. U. L. Rev. 723 (2016) ................................... 3, 4, 5, 15

IRS, Notice 2016-66 ......................................................................... 5, 6, 17

IRS, Notice 2025-24 .................................................................................. 9

Okla. Dep't. of Ins. Comment Letter on the Final Rule (June 13, 2023).................. 18

SRA 831b Admin Comment Letter on the Final Rule (June 9, 2023) .................. 3, 18

The Queen Firm, LLC Comment Letter on the Final Rule (June 6, 2023)....... 4, 9, 21

## SUMMARY OF ARGUMENT

Captive insurance is a common form of self-insurance, in which a business creates its own insurance company to insure or reinsure risks specific to itself and its affiliates. Captives offer several benefits, including allowing insureds to maintain coverage for low-frequency, high-severity risks for which commercial insurance policies are often cost-prohibitive or unavailable. Today, many companies (including most Fortune 500 companies) use captive insurance. Recognizing both the benefits of captives and the costs of forming and operating them, Congress enacted legislation to make it economically feasible for small businesses to use captive insurance, known as "micro-captive" insurance. *See* 26 U.S.C. § 831(b).

Plaintiffs here seek a preliminary injunction against the enforcement of the IRS's rule titled *Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest*, 90 Fed. Reg. 3,534 (Jan. 14, 2025) (the "Final Rule"), which imposes substantial irreparable harm on Plaintiffs by illegally reclassifying a vast array of the micro-captive industry as presumptive or potential tax-evasion schemes.

Plaintiffs are likely to prevail on their argument that the Final Rule is illegal. First, the Final Rule exceeds the IRS's statutory authority by reclassifying broad swaths of the micro-captive insurance industry as presumptively or potentially tax-evasive, directly contrary to Congress' decision to encourage this form of insurance, and despite Congress already providing different statutory criteria to prevent abuse of micro-captive tax incentives. The Final Rule imposes extra-statutory criteria that distort the careful balance that Congress struck between ensuring that the micro-

captive tax incentive is broadly available and preventing abuse of this form for non-insurance purposes. Second, even if the IRS had authority to override Congress' policy judgment regarding micro-captives, the agency acted arbitrarily and capriciously here in designing the Final Rule—just as it did nearly a decade ago when it issued Notice 2016-66, which imposed a similarly onerous classification scheme and which the federal courts struck down. Just like the invalidated Notice 2016-66, the Final Rule fails to set forth any evidence that the micro-captives subject to its requirements pose any risk of tax abuse. Further, the Final Rule arbitrarily imposes disclosure obligations based upon extra-statutory criteria that are common—and, in fact, expected—features of micro-captive arrangements, without evidence that the existence of any of these criteria is indicative of tax abuse.

A preliminary injunction is necessary to avoid irreparable harm to Plaintiffs and the public. Plaintiff Strategic Risk Alternatives, LLC d/b/a SRA 831(b) Admin ("SRA") has lost multiple clients due to the Final Rule, and now that the Final Rule's July 31, 2025 disclosure deadline has passed, SRA can project with confidence that it will lose another 25 to 35 clients before the end of this year unless the Final Rule is enjoined. All of these losses will be irreparable, even if the Final Rule is ultimately invalidated at the end of this case. The public will suffer substantial harms as well, including because Congress determined that encouraging micro-captives is in the public interest and the Final Rule undermines this goal.

This Court should preliminarily enjoin Defendants from enforcing the Final Rule against Plaintiffs, their customers, and their affiliates.

## NATURE AND STAGE OF PROCEEDINGS

### A.    Congress Provides Tax Benefits To Make Captive Insurance Economically Viable For Small Businesses

Captive insurance offers a variety of benefits to insureds and the public. Captives allow insureds to tailor coverage to their specific business needs, including low-frequency, high-severity risks or idiosyncratic risks for which commercial insurance policies are cost-prohibitive or unavailable.  Del. Captive Ins. Ass'n Comment Letter on the Final Rule at 2 (June 13, 2023) ("DCIA Comment");[1] Drew Estes, *Captive Insurance Companies: Why Policymakers Have It All Wrong*, 44 Cap. U. L. Rev. 723, 729–30, 737 (2016).  Captive insurance owners enjoy lower and more stable premium prices, coverage customized to the insured's business and risk tolerance, and more responsive claims processing.  Ala. Captive Ins. Ass'n Comment Letter on the Final Rule at 2–3 (June 13, 2023) ("ACIA Comment");[2] Estes, *supra*, at 730, 740.  The public also benefits from captive insurance because captive arrangements motivate insureds to adopt industry best practices for risk mitigation, SRA 831b Admin Comment Letter on the Final Rule at 3 (June 9, 2023) ("SRA Comment");[3] ACIA Comment at 11; *see also* Estes, *supra*, at 734, 739, and allow businesses to finance these risks through tax-advantaged, compounding accumulations of reserves (rather than forcing the private sector to absorb solvency-

---

[1]    Available at https://www.regulations.gov/comment/IRS-2023-0017-0076 (all websites last visited Aug. 5, 2025).

[2] Available at https://www.regulations.gov/comment/IRS-2023-0017-0103.

[3] Available at https://www.regulations.gov/comment/IRS-2023-0017-0039.

threatening losses).  The Queen Firm, LLC Comment Letter on the Final Rule at 19 (June 6, 2023) ("Queen Comment")[4]; *see also* Estes, *supra*, at 729–30.

Recognizing these benefits, Congress has provided micro-captives with important federal tax benefits.  In 1986, Congress enacted Section 831(b) to provide a federal income tax benefit to qualifying small insurance companies, including small captives.  Tax Reform Act of 1986, Pub. L. No.99-514, § 1024(a), 100 Stat. 2085, 2405 (1986).  As originally enacted, Section 831(b) allowed certain captives to avoid paying federal income tax on premium income, if the captive's total premium payments fell below $1.2 million.  Tax Reform Act of 1986, Pub. L. No.99-514, § 1024(a), 100 Stat. 2085, 2405 (1986).  Instead, these micro-captives could elect to pay federal income tax solely on income earned from investing insurance premiums.  *Id.*

In 2015, Congress passed the Protecting Americans from Tax Hikes ("PATH") Act, Pub. L. 114-113, 129 Stat. 2242 (2015), which extended Section 831(b) to more micro-captives while also preventing abuse of the micro-captive form for non-insurance purposes.  *See* Estes, *supra*, at 748–49.  To avail itself of Section 831(b), a micro-captive must be an "insurance company" (meaning that over 50% of its business during the taxable year is issuing insurance or annuity contracts or reinsuring risks underwritten by insurance companies), 26 U.S.C. § 831(b)(2)(A); *see id.* § 816(a), receive less than $2.2 million in net written premiums during the taxable year, *id.* § 831(b)(2)(A)(i), meet one of two "diversification requirements," *id.* § 831(b)(2)(A)(ii), and make the Section 831(b) election, *id.* § 831(b)(2)(A)(iii).  The PATH Act added a

---

[4] Available at https://www.regulations.gov/comment/IRS-2023-0017-0017.

diversification requirement to Section 831(b) to prevent perceived abuses, *see id.* § 831(b)(2)(A)(ii), and allowed micro-captives to meet this requirement in one of two ways. One option is to satisfy the "risk diversification test," whereby "no more than 20 percent" of the company's "net written premiums (or, if greater, direct written premiums)" are "attributable to any one policyholder." *Id.* § 831(b)(2)(B)(i)(I). Alternatively, the company can meet the "relatedness test," where the captive's owners and its family members hold roughly the same interest in the insured company as they do in the captive itself. *Id.* § 831(b)(2)(B)(i)(II). The PATH Act's diversification mandate ensures that micro-captives are adequately diverse in terms of ownership and risk exposure, and that the benefits of the Section 831(b) election are not concentrated in the hands of a single party in a manner that could suggest that the captive is being used as a tax shelter. *See* Estes, *supra*, at 748–49.

### B. The IRS Issues Notice 2016-66 To Attack Micro-Captives, But A Federal Court Strikes Down That Notice

The IRS has for at least a decade strongly disagreed with Congress' policy in favor of micro-captive formation. In 2016, the IRS issued Notice 2016-66, which purported to classify a large number of Section 831(b) micro-captives as "transactions of interest," *see* IRS, Notice 2016-66,[5] a type of "reportable transaction" that "the Secretary determines as having a potential for tax avoidance and evasion" under 26 C.F.R. § 1.6011-4 and 26 U.S.C. § 6011. *See* 26 U.S.C. § 6707A(c)(1). A transaction

---

[5] Available at https://www.irs.gov/pub/irs-drop/n-16-66.pdf.

of interest is a potential tax-evasion scheme subject to onerous disclosure obligations and penalties for non-disclosure.  *See* Notice 2016-66, *supra*, §§ 3.01, 3.06.

Through Notice 2016-66, the IRS classified a Section 831(b) micro-captive as a transaction of interest if the owner of the entity owns, directly or indirectly, at least 20% of the micro-captive's voting power or value, and either (i) provided or agreed to provide tax-free financing to its insureds or related parties, or (ii) had a "loss ratio" of less than 70% over the most recent five taxable years.  Notice 2016-66, *supra*.  "Loss ratio" measures the amount a micro-captive incurs for insured losses and claim administration expenses against the premiums that it collects after paying policyholder dividends.  *See id.*  So if a micro-captive earns $1,000,000 in premiums, incurs $200,000 in losses and expenses, and issues $500,000 in policyholder dividends, its loss ratio would be 40% ($200,000 / ($1,000,000 - $500,000)).

In 2022, a district court invalidated Notice 2016-66 under the APA.  In addition to being an invalid "legislative rule," *CIC Servs. LLC v. IRS*, 592 F. Supp. 3d 677, 682 (E.D. Tenn. 2022), Notice 2016-66 was arbitrary and capricious because the IRS failed to support its "decision to designate micro-captive arrangements as transactions of interest" with any "relevant data and [supporting] facts."  *Id.* at 685.

### C.    The IRS Promulgates The Final Rule, Which Continues The Agency's Campaign Against Small Captives

a. On January 14, 2025, the IRS promulgated the Final Rule, adopting a scheme even more clearly unlawful than in its invalidated Notice 2016-66.  *See* 90 Fed. Reg. at 3,534.  Like the invalidated Notice 2016-66, the Final Rule identifies a broad swath of Section 831(b) micro-captives—insurance arrangements that

Congress explicitly acted to incentivize, *supra* pp.4–5—as transactions of interest, establishes onerous disclosure requirements, and imposes substantial penalties for non-disclosure.  But the Final Rule goes even further, now classifying many Section 831(b) micro-captives as "listed transactions"—a reportable transaction that the "IRS has determined to be a tax avoidance transaction."  26 C.F.R. § 1.6011-4(b)(2).  In other words, a listed transaction is a presumptive tax avoidance transaction.  *See id.*

The Final Rule's classification scheme and disclosure requirements apply to Section 831(b) micro-captives that satisfy three extra-statutory criteria:

- <u>The 20% Relationship Test</u>. The 20% Relationship Test is a prerequisite to being deemed either a listed transaction or a transaction of interest under the Final Rule.  90 Fed. Reg. at 3,559; 26 C.F.R. § 1.6011-10(b)(1)(iii).  This test is met if at "least 20 percent of [the captive's] assets or the voting power or value of its outstanding stock or equity interests is directly or indirectly owned, individually or collectively, by an Insured, an Owner, or persons Related to an Insured or an Owner."  90 Fed. Reg. at 3,559; 26 C.F.R. § 1.6011-10(b)(1)(iii).

- <u>The Financing Factor</u>.  A captive meets the Financing Factor if it "made available as financing or otherwise conveyed" funds to a policyholder, a policyholder's owner, or a related party "in a transaction that did not result in taxable income or gain," "any portion of the amounts" the captive earned from insurance contracts.  90 Fed. Reg. 3,560; 26 C.F.R. § 1.6011-10(c)(1)(i).

- <u>The Loss Ratio Factor</u>. A captive meets the Loss Ratio Factor for listed transactions if, during the last 10 taxable years, its Loss Ratio is less than 30% ("30% Loss Ratio Factor"). *See* 90 Fed. Reg. at 3,560; 26 C.F.R. § 1.6011-10(c)(2). A captive meets the Loss Ratio Factor for transactions of interest if, during the last 10 taxable years, its Loss Ratio is less than 60% ("60% Loss Ratio Factor"). 90 Fed. Reg. at 3,560, 3,562.

The Final Rule classifies a Section 831(b) micro-captive as a transaction of interest (and so a potential tax-avoidance transaction) if it meets the 20% Relationship Test and also meets either (i) the Financing Factor, or (ii) the 60% Loss Ratio Factor. 90 Fed. Reg. at 3,562–63. A micro-captive is a listed transaction (and so a presumptive tax-avoidance transaction) if it meets the 20% Relationship Test, the Financing Factor, and the 30% Loss Ratio Factor. *Id.* at 3,559–60.

Like with Notice 2016-66, the IRS again failed to develop an evidentiary basis for the Final Rule. The Final Rule merely relies upon the IRS's previously issued notices concerning micro-captive insurance transactions, and notes that the Tax Court has, on a handful of occasions, concluded that specific micro-captives were tax evasive. 90 Fed. Reg. at 3,538. The IRS purported to justify the Financing Factor by stating that, "based on its experience, . . . in transactions structured as described in the proposed regulations, financing arrangements that create a tax-deferred circular flow of funds are indicative of tax avoidance." *Id.* at 3,546. The IRS purported to justify the Loss Ratio Factor by asserting that whether a captive "[p]ric[es] premiums far in excess of what is reasonably needed to fund insurance operations" is "a strong

indicator of tax avoidance," without providing any reasoned explanation as to why its chosen Loss Ratios would indicate the pricing is unreasonable. *Id.* at 3,540. Further, the IRS relied heavily upon data from the National Association of Insurance Commissioners ("NAIC"), which aggregates information from the property and casualty insurance industry at large, including personal and commercial lines of coverage, but excludes the vast majority of captive insurance companies. *See* Queen Comment at 8–19.

### D.   Plaintiffs File This Lawsuit Challenging The Final Rule And Now Seek Preliminary Injunctive Relief

Plaintiffs—a captive insurance company, a captive insurance owner, and a captive insurance material advisor, *see* ECF No.1 ("Compl.") ¶¶ 15, 16, 25—filed a three-count complaint seeking to vacate the Final Rule. Meanwhile, taxpayers with information to report under the Final Rule had to file their disclosure statements by July 31, 2025. *See* IRS, Notice 2025-24.

Plaintiff SRA has determined that nearly *all* of the micro-captive insurance companies that it has managed since 2015 will constitute a reportable transaction under the Final Rule, Ex. A ("SRA Decl.") ¶ 6, and it has already received six requests from clients to shut down their micro-captive insurance companies, with a dozen more electing to revoke their Section 831(b) elections, *id.* ¶ 9. Since the July 31, 2025, deadline for disclosures has come and gone, Plaintiff SRA can now estimate with confidence, based on communications with its clients, that it expects to lose between 25 and 35 clients before the end of this year as a direct result of the Final Rule absent a preliminary injunction, costing SRA substantial, ongoing revenue from these

clients. *Id.* ¶ 10. Once clients shut down their micro-captives, many of those clients will be lost to SRA forever. *Id.* ¶ 12.

## STATEMENT OF THE ISSUE

Plaintiffs ask this Court to decide whether they are entitled to an injunction preliminarily enjoining Defendants from enforcing the Final Rule against them, their clients, and their affiliates. Plaintiffs must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that [they] will suffer irreparable injury absent the injunction; (3) that the threatened injury outweighs any harm the injunction might cause the defendants; and (4) that the injunction will not impair the public interest." *Enrique Bernat F., S.A. v. Guadalajara, Inc.*, 210 F.3d 439, 442 (5th Cir. 2000). The first two factors are the most critical, *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020), and the second two merge when the government is the defendant, *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.  The Court Should Preliminarily Enjoin Defendants From Enforcing The Final Rule Against Plaintiffs, Their Clients, And Their Affiliates

#### A.  Plaintiffs Have Shown That The Final Rule Is Likely Unlawful

The APA requires courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory

authority," and may not "defer to an agency interpretation of the law." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024); *see also id.* at 391–92.[6]

### 1. The Final Rule Exceeds The IRS's Statutory Authority

a. "When interpreting statutes, [courts] begin with the text's plain meaning, ascertained by reference to 'the particular statutory language at issue, as well as the language and design of the statute as a whole.'" *Allen v. Vertafore, Inc.*, 28 F.4th 613, 617 (5th Cir. 2022) (citation omitted). Courts must avoid an interpretation that renders part of a statute "superfluous." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 294 (5th Cir. 2020). Further, "[a]gency action must be found to be consistent with the congressional purposes underlying the authorizing statute." *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 655 (D.C. Cir. 1983) (citation omitted). "It is beyond dispute that agency action . . . which frustrates the congressional policy which underlies a statute[ ] is invalid." *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 715 (8th Cir. 1979). Therefore, courts must "reject administrative [conduct that is] contrary to clear congressional intent" or that "frustrate[s] the policy Congress sought to implement." *Friends of Animals v. Haaland*, 997 F.3d 1010, 1016 (9th Cir. 2021) (citations omitted); *see also Miss. Poultry Ass'n, Inc. v. Madigan*, 992 F.2d 1359, 1364 (5th Cir. 1993), *amended*, 9 F.3d 1113 (5th Cir. 1993), *on reh'g*, 31 F.3d 293 (5th Cir. 1994) (rejecting final rule

---

[6] For purposes of this preliminary injunction motion, Plaintiffs address their likelihood of success only on certain claims in their Complaint.

permitting different sanitary inspection factors than Congress intended because it is not the agency's "purview" to "alter, frustrate, or subvert congressional policy").

b. Here, it is "likel[y]," *Enrique Bernat F.*, 210 F.3d at 442, that the Final Rule exceeds the IRS's statutory authority because the Rule is "[in]consistent with," *Planned Parenthood*, 712 F.2d at 655, and "frustrates the congressional policy" supporting Section 831(b), *Oglala Sioux Tribe*, 603 F.2d at 715; *Friends of Animals*, 997 F.3d at 1016; *Miss. Poultry Ass'n*, 992 F.2d at 1364. The Final Rule exceeds the IRS's statutory authority because it uses non-statutory criteria to classify micro-captive insurance transactions as presumptively or potentially tax-abusive and, in doing so, disrupts the careful balance that Congress struck between incentivizing micro-captives and preventing abuse of this form. In particular, the Final Rule purports to rewrite Congress' statutory framework for dispensing Section 831(b)'s tax benefits by disincentivizing an entire category of Section 831(b) captives that Congress expressly legislated to incentivize—namely, those that qualify for Section 831(b) benefits by virtue of meeting Congress' relatedness test.

The Final Rule's non-statutory criteria for Section 831(b) micro-captives targets for disfavored treatment the types of transactions Congress sought to incentivize. In the PATH Act, Congress specifically amended Section 831(b) to effectuate twin goals: to incentivize use of small captives while also curbing the risk that captive insurance arrangements are used for tax-abusive purposes. *See supra* pp.4–5. To address the first goal, Congress made Section 831(b)'s federal tax benefits available to captive insurance companies that receive less than $2.2 million in net

written premiums during the taxable year.  26 U.S.C. § 831(b)(2)(A)(i).  To address the latter goal of curbing tax abuse, Congress added a "diversification" requirement, which provides two alternative statutory criteria—the risk diversification test and the relatedness test—at least one of which must be met before a micro-captive is eligible for Section 831(b)'s benefits.  *Id.* § 831(b)(2)(B)(i)(I), (II).  In the Final Rule, the IRS has imposed criteria that are different in kind, fundamentally changing the careful balance that Congress struck in the PATH Act between incentivizing micro-captive formation and deterring abuse of the micro-captive form.

Under the Final Rule, Section 831(b) micro-captives are now subject to non-statutory criteria that will disincentivize small businesses from relying on micro-captives, contrary to Congress' intent.  *See Friends of Animals*, 997 F.3d at 1016.  As discussed immediately below, the 20% Relationship Test—which subjects Section 831(b) micro-captives to additional scrutiny if an insured, owner, or related person owns a 20% or greater interest in the captive, *see* 90 Fed. Reg. at 3,559—undermines Congress' intent that micro-captives be permitted to elect Section 831(b) taxation *even if* such circumstances are present.  *See supra* pp.4–5.  And the Financing and Loss Ratio Factors—which look for related-party financing and examine the ratio of incurred losses against earned premiums—disincentivize entities from forming and operating micro-captives, as these entities may now be ineligible for Section 831(b)'s benefits if they either use related-party loans to make a return on their premiums or maintain high surplus reserves to cover future claims. *See infra* pp.4–5.

The Final Rule also undermines Congress' judgment that a micro-captive may take advantage of Section 831(b) even if a single policyholder has a greater than 20% interest in the captive, so long as the captive's ownership roughly mirrors the insured's ownership (*i.e.*, the PATH Act's "relatedness test"). Under the Final Rule, captives that are eligible for Section 831(b) benefits only via this relatedness test are inherently suspect, and will be classified as presumptive or potential tax-evasion schemes if they also exhibit certain other common features of micro-captive insurance transactions. Consider a family-owned manufacturing business with a micro-captive that insures only this parent company. If the father owns 60% of both the manufacturing business and the micro-captive and the daughter owns 40% of both the manufacturing business and the micro-captive, then the micro-captive is eligible for Section 831(b) benefits under Congress' relatedness test (even if it would not be eligible for those benefits under Congress' alternative risk diversification test). But under the Final Rule's threshold 20% Relationship Test, this ownership structure is now systematically disfavored—despite the fact that Congress has expressly identified this ownership structure as one that it wants to incentivize. *See* 26 U.S.C. § 831(b)(2)(B)(i)(II). If the micro-captive also has low claims or related-party financing—common features of micro-captive arrangements, *infra* pp.19–20—then it will generally be classified as either a listed transaction or a transaction of interest, entirely at odds with Congress' goal of incentivizing these arrangements.

While the IRS has authority to identify tax abuse, *see* 26 U.S.C. § 6707A(c), it cannot turn transactions that Congress specifically sought to encourage into tax-

avoidance schemes through administrative fiat, *accord Planned Parenthood*, 712 F.2d at 655; *Oglala Sioux Tribe*, 603 F.2d at 715; *Friends of Animals*, 997 F.3d at 1016; *Miss. Poultry Ass'n*, 992 F.2d at 1364.   Congress was aware of the potential for tax abuse when it made federal tax benefits available to micro-captives that satisfy Section 831(b), *see* Estes, *supra*, at 748–49, and the Final Rule contravenes Congress' decision to expand its Section 831(b) regime to micro-captives that meet Section 831(b)'s requirements, *see Nat'l Life & Accident Ins. Co. v. United States*, 524 F.2d 559, 560 (6th Cir. 1970).   Because the Final Rule is therefore "[in]consistent with the congressional purposes underlying" Section 831(b), *Planned Parenthood*, 712 F.2d at 655, and "frustrates the congressional policy" embodied in that statute, *Oglala Sioux Tribe*, 603 F.2d at 715, the IRS exceeded its statutory authority in promulgating it, *see also Friends of Animals*, 997 F.3d at 1016; *Miss. Poultry Ass'n*, 992 F.2d at 1364.

### 2. The Final Rule Is Arbitrary And Capricious

a. In deciding whether agency action is arbitrary and capricious, courts consider whether the agency "relied on factors which Congress has not intended it to consider, [or] entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   The agency must "examine the relevant data and articulate a satisfactory explanation for its action."   *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation omitted); *see Dep't of Comm. v. New York*, 588 U.S. 752, 773 (2019). Applying this caselaw, a federal court has already determined that the IRS's prior

effort to disfavor micro-captives—Notice 2016-66—was arbitrary and capricious because the agency failed to provide sufficient "data and facts" to support its "decision to designate micro-captive arrangements" as "reportable transactions." *See CIC Servs.*, 592 F. Supp. 3d at 685. As the court explained, "[s]imply including cases in the administrative record that suggest certain tax structures could be abusively employed is not synonymous with examining relevant facts and data in connection with issuing the Notice." *Id.* at 687.

b. Even if this Court disagrees that the IRS exceeded its statutory authority in taking transactions that Congress sought to encourage and classifying them as presumptive or potential tax shelters, the Final Rule's categorization of a broad swath of Section 831(b) micro-captives as presumptive or potential tax-avoidance transactions finds no support in the record, and is therefore arbitrary and capricious.

As with Notice 2016-66, the IRS has yet again failed to provide an adequate record basis for classifying micro-captives as reportable transactions. *See CIC Servs.*, 592 F. Supp. 3d at 685–86. Because the IRS has premised its new classification scheme on criteria that are present in standard micro-captive insurance arrangements, many legitimate Section 831(b) micro-captives will qualify as either listed transactions or transactions of interest. *See* DCIA Comment at 3, 9. As justification for this sweeping reclassification scheme, the Final Rule simply references the agency's own previously issued notices and "long-standing positions" attacking micro-captives, as well as a handful of Tax Court decisions finding that certain micro-captives engaged in tax abuse. 90 Fed. Reg. at 3,583. ***These are the***

*same sources that the IRS attempted to rely upon to justify its attack on the micro-captive industry in Notice 2016-66*.    *CIC Servs.*, 592 F. Supp. 3d at 685–87.[7]  The IRS's failure to supply any data or facts to support its new regulatory mandate is particularly problematic here, where the Final Rule now seeks to classify many Section 831(b) micro-captives as presumptively illegal *listed transactions*, 90 Fed. Reg. at 3,534, as opposed to Notice 2016-66, which concerned only potentially illegal transactions of interest, *see* Notice 2016-66, *supra*.

More specifically, the IRS did not provide record evidence to support its arbitrary new extra-statutory criteria.   Neither the Loss Ratio Factor nor the Financing Factor are appropriate, record-based reasons to conclude that a micro-captive is a tax-abusive scheme, *see* 90 Fed. Reg. at 3,539–40, 3,545–46,[8] as both are common features of micro-captives that will, accordingly, only bring a wide array of legitimate micro-captive insurance arrangements within the Final Rule's scope.

As to the Loss Ratio Factor, the IRS offers no "satisfactory explanation," *Fox Television Stations*, 556 U.S. at 513 (citation omitted), for its determination that the Final Rule's Loss Ratio thresholds are indicative of tax abuse.   The IRS asserts

---

[7] Throughout the Final Rule, the IRS appears to rely on the fact that it is prohibited from discussing specific taxpayer return information to justify its lack of data or facts to support its conclusion that micro-captives are or may be tax-evasion schemes.  *See, e.g.*, 90 Fed. Reg. at 3,539.   But as even the agency recognizes, it is not barred from disclosing information "in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer." 26 U.S.C. § 6103(b)(2)(D).  If the agency had relevant data, it could have disclosed it in a manner consistent with its confidentiality obligations.

[8] For purposes of this motion, Plaintiffs focus on the Financing Factor and Loss Ratio Factor, but the 20% Relationship Test is also arbitrary, as it arbitrarily scrutinizes single-owner micro-captives, even though a multi-owner risk-pool captive will have thinner risk. *See* 90 Fed. Reg. at 3,554–55.

without record support that the Loss Ratio Factor seeks to determine whether a captive "pric[es] premiums far in excess of what is reasonably needed to fund insurance operations." 90 Fed. Reg. at 3,540. But using the Final Rule's 30% and 60% Loss Ratios as a proxy for tax abuse renders the Final Rule's classification scheme irrationally overbroad. *See* DCIA Comment at 7–9. Having a lower-than-average Loss Ratio—and certainly lower than the 60% threshold and even the 30% threshold identified in the Final Rule—is an extremely common feature of micro-captives. *See* Okla. Dep't. of Ins. Comment Letter on the Final Rule at 1 (June 13, 2023);[9] Captive Ins. Cos. Ass'n Comment Letter on the Final Rule at 8 (June 13, 2023).[10] Unlike many other types of insurance providers, captives typically provide coverage for low-frequency, high-severity risks (such as global pandemics, large oil spills, or terrorist attacks) that require them to maintain large capital reserves to pay for claims in the event the catastrophic risk comes to pass. SRA Comment at 2, 4–5. Because these low-frequency risks may not materialize in any given year (if at all), captives will almost always have a lower Loss Ratio than their commercial insurance counterparts, whose business models do not require the same type of capital surplus.

The Final Rule downplayed this critical distinction and instead relied almost exclusively on inapplicable NAIC data to support its flawed Loss Ratio Factor, which an agency cannot do. The NAIC data set forth an aggregated loss ratio of 72.5% for the U.S. property-casualty industry at large. *See* SRA Comment at 2. But this is an

---

[9] Available at https://www.regulations.gov/comment/IRS-2023-0017-0099.

[10] Available at https://www.regulations.gov/comment/IRS-2023-0017-0063.

apples-to-oranges comparison, given the unique type of risk (low-frequency but high-severity) typically covered by micro-captives.  *Id.*; DCIA Comment at 2.  Not only do most captives not even report to the NAIC, rendering this dataset wholly unrepresentative of the micro-captive industry, Am. Acad. of Actuaries Comment Letter on the Final Rule at 2–4 (June 13, 2023),[11] this data also comprises personal coverage lines such as auto and homeowners insurance that are rarely covered by captives and exhibit higher loss ratios due to market competition, *id.* at 3; *see* 90 Fed. Reg. at 3,542.  And even if these particular lines of business are excluded, the purported "average" loss ratio for property-casualty insurance companies under the NAIC dataset is 66%—as even the IRS recognized.  *Id.* at 3,542.  The agency fails to explain why a 60% Loss Ratio—well in line with the property-casualty industry standard—is indicative of anything beyond legitimate insurance coverage in the micro-captive context.  *See id.* at 3,541 (recognizing that a loss ratio of 28% can constitute legitimate insurance).  It was arbitrary and capricious for the agency not to aggregate any information specific to the micro-captive industry to inform its decisionmaking process, especially where its failure to do so has resulted in a Final Rule that will unreasonably classify many legitimate Section 831(b) micro-captives as presumptive or potential tax shelters.

Nor does the Final Rule articulate any record-supported basis for concluding that micro-captives that engage in related-party financing (*i.e.*, the Financing Factor) are more likely to be abusive tax shelters.  Instead, the Final Rule merely asserts

---

[11] Available at https://www.regulations.gov/comment/IRS-2023-0017-0108.

without support that "based on its experience, the IRS maintains that, in transactions structured as described . . . financing arrangements that create a tax-deferred circular flow of funds are indicative of tax avoidance." 90 Fed. Reg. at 3,546. But this vague reference to IRS's claimed experience in plainly insufficient. *See Nat'l Tour Brokers Ass'n v. ICC*, 671 F.2d 528, 533 (D.C. Cir. 1982) (agencies may not rely upon "'experience' to provide the necessary factual support" unless that "experience is made part of the record and susceptible to judicial review" (citation omitted)). Further, the Final Rule does not account for the fact that related-party financing is an expected—and often intended—characteristic of a micro-captive insurance arrangement, and instead falsely assumes that such investments are "merely using funds for something other than claims payment." DCIA Comment at 8. That assumption is unsupported and incorrect. "Insurance companies invest their premiums in order to make a return that can help offset loss payments and expenses," and in the captive context, "a loan to a related party may serve as an investment that is not correlated to stock or bond market performance, providing a fixed income stream that can be matched with potential claims obligations." *Id.* The IRS recognized the importance of related-party financing in the Final Rule, noting that it can be a "bona fide financing arrangement between the related parties." 90 Fed. Reg. at 3,546. The agency provided no rational justification for subsequently concluding that such financing, in and of itself, is "indicative of tax avoidance." *Id.*

Finally, the Final Rule is arbitrary and capricious because it fails to address reasonably the significant harmful effects that the Final Rule's non-statutory criteria

will have on the micro-captive insurance industry. For example, by predicating disclosure obligations (and the consequential loss of income tax benefits) on the Loss Ratio Factor, the Final Rule punishes captives for not lowering premium prices and not paying policyholder dividends (which would reduce the denominator in the Loss Ratio calculation). *See* 90 Fed. Reg. at 3,534. And so to comply with the Final Rule and ensure that they are able to continue taking advantage of the tax benefits that Congress has provided small insurers, many Section 831(b) micro-captives will necessarily need to limit their surplus reserves, thereby jeopardizing their ability to pay future claims (which may also run afoul of state regulations, *see, e.g.*, Tex. Ins. Code § 964.056). In other words, the Final Rule's Loss Ratio Factor penalizes prudent risk management and undermines Congress' goal of enabling small insurers to build financial resilience. Queen Comment at 19–20. The IRS ignored this "important aspect of the problem," in violation of the APA. *State Farm*, 463 U.S. at 43.[12]

### B.    Plaintiffs Will Be Irreparably Harmed Without A Preliminary Injunction Against The Enforcement Of The Final Rule

1. Suffering losses "with no guarantee of eventual recovery" constitutes irreparable harm. *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (per

---

[12] Nothing in *Swift v. Comm'r of Internal Revenue*, __ F.4th ___, 2025 WL 1949147 (5th Cir. July 16, 2025), changes this conclusion. *Swift* affirmed the Tax Court's holding that "premium payments made to [captive insurance companies] were not for insurance and could not be deducted as business expenses." *Id.* at *8. *Swift* reached that conclusion after analyzing a number of nuanced and case-specific factors, including "the apparent lack of any business need for the Captives, the irregular handling of claims, the various oddities contained in the policies, the unreasonable, reverse-engineered premiums, and the availability of similar commercial coverage at a fraction of the cost." *Id.* The Final Rule, in contrast, contains no such nuance. If anything, *Swift* shows that the Final Rule's blunderbuss approach is unnecessary to address any issues that may arise in this context.

curiam).  Economic harm can be irreparable when a business suffers the loss of customers and goodwill that "might be incapable of calculation."  *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989).  Similarly, significant "disruption" caused by unlawful regulation constitutes an "irreparable injury to [a] business."  *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 419, 423 (1942).  Complying with an agency order later held invalid "almost *always* produces the irreparable harm of nonrecoverable compliance costs," because "federal agencies generally enjoy sovereign immunity for any monetary damages."  *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 643 (5th Cir. 2023) (citation omitted).

2. Here, Plaintiffs are likely to suffer significant harm from the Final Rule that cannot be remedied even if the Final Rule is set aside at the conclusion of this litigation.  Now that the Final Rule's July 31, 2025 reporting deadline has passed, SRA has determined—based upon extensive conversations with its clients—that it will lose approximately 25 to 35 clients **by the end of this year** if the Final Rule remains in effect, as more and more clients close their captive insurance operations.  SRA Decl. ¶¶ 9–10, 12.  That is because the Final Rule classifies nearly all of SRA's clients since 2015 as either transactions of interest or listed transactions.  *Id.* ¶ 6.  Armed with this knowledge, some of these companies are concluding that because the IRS now considers most or all of their legitimate captive insurance transactions to be presumptive or potential tax shelters under the Final Rule, the risks of having their captives audited and the Section 831 tax incentive disallowed is now too high to

- 22 -

continue using this form of insurance. *Id.* ¶ 12. If, however, Defendants are enjoined from enforcing the Final Rule, these companies would continue to use their captives just as they did before the Final Rule, as these captives satisfy Congress' statutory criteria for taking advantage of the Section 831 tax benefit. *Id.* ¶ 13. It is likely that most of these clients will never return once lost, even if the Final Rule is set aside at the end of this litigation, given the costs of incorporating a new captive insurance program as well as the fact that these businesses will have established a new commercial insurance program to replace the captive structure. *Id.* ¶ 12. In other words, these clients will be gone forever. *See id.*

SRA has already lost clients as a direct result of the Final Rule and, as a result, has already lost unrecoverable business. *Id.* ¶¶ 12–14. After the IRS published the Final Rule, six of the micro-captive insurance companies managed by SRA requested to close. *Id.* ¶ 9. At least 12 more of SRA's clients have elected to revoke the Section 831(b) election—a change that will allow them to continue providing insurance but will require them to forgo Section 831(b)'s benefits and pay federal income tax on premiums as well as investment income. *Id.* ¶ 9. The Final Rule has already caused SRA to lose an estimated $36,000 in management fees, with another $115,000 in management fees to be lost by the end of the year. *Id.* ¶ 14. A preliminary injunction is necessary to prevent SRA from suffering additional unrecoverable losses while the parties litigate the merits of this case.

If this litigation extends past this year (which is likely, especially if there are appeals), SRA will suffer even further irreparable harm. SRA anticipates losing at

least 10 to 20 more clients each year that this litigation continues. *Id.* ¶ 12. The Final Rule also substantially increases the risk of expensive IRS audits for SRA and its clients, which audits would require SRA and its clients to incur nonrecoverable compliance and defense costs during the pendency of this litigation. *Id.* ¶¶ 15–16. And because the Final Rule's obligations are ongoing, SRA will incur reporting and audit-related costs in each subsequent year. *Id.* ¶¶ 15–16.

C.    **The Public Interest And The Equities Strongly Favor A Preliminary Injunction**

1. The final two factors—the public interest and the balance of the equities— "merge" when the government is the opposing party. *Nken*, 556 U.S at 435. For these factors, "the court considers whether the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and whether the grant of an injunction will disserve the public interest." *Tex. A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792, 811 (S.D. Tex. 2025). "[N]either [the government] nor the public has any interest in enforcing a regulation that violates federal law." *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024) (citation omitted); *see also BST Holdings, LLC v. Occupational Safety & Health Admin.*, 17 F.4th 604, 618 (5th Cir. 2021) (noting that "[a]ny interest" a government agency "may claim in enforcing an unlawful" regulation is "illegitimate").

2. Here, the public interest strongly favors this Court preliminarily enjoining the Final Rule during the pendency of Plaintiffs' APA lawsuit. As explained, the Final Rule is illegal, *see supra* pp.10–21, and neither the IRS nor the public have any interest in the enforcement of an illegal rule, *see Book People, Inc.*, 91 F.4th at 341;

- 24 -

*see also BST Holdings, LLC*, 17 F.4th at 618; *accord League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

The important public benefits associated with captive insurance—benefits that Congress has recognized and specifically legislated to incentivize—further weigh in favor of preliminarily enjoining the Final Rule. The captive insurance structure incentivizes prudent risk management practices by keeping risk within the corporate family, and allows businesses to finance potential losses through tax advantaged reserves without forcing the private sector to absorb solvency-threatening losses. *Supra* pp.3–4. Captive insurance arrangements are also beneficial for policyholders' bottom line, and Section 831(b) makes those valuable benefits available to small businesses, benefiting the economy at large. *See supra* pp.3–4. Congress recognized these important benefits when it enacted Section 831(b) and subsequently expanded its scope through the PATH Act, while also curbing the potential that micro-captives could be used for tax-abusive purposes. *See supra* pp.4–5. The Final Rule will undermine these benefits by disincentivizing small businesses from owning and operating micro-captives. *Supra* pp.12–13. It is Congress' judgment that this form of insurance is beneficial for the public at large—not the IRS's repeated hostility to this type of insurance—that counts in the public interest balance.

## CONCLUSION

This Court should grant Plaintiffs' Motion and preliminarily enjoin Defendants from enforcing the Final Rule against Plaintiffs, their clients, and their affiliates until this Court enters a final judgment on the merits.

Respectfully submitted,

BY: */s/Chris Verducci*　　　　　

　　　　　Chris Verducci (Attorney in Charge)
　　　　　TROUTMAN PEPPER LOCKE LLP
　　　　　State Bar No. 24051470
　　　　　Southern District No. 639289
　　　　　chris.verducci@troutman.com
　　　　　600 Travis Street, Suite 2800
　　　　　Houston, Texas 77002
　　　　　(713) 226-1200 (Telephone)
　　　　　(713) 223-3717 (Fax)

**Of Counsel:**

Misha Tseytlin (pro hac vice admitted)
TROUTMAN PEPPER LOCKE LLP
111 S. Wacker Dr.
Suite 4100
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

David B. Dove (pro hac vice admitted)
TROUTMAN PEPPER LOCKE LLP
600 Peachtree Street, N.E.
Suite 3000
Atlanta, GA 30308
(404) 885-3680
(404) 885-3900 (fax)
david.dove@troutman.com

*Attorneys for Plaintiffs*

Dated:  August 14, 2025

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(D), I hereby certify that counsel for Plaintiffs conferred with counsel for Defendants on August 13, 2025 concerning this Motion, and counsel cannot agree about the disposition of the Motion.

*/s/ Chris Verducci*
CHRIS VERDUCCI
State Bar No. 24051470

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of August, 2025, a true and accurate copy

of the foregoing was served via the Court's CM/ECF system upon all counsel of record.


/s/ Chris Verducci
CHRIS VERDUCCI
State Bar No. 24051470