IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
Houston Division

DRAKE PLASTICS LTD. CO., *et al.*,      )
                                        )      Case No. 4:25-cv-2570
     Plaintiffs,                       )
                                        )      Judge Lee H. Rosenthal
     v.                                )
                                        )
INTERNAL REVENUE SERVICE, *et al.*,     )
                                        )
     Defendants.                       )
_____ )

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Dated: 09/05/2025

*/s/ Moira E. Goodwin*
MOIRA E. GOODWIN (attorney-in-charge)
DC Bar No. 1780293
S.D. Tex. No. 3924157
ADAM S. DOMITZ (of counsel)
NY Bar No. 6213896
S.D. Tex. No. 3926145
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 227
Washington, D.C. 20044
202-718-7056 (phone)
202-514-6866 (fax)
moira.e.goodwin@usdoj.gov
adam.s.domitz@usdoj.gov

## Table of Contents

I.   Introduction. ................................................................................................. 1

II.  Background. .................................................................................................. 2

   a.   Micro-captive insurance and I.R.C. § 831(b). ...................................... 2

   b.   Reportable transactions. ....................................................................... 4

   c.   Statement of the nature and stage of the proceeding. ........................... 5

III. Argument. ..................................................................................................... 8

   a.   The Court must first assure itself of its subject-matter jurisdiction. ................................. 10

      i.   Neither Drake Plastics nor Drake Insurance has Article III standing. ................... 10

      ii.  Plaintiffs cannot request, and the Court cannot order, relief that
           would violate the Anti-Injunction Act. ................................................ 13

   b.   Plaintiffs cannot meet their burden to justify a preliminary injunction. ......................... 14

      i.   Plaintiffs are unlikely to succeed on the merits. ................................. 15

         1.   Plaintiffs are unlikely to succeed on their exceeds-authority claim. ........... 15

         2.   Plaintiffs are unlikely to succeed on their arbitrary-and-capricious
              claim. ........................................................................................ 18

      ii.  Plaintiffs fail to plausibly allege irreparable harm that would be remedied by a
           preliminary injunction. ..................................................................... 22

      iii. A preliminary injunction would harm the public interest. ...................... 23

   c.   Any injunction should be limited in scope. ......................................... 24

IV.  Conclusion. ................................................................................................. 25

## <u>Table of Authorities</u>

**Page(s)**

**Cases**

*Avrahami v. Comm'r*,
    149 T.C. 144 (2017)...................................................................................3, 4, 6, 7

*Campbell v. Lamar Inst. of Tech.*,
    842 F.3d 375 (5th Cir. 2016) ...............................................................................13

*Caylor Land & Dev., Inc. v. Comm'r*,
    T.C. Memo. 2021-30, 2021 WL 915613 (2021)......................................................3

*CFM Ins. v. Comm'r*,
    T.C. Memo. 2025-83, 2025 WL 2207492 (2025)....................................................3

*CIC Servs., LLC v. IRS*,
    Case No. 3:25-cv-146-TRM-JEM (E.D. Tenn.) (filed Apr. 9, 2025) ........................8

*CIC Servs., LLC v. IRS*,
    592 F. Supp. 3d 677 (E.D. Tenn. 2022), *as modified by* 2022 WL 2078036
    (E.D. Tenn. June 2, 2022) ................................................................................5, 6

*CIC Servs., LLC v. IRS*,
    593 U.S. 209 (2021)........................................................................... *passim*

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983)...............................................................................................12

*Clapper v. Amnesty Intern. USA*,
    568 U.S. 398 (2013).............................................................................................10

*Daniels Health Scis., LLC v. Vascular Health Scis. LLC*,
    710 F.3d 579 (5th Cir. 2013) ...............................................................................24

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021).......................................................................................19, 20

*Franklin v. United States*,
    2021 WL 4458377 (N.D. Tex. Sept. 29, 2021), *aff'd*, 49 F.4th 429 (5th Cir.
    2022) ..................................................................................................................14

*George v. Abbott*,
    2024 WL 5701878 (S.D. Tex. Oct. 4, 2024).........................................................13

*Gill v. Whitford,*
   585 U.S. 48 (2018)...................................................................................25

*Huawei Techs. USA, Inc. v. FCC,*
   2 F.4th 421 (5th Cir. 2021) ...............................................................19, 22

*Janvey v. Alguire,*
   647 F.3d 585 (5th Cir. 2011) ................................................................23

*Jones v. Comm'r,*
   T.C. Memo. 2025-25, 2025 WL 1924077 (2025)...................................3

*Kadau v. Comm'r,*
   T.C. Memo. 2025-81, 2025 WL 2181155 (2025)...................................3

*Keating v. Comm'r,*
   T.C. Memo. 2024-2, 2024 WL 50234 (2024)........................................3

*Kentucky v. Yellen,*
   54 F.4th 325 (6th Cir. 2022) ...............................................................11

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024).................................................................................8

*Lowery v. Mills,*
   690 F. Supp. 3d 692 (W.D. Tex. 2023), *appeal docketed at* 24-50879 (5th Cir.
   Nov. 5, 2024) ........................................................................................25

*Mayfield v. U.S. Dep't of Lab.,*
   117 F.4th 611 (5th Cir. 2024) .........................................................15, 16

*McConnell v. Fed. Election Comm'n,*
   540 U.S. 93 (2003) *overruled on other grounds by Citizens United v. Fed.
   Election Comm'n,* 558 U.S. 310 (2010)................................................13

*Palacios v. DHS,*
   407 F. Supp. 3d 691 (S.D. Tex. 2019) ................................................22

*Patel v. Comm'r,*
   T.C. Memo. 2024-34, 2024 WL 1270772 (2024).................................3

*Rest. L. Ctr. v. U.S. Dep't of Lab.,*
   120 F.4th 163 (5th Cir. 2024) .........................................................17, 18

*Rivero v. Fid. Invs., Inc.,*
   1 F.4th 340 (5th Cir. 2021) ................................................................14

*Robinson v. Ardoin*,
    37 F.4th 208 (5th Cir. 2022) ...........................................................................24

*Royalty Mgmt. Ins. v. Comm'r*,
    T.C. Memo. 2024-87, 2024 WL 4200129 (2024), *appeal dismissed*, 2025 WL
    512503 (10th Cir. Jan. 10, 2025) .......................................................................3

*Ryan, LLC v. IRS*,
    Case No. 3:25-cv-78-B (N.D. Tex.) (filed Jan. 10, 2025) ........................................8

*Shenzhen Youme Info. Tech. Co., Ltd. v. FDA*,
    --- F.4th ----, 2025 WL 2249610 (5th Cir. July 23, 2025) ...................................19

*Stringer v. Whitley*,
    942 F.3d 715 (5th Cir. 2019) .............................................................................10

*Swift v. Comm'r*,
    144 F.4th 756 (5th Cir. 2025) .........................................................................1, 2

*Swift v. Comm'r*,
    T.C. Memo. 2021-13, 2024 WL 378671 (2024), *aff'd*, 144 F.4th 756 (5th Cir.
    2025) .............................................................................................................3

*Syzygy Ins. Co. v. Comm'r*,
    T.C. Memo. 2019-34, 2019 WL 1559540 ..........................................................2, 3

*Tex. A&M Queer Empowerment Council v. Mahomes*,
    772 F. Supp. 3d 792 (S.D. Tex. 2025) ...............................................................14

*Tex. Trib. v. Caldwell Cnty.*,
    121 F.4th 520 (5th Cir. 2024) ...........................................................................24

*Texas v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
    700 F. Supp. 3d 556 (S.D. Tex. 2023) ...............................................................24

*Texas v. United States*,
    126 F.4th 392 (5th Cir. 2025) ...........................................................................11

*Texas v. United States*,
    497 F.3d 491 (5th Cir. 2007) .............................................................................15

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021).........................................................................................11

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025)................................................................................11, 25

*United States v. Lee*,
    455 U.S. 252 (1982) ................................................................................................24

*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023), *rev'd on other grounds*, *Bondi v. VanDerStok*,
    145 S. Ct. 857 (2025) .............................................................................................15

**Statutes**

I.R.C. § 162 .....................................................................................................................2, 4

I.R.C. §§ 801–848 ...............................................................................................................2

I.R.C. § 831(a) .....................................................................................................................2

I.R.C. § 831(b) ............................................................................................................. *passim*

I.R.C. § 6011 ................................................................................................................ *passim*

I.R.C. § 6111 .........................................................................................................................5

I.R.C. § 6501 .......................................................................................................................17

I.R.C. § 6662A ....................................................................................................................17

I.R.C. § 6707 ...................................................................................................................5, 17

I.R.C. § 6707A .............................................................................................................. *passim*

Anti-Injunction Act, I.R.C. § 7421 ........................................................................10, 13, 14

Declaratory Judgment Act, 28 U.S.C. § 2201 ...................................................................14

**Other Authorities**

Fed. R. Civ. P. 65(c) ..........................................................................................................25

*Tax Shelters: Hearing Before the S. Comm. on Finance*, 107th Cong. (2002) ...............5

*IRS Releases 2022 Tax Gap Projections* (https://perma.cc/2MGY-F763) .....................24

Joshua D. Blank & Ari Glogower, *The Tax Information Gap at the Top*, 108 Iowa
    L. Rev. 1598.......................................................................................................24

Notice 2016-66, 2016 WL 6462459 ....................................................................................5

Notice 2025-24, 2025 WL 1135622 ..................................................................................23

Rev. Proc. 2025-13, 2025 WL 99880 ................................................................................12

Roger Mceowen, *Captive Insurance*, 49 Est. Plan. 03 ...................................................2

Treas. Reg. § 1.162-1 ...................................................................................................2

Treas. Reg. § 1.6011-4 ...........................................................................4, 5, 12, 13, 15, 18

Treas. Reg. § 1.6011-10 ..................................................................................... *passim*

Treas. Reg. § 1.6011-11 ...................................................................................7, 8, 16

Treasury Department's Enforcement Proposals for Abusive Tax Avoidance
     Transactions (Mar. 20, 2002) (https://perma.cc/SHW7-WWWG) ...........................................5

## I.    Introduction.

In a typical (if oversimplified) micro-captive transaction, Company A owns a separate but related Company B, that exists to insure the risks of Company A (and any related entities). When Company A pays "insurance premiums" to Company B, Company A can take a § 162 business-expense deduction for the payments, and if Company B makes an § 831(b) election, it need not include those payments in its taxable income. The result is neither company pays immediate tax on the would-be income (Company B by the exclusion, and Company A by using the deductions to offset an equal amount of its other would-be income). Company B may then return the economic benefit of the income to Company A, either through a loan, a dividend (taxed at a lower rate), or by using the income for Company A's benefit, such as by purchasing property to be used by Company A.

The transaction described above may be completely legitimate. If Company B is a legitimate insurance company, then there is no *improper* tax avoidance, even though no tax is immediately paid on the premiums. "That much, for better or worse, is a congressional choice." *CIC Servs., LLC v. IRS*, 593 U.S. 209, 213 (2021). But if the "insurance premiums" paid from Company A to Company B are "not really for insurance," then the transaction is abusive. *Cf. id.* And as recent Fifth Circuit precedent confirms, *Swift v. Comm'r*, 144 F.4th 756 (5th Cir. 2025), "some micro-captive transactions are of that kind," *CIC Servs., LLC*, 593 U.S. at 213.

Taxpayers must file "return[s] or statement[s]" as required by "regulations prescribed by the Secretary." I.R.C. § 6011; *see also CIC Servs., LLC*, 593 U.S. at 213. When Treasury identifies a "reportable transaction," that requirement is backed by the § 6707A penalty. *See* I.R.C. § 6707A(a). A reportable transaction is "of a type which the Secretary determines as having a potential for tax avoidance or evasion." I.R.C. § 6707A(c)(1).

Pursuant to the express delegations under § 6011 and § 6707A, Treasury promulgated a notice-and-comment regulation identifying certain micro-captive arrangements as reportable transactions. *See* Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest, 90 Fed. Reg. 3,534 (Jan. 14, 2025) (codified at Treas. Reg. § 1.6011-10 and § 1.6011-11) (full text attached as Exhibit 1) (hereinafter "Final Rule"). Plaintiffs challenge the Final Rule under the APA and have moved to preliminarily enjoin its enforcement while that challenge proceeds. Plaintiffs' motion for preliminary injunction should be denied.

## II.    Background.

### a.    Micro-captive insurance and I.R.C. § 831(b).

In a captive insurance transaction, a parent company owns a separate but related entity (a "captive"), whose purpose is to insure the risks of the parent company. *See* Roger Mceowen, *Captive Insurance*, 49 Est. Plan. 03, at *3 (July 2022). Captive insurance, like most aspects of insurance, is created and regulated by state law.[1] *See* Captive Insurance Companies, 0110 REGSURVEYS 6 (July 2024). The Internal Revenue Code contains no definition of (or reference to) captive insurance. *Cf. Syzygy Ins. Co. v. Comm'r*, T.C. Memo. 2019-34, 2019 WL 1559540, at *28–29 ("Neither the Code nor the regulations define insurance.").

The Code does, however, govern the tax treatment of insurance, broadly defined. *See* I.R.C. §§ 801–848. For instance, non-life insurance companies are generally taxed on all income at the corporate rate. I.R.C. § 831(a). And entities paying insurance premiums in connection with a trade or business can deduct amounts paid as an ordinary and necessary business expense under I.R.C. § 162(a). *See* Treas. Reg. § 1.162-1(a).

---

[1] A company may also locate its captive in a foreign jurisdiction. *E.g. Swift*, 144 F.4th at 761 (captives incorporated in the Federation of Saint Christopher and Nevis). Regardless, captive insurance is not created, defined, or regulated by U.S. federal law.

While the Code does not define or regulate the "captive" piece of micro-captive insurance, it does define the "micro." That is the function of § 831(b), which is central to Plaintiffs' claims. If any non-life insurance company has "net written premiums (or, if greater, direct written premiums) for the taxable year" that "do not exceed $2,200,000," and it meets one of two diversification requirements, it can elect under § 831(b) to be taxed on only its investment income. I.R.C. § 831(b). The result is income received from premiums, which is deducted as a business expense from the entity paying those premiums, is excluded from the recipient's income and altogether exempt from current tax. *Avrahami v. Comm'r*, 149 T.C. 144, 179 (2017).

So long as the micro-insurance company is a legitimate insurance company, the exclusion of such income from tax is not improper. Indeed, it is the congressional design. *CIC Servs., LLC*, 593 U.S. at 213. But the § 831(b) and § 162(a) tax benefits presume that the captive "transact[s] in insurance," and that the insurance premiums are "truly payments for insurance." *Syzgy Ins. Co., Inc.*, 2019 WL 1559540, at *10. And as recent cases show, taxpayers are claiming tax benefits for § 831(b) micro-captive arrangements that fail to provide real insurance.[2] Captives provide more opportunity for abuse because the captive-insurer and the parent-insured are related entities. *Caylor Land & Dev., Inc. v. Comm'r*, T.C. Memo. 2021-30, 2021 WL 915613, at *10 (2021). The parent can "pay" premiums to the captive and obtain a *tax* benefit without losing the

---

[2] *E.g.*, *Avrahami v. Comm'r*, 149 T.C. 144 (2017) (micro-captive failed to distribute risk and did not act as insurer commonly would); *Syzygy Ins. Co. v. Comm'r*, T.C. Memo. 2019-34, 2019 WL 1559540 (2019) (same); *Caylor Land & Dev., Inc. v. Comm'r*, T.C. Memo. 2021-30, 2021 WL 915613 (2021) (same); *Patel v. Comm'r*, T.C. Memo. 2024-34, 2024 WL 1270772 (2024) (same); *Jones v. Comm'r*, T.C. Memo. 2025-25, 2025 WL 1924077 (2025) (same); *Keating v. Comm'r*, T.C. Memo. 2024-2, 2024 WL 50234 (2024) (not insurance in commonly accepted sense); *Royalty Mgmt. Ins. v. Comm'r*, T.C. Memo. 2024-87, 2024 WL 4200129 (2024), *appeal dismissed*, 2025 WL 512503 (10th Cir. Jan. 10, 2025) (same); *Swift v. Comm'r*, T.C. Memo. 2021-13, 2024 WL 378671 (2024), *aff'd*, 144 F.4th 756 (5th Cir. 2025) (same); *Kadau v. Comm'r*, T.C. Memo. 2025-81, 2025 WL 2181155 (2025) (same); *CFM Ins. v. Comm'r*, T.C. Memo. 2025-83, 2025 WL 2207492 (2025) (same).

3

*economic* benefit of the funds. *See Avrahami*, 149 T.C. at 179. Plus, while payments made as insurance premiums are deductible under § 162(a), "amounts set aside in a loss reserve as a form of self-insurance are not." *Avrahami*, 149 T.C. at 174.

As the above makes clear, one need only explain a § 831(b) micro-captive transaction to demonstrate its potential for tax avoidance. Thus, using the express authority delegated by Congress in I.R.C. § 6707A, Treasury identified certain § 831(b) micro-captive transactions as "reportable transactions."

### b. Reportable transactions.

Section 6011 requires taxpayers to "make a return or statement according to . . . regulations prescribed by the Secretary." I.R.C. § 6011. Pursuant to that express delegation, Treasury previously created the reportable transaction disclosure regime by notice-and-comment regulation, which Plaintiffs do not challenge. *See* Tax Shelter Regulations, 68 Fed. Reg. 10,161 (Mar. 4, 2003) (codified at Treas. Reg. § 1.6011-4). The existing regulation identifies five types of reportable transactions, all of which trigger a disclosure obligation. Treas. Reg. § 1.6011-4(b). Two are relevant here: "listed transactions" and "transactions of interest." *Id.* The regulation defines a listed transaction as "a transaction that is the same as or substantially similar to one of the types of transactions that the Internal Revenue Service (IRS) has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction," Treas. Reg. § 1.6011-4(b)(2), and a transaction of interest as "a transaction that is the same as or substantially similar to one of the types of transactions that the IRS has identified by notice, regulation, or other form of published guidance as a transaction of interest," Treas. Reg. § 1.6011-4(b)(6). The regulation makes clear that identification of a listed transaction or transaction of interest "shall not affect the legal determination of whether the

taxpayer's treatment of the transaction is proper." Treas. Reg. § 1.6011-4(a).

Initial compliance with Treas. Reg. § 1.6011-4 was, "to put it bluntly, a joke." *Corporate Tax Shelters: Hearing Before the S. Comm. on Finance*, 107th Cong. 2 (2002) (statement of Max Baucus, Chairman, S. Comm. on Finance). Thus, Congress enacted I.R.C. § 6707A, which incorporated the reportable transaction framework into statute and created an enforcement mechanism—the failure-to-disclose penalty—to compel compliance. *Cf.* Treasury Department's Enforcement Proposals for Abusive Tax Avoidance Transactions (Mar. 20, 2002) (https://perma.cc/SHW7-WWWG). Under the statute, as under the regulation, a reportable transaction is whatever the IRS identifies as a reportable transaction pursuant to Treas. Reg. § 1.6011-4. All reportable transactions must be "of a type which the Secretary determines as having a potential for tax avoidance or evasion," I.R.C. § 6707A(c)(1), and listed transactions must be "specifically identified by the Secretary as a tax avoidance transaction for purposes of section 6011," I.R.C. § 6707A(c)(2). If a participant fails to disclose a reportable transaction, the IRS can assess a penalty under I.R.C. § 6707A(a), and if a material advisor fails to disclose connection to a reportable transaction, the IRS can assess a penalty under I.R.C. § 6707(a).[3]

### c. Statement of the nature and stage of the proceeding.

In 2016, Treasury identified certain § 831(b) micro-captive transactions as transactions of interest. *See* Notice 2016-66, 2016 WL 6462459. A court vacated Notice 2016-66 under the APA for failure to comply with notice-and-comment procedures. *See CIC Servs., LLC v. IRS*, 592 F.

---

[3] A material advisor is a person that receives gross income in excess of the statutory threshold for providing "any material aid, assistance, or advice with respect to organizing, managing, promoting, selling, implementing, insuring, or carrying out any reportable transaction." I.R.C. § 6111(b)(1); *see also CIC Servs., LLC*, 593 U.S. at 212–13. According to the Complaint, Plaintiff SRA is a material advisor. D.E. 1 ¶ 25.

Supp. 3d 677, 683 (E.D. Tenn. 2022), *as modified by* 2022 WL 2078036 (E.D. Tenn. June 2, 2022). The court further held that Notice 2016-66 was arbitrary and capricious because the administrative record did not include sufficient "facts and data showing that micro-captive insurance arrangements have a potential for tax avoidance or evasion." *Id.* at 687.

The Government responded reasonably—Treasury underwent notice-and-comment procedures to identify the relevant § 831(b) micro-captive transactions as reportable transactions by regulation, building a thorough record to explain such transactions' potential for tax avoidance. The Final Rule is the result.

In so doing, Treasury opted not to identify all § 831(b) micro-captive arrangements as reportable transactions. Instead, it sought to limit the scope of the disclosure requirement to transactions with characteristics more likely to indicate tax avoidance. Obviously, Treasury cannot draw a substantively perfect line—were it to promulgate a rule defining the reportable transaction as "§ 831(b) micro-captive insurance arrangements that are 'not really' insurance," it would be surprising if a single disclosure were made. *Cf. CIC Servs., LLC*, 593 U.S. at 213. Nor would it be administrable for the IRS (or fair to taxpayers) if the pain-of-penalty disclosure requirement depended on the "facts and circumstances" analysis that governs the not-really-insurance determination. *Cf. Avrahami*, 149 T.C. at 177 (2017). Treasury thus "developed . . . objective factors to ensure administrability and clarity for taxpayers." Final Rule at 3,535. The bright-line factors correlate with abusive transactions, but the factors do not control whether any given transaction will ultimately be deemed invalid on its merits. *Id.* at 3,538. Two of those factors feature in Plaintiffs' challenge: the "loss ratio factor" and the "financing factor."

The loss ratio factor "measures whether the amount of liabilities incurred for insured losses and claims administration expenses is significantly less than the amount of premiums

earned, adjusted for policyholder dividends" over the course of a ten-year computation period (for listed transactions, *see* Treas. Reg. § 1.6011-10(b)(2)(ii)) or an up-to-ten-year computation period (for transactions of interest, *see* Treas. Reg. § 1.6011-11(b)(2)(ii)). Final Rule at 3,540. If an arrangement *is* tax avoidant, one would expect it to have a low loss ratio, which would reflect high premiums paid from parent to captive (to get the tax benefits of § 162(a) and § 831(b)) and low amounts of claims paid out from captive to parent (because the captive is not insuring legitimate risks). *Cf. id.* Recognizing that low loss ratios correlate with avoidant transactions, Treasury included a loss ratio factor of 30% in its definition of a listed transaction, and a loss ratio factor of 60% in its definition of a transaction of interest. *Id.* at 3,542; Treas. Reg. § 1.6011-10(c)(2) (listed transaction); Treas. Reg. § 1.6011-11(c)(2) (transaction of interest).

The financing factor keys in on funds passing back from the captive-insurer to the parent-insured, which, in transactions which *are* tax avoidant, exacerbates the harm to the fisc. Final Rule at 3,546. As the Final Rule explains, when financing arrangements between the parent and the captive are involved, "such Captives return some portion of those tax-deferred amounts directly or indirectly to the Insured or related parties via a loan, capital contributions to a special purpose vehicle, or other financing arrangements for which a current tax does not apply." *Id.* at 3,546. The result is that "amounts paid as premiums have not only avoided ordinary taxation but have continued to avoid tax while back in the hands of the related parties who caused the premiums to be paid and deducted." *Id.* at 3,546; *accord Avrahami*, 149 T.C. at 179 (explaining that related-party financing in an § 831(b) arrangement could "generate nearly $1.2 million in tax deductions while arguably only moving money from one pocket to another").

To qualify as a **listed transaction**, a transaction must be closely held, exist for at least ten years, and satisfy *both* the financing factor *and* the 30% loss ratio factor. Treas. Reg. § 1.6011-

10(c). To qualify as a **transaction of interest**, a transaction must be closely held and satisfy *either* the financing factor *or* the 60% loss ratio factor. Treas. Reg. § 1.6011-11(c).

Despite receiving full notice-and-comment procedures and displaying self-evident thoroughness, the Final Rule immediately drew three functionally identical APA challenges (including this one).[4] Here, Plaintiffs claim the Final Rule exceeds Treasury's statutory authority (Count I), is arbitrary and capricious for lack of reasoned justification (Count II), and is arbitrary and capricious for failure to adequately respond to comments (Count III). D.E. 1. Plaintiffs moved for a preliminary injunction on Counts I and II. D.E. 17.

### III.    Argument.[5]

Plaintiffs fail to carry the heavy burden to justify preliminary injunctive relief. On the merits, Plaintiffs struggle to show even a possibility of success, let alone a likelihood. Plaintiffs' allegations of irreparable harm are implausible. And the public interest is served by an IRS with sufficient information to identify and challenge abusive transactions.

On the exceeds-authority count (Count I), Plaintiffs fail to establish a likelihood of success. It is difficult to imagine a more express delegation of discretionary authority than § 6707A(c). *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) (acknowledging that a "statute's meaning may well be that the agency is authorized to exercise a degree of discretion" *e.g.*, when a statute "expressly delegates to an agency the authority to give meaning to a particular statutory term" (citation modified)). Despite purporting to raise an exceeds-authority claim, and despite black-letter administrative law establishing that the text of an

---

[4] The other challenges are *CIC Servs., LLC v. IRS*, Case No. 3:25-cv-146 (E.D. Tenn.) (filed Apr. 9, 2025) and *Ryan, LLC v. IRS*, Case No. 3:25-cv-78 (N.D. Tex.) (filed Jan. 10, 2025).

[5] Pursuant to the Court's procedures, we begin with a summary of the argument and incorporate into each subsection a "statement of the issues to be ruled on" and the standard of review.

authorizing statute controls an exceeds-authority analysis, the text of § 6707A(c) never appears in Plaintiffs' exceeds-authority argument. *See* D.E. 17-1 at 16–20.[6] Congress delegated authority to Treasury to identify reportable transactions. In the Final Rule, Treasury identified two reportable transactions. Even if, as Plaintiffs contend, that action were inconsistent with the congressional intent behind the micro-captive-specific version of § 831(b) that Plaintiffs imagine (but which does not exist), Treasury would still have the *authority* under § 6707A(c) to do exactly what it did. To succeed on their exceeds-authority claim, Plaintiffs would require both different facts and different law. Having neither, they cannot establish a likelihood of success on the merits.

On Count II, a rule will survive a *State Farm*-style arbitrary-and-capricious challenge so long as the agency reasonably considered the relevant issues and reasonably explained its decision. Even without the benefit of the certified administrative record, the Government can point to the specific page(s) of the Final Rule on which each of Plaintiffs' arguments is addressed. Plaintiffs may disagree with the analysis, but they cannot say it is not there. Because reasoned analysis is all the APA requires, Plaintiffs are unlikely to succeed on the merits.

On irreparable harm, Plaintiffs claim SRA is losing clients by the day, and the Final Rule must be enjoined else SRA will lose "25 to 35 clients before the end of this year." D.E. 17-1 at 7. If that is true, it is not the Final Rule and its disclosure requirement causing those losses. If SRA were losing clients because of the disclosure requirement, this motion for preliminary injunction would have been filed *before* this year's July 31 disclosure deadline. This year's deadline having passed, SRA's clients likely will not be required to submit another disclosure for another *thirteen*

---

[6] If a document's internal pagination conflicts with the page number stamped by ECF, this brief uses the ECF page number.

*months*. There is no exigency to justify extraordinary preliminary relief.

Finally, the equities favor the Government. This case is not about limiting taxpayers' access to micro-captive insurance or its tax benefits. It is only about whether participants to certain transactions (and their material advisors) must *disclose* those transactions to the IRS. If taxpayers file a disclosure and the transaction is legitimate, they are out their compliance costs. If taxpayers do not file a disclosure and their transaction is illegitimate, the fisc could be out millions. The best way for the IRS to catch tax abuse is to know about it. The public interest is best served by a well-informed IRS. Plaintiffs' motion should be denied.

### a.  The Court must first assure itself of its subject-matter jurisdiction.

At the start, two points merit brief attention. First, Drake Insurance and Drake Limited lack standing because they are not subject to the reporting requirement and will not become subject to it imminently. Second, to the extent this suit seeks to enjoin the IRS from taking any action beyond enforcement of the disclosure requirement, it implicates the Anti-Injunction Act.

### i.  Neither Drake Plastics nor Drake Insurance has Article III standing.

"To have Article III standing, a plaintiff must show an injury in fact that is fairly traceable to the challenged action of the defendant and likely to be redressed by the plaintiff's requested relief." *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019). A plaintiff seeking injunctive relief "can satisfy the redressability requirement only by demonstrating a continuing injury or a threatened future injury." *Id.* A threatened future injury must be "(1) potentially suffered by the plaintiff, not someone else; (2) 'concrete and particularized,' not abstract; and (3) 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 720–21; *see also Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) ("[T]hreatened injury must be 'certainly impending.'").

Plaintiffs claim the Final Rule injures them by requiring them to compile and submit

information reports to the IRS. As to SRA, the Government does not challenge this contention at this stage. But Drake Plastics and Drake Insurance have failed to establish a substantial risk of future injury, which means they cannot establish a likelihood of success on the merits.[7]

Drake Plastics and Drake Insurance primarily assert "ongoing" economic injuries caused by the reporting requirement. *See* D.E. 1 ¶ 18 ("[T]he Final Rule requires substantial time, effort, and financial resources, and will greatly increase the time and expense associated with the preparation of tax returns."), ¶ 22 ("[T]he Final Rule will require them to continue to spend time preparing and submitting the required disclosures, and incurring costs associated with the same, on an ongoing basis."). Drake Plastics and Drake Insurance alternatively assert risk of fines and criminal liability, D.E. 1 ¶ 19, risk of "reputational harm," D.E. 1 ¶ 20, and a "likel[ihood]" of "additional scrutiny from state regulators," D.E. 1 ¶ 21. The risk of these harms is neither "imminent" nor "substantial." *Cf. TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021).

Only "participants" and "material advisors" to a reportable transaction must file disclosures under the Final Rule. *See* Treas Reg. § 1.6011-10(g); § 1.6011-11(g). If a captive has revoked its § 831(b) election, "taxpayers who participated in the listed transaction" (or transaction of interest) "with respect to that Captive, including any Insureds, Owners, and Intermediaries, will not be considered participants in the transaction. . . for any taxable year in

---

[7] Only one plaintiff need establish standing for a case to proceed, *see Texas v. United States*, 126 F.4th 392, 405 (5th Cir. 2025), and, as stated, the Government does not challenge the standing of SRA. We thus concede that, in the typical case, the Court may not adjudicate the standing of Drake Plastics and Drake Insurance. But a Court should consider each plaintiff's standing before issuing a preliminary injunction, because an injunction can be no "broader than necessary to provide complete relief to each plaintiff *with standing to sue*." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562–63 (2025) (emphasis added). The present posture thus puts the standing of each plaintiff at issue, and if the Court considers the standing of Drake Plastics and Drake Insurance and finds it lacking, they should be dismissed. *E.g.*, *Kentucky v. Yellen*, 54 F.4th 325, 341 n.12 (6th Cir. 2022).

which the section 831(b) revocation is effective." Treas. Reg. § 1.6011-10(f)(3); § 1.6011-11(f)(3). In other words, once an § 831(b) election is revoked, the disclosure obligation disappears for all parties to the transaction. The Rule further clarifies that if a captive requests to revoke its § 831(b) election "on or before the date prescribed for filing" its disclosure statement (which is the date its annual return is due, *see* Treas. Reg. § 1.6011-4(e)) its transaction will not be deemed reportable for taxable years ending before January 1, 2026. Treas. Reg. § 1.6011-10(h)(1); § 1.6011-11(h)(1); *see also* Rev. Proc. 2025-13, 2025 WL 99880. Thus, timely revocation of an § 831(b) election removes a taxpayer's disclosure obligation under the Final Rule for both prior years and future years.

Drake Plastics owns Drake Insurance, which is a captive insurance company. D.E. 1 ¶ 15. Drake Insurance revoked its § 831(b) election in April 2025. D.E. 1 ¶ 16, 23. Because Drake Insurance revoked its § 831(b) election before any applicable filing deadline, neither it nor Drake Plastics has a disclosure obligation under the regulations—past, current, or future. Neither must incur compliance costs, expend resources, or risk fines or criminal liability. *Cf.* D.E. 1 ¶ 18–19. Thus, neither can plausibly establish an economic injury-in-fact. And because they are not subject to the disclosure requirement, any reputational harm or regulatory scrutiny they might suffer (assuming the risk of such harm were concrete and nonspeculative—which we do not concede) would not be caused by the Final Rule or redressed by its vacatur. *Cf.* D.E. 1 ¶ 20–21.

The complaint alleges that Drake Insurance may "reinstate" its § 831(b) election "if the Final Rule is enjoined." D.E. 1 ¶ 23. That allegation is implausible. *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) ("It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry."). When a taxpayer requests to revoke its § 831(b) election, it certifies (under penalty of perjury) that it will not reinstate that election for at least five years.

12

*See* Rev. Proc. 2025-13 § 4.02(2)(d), 2025 WL 99880. Without an § 831(b) election made by a party to the transaction, a taxpayer, by definition, cannot be a participant in a reportable transaction under the Final Rule. *See* Treas. Reg. § 1.6011-10(b)(1)(i) (defining captive, in part, as an entity with an § 831(b) election); § 1.6011-11(b)(1) (incorporating same definition). Thus, there is no possibility that Drake Insurance will re-engage in a reportable micro-captive transaction—whether the Final Rule is vacated or not—for at least five years, which is "too remote temporally to satisfy Article III standing." *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 226 (2003) (no standing where injury could not occur for five years) *overruled on other grounds by Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 365–66 (2010).

Because Drake Insurance revoked its § 831(b) election and cannot imminently reinstate it if the Final Rule were enjoined, Drake Insurance and Drake Plastics cannot allege a present or future injury to justify prospective relief.[8] This conclusion holds even if the decision to revoke the § 831(b) election was made because of the challenged Rule. *Compare Campbell v. Lamar Inst. of Tech.*, 842 F.3d 375, 382 (5th Cir. 2016) (finding no standing for injunctive relief where student voluntarily withdrew from school due to challenged policy and would not return), *with George v. Abbott*, 2024 WL 5701878, at *1 (S.D. Tex. Oct. 4, 2024) (finding standing despite voluntary withdrawal from school due to challenged policy because the plaintiff "desire[d] and intend[ed] to reenroll" if the challenged policy were enjoined).

### ii. Plaintiffs cannot request, and the Court cannot order, relief that would violate the Anti-Injunction Act.

To the extent Plaintiffs seek only to enjoin enforcement of the disclosure requirement,

---

[8] Drake Plastics does not allege an imminent intention to incorporate a new captive, *cf.* D.E. 1, and neither alleges that their existing arrangement, without an § 831(b) election, qualifies for reporting as "substantially similar" to the transactions identified by the Final Rule, Treas. Reg. § 1.6011-4(c)(4) (defining substantially similar).

this suit does not implicate I.R.C. § 7421(a), the Anti-Injunction Act.[9] *CIC Servs., LLC*, 593 U.S. at 223 (holding AIA did not bar suit challenging a reporting mandate). But were that Plaintiffs' only objective, little of their brief would make sense. Plaintiffs are not focused on the disclosure requirement, they are focused on the (mistaken) belief that the factors that trigger the disclosure obligation require disallowance of the disclosed-transaction on its merits. Plaintiffs are wrong that a reportable transaction is treated as presumptively invalid by the IRS. But to the extent this suit seeks to limit the IRS's ability to review and challenge § 831(b) micro-captive transactions, including by using information reported pursuant to the disclosure regime, it cannot proceed. *See id.* at 219 (explaining that AIA did not bar suit challenging a reporting mandate because it did not seek relief "from any impending or eventual tax obligation"). The AIA may not require dismissal of this suit at this stage, but its limitations should inform the Court's analysis.

> **b. Plaintiffs cannot meet their burden to justify a preliminary injunction.**

Plaintiffs moved for a preliminary injunction on Counts I and II. The Court may only grant a preliminary injunction if Plaintiffs show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Tex. A&M Queer Empowerment Council v. Mahomes*, 772 F. Supp. 3d 792, 799–800 (S.D. Tex. 2025) (quoting *Jones v. Tex. Dep't of Crim. Just.*, 880 F.3d 756, 759 (5th Cir. 2018) (per curiam)). A preliminary injunction is an "extraordinary remedy." *Id.* at 800.

---

[9] At least some of Plaintiffs' requested relief may still be barred by the Declaratory Judgment Act. *See Rivero v. Fid. Invs., Inc.*, 1 F.4th 340, 345–46 (5th Cir. 2021) (holding DJA divested court of jurisdiction even though AIA did not apply); *Franklin v. United States*, 2021 WL 4458377 (N.D. Tex. Sept. 29, 2021), *aff'd*, 49 F.4th 429 (5th Cir. 2022) (observing that *Rivero* "implies that the limitation in the DJA may restrict the jurisdiction even further than the AIA").

### i. Plaintiffs are unlikely to succeed on the merits.

#### 1. Plaintiffs are unlikely to succeed on their exceeds-authority claim.

Plaintiffs contend Treasury exceeded its authority in the Final Rule by "us[ing] non-statutory criteria to classify micro-captive insurance transactions as presumptively or potentially tax abusive." D.E. 17-1 at 17. Plaintiffs are unlikely to succeed on this exceeds-authority claim.

The APA empowers courts to set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *VanDerStok v. Garland*, 86 F.4th 179, 188 (5th Cir. 2023), *rev'd on other grounds*, *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025) (quoting 5 U.S.C. § 706(2)(C)). "The authority of administrative agencies is constrained by the language of the statute they administer." *Texas v. United States*, 497 F.3d 491, 500–01 (5th Cir. 2007). To determine whether an agency exceeded its statutory authority, courts look to the "plain language" of the "statute under which the agency purports to act." *VanDerStok*, 86 F.4th at 188. When the authorizing statute includes an express delegation of discretionary authority, "the question is whether the Rule is within the outer boundaries of that delegation." *Mayfield v. U.S. Dep't of Lab.*, 117 F.4th 611, 617 (5th Cir. 2024).

Treasury issued the Final Rule pursuant to I.R.C. §§ 6011 and 6707A, the latter of which incorporates and codifies the reportable transaction framework set out in Treas. Reg. § 1.6011-4. Under that framework, taxpayers participating in "reportable transactions" must disclose that participation. Treas. Reg. § 1.6011-4(a). Section 6707A confers broad discretionary authority to Treasury to identify reportable transactions, requiring only that the Secretary "determine[]" that the transaction "ha[s] a potential for tax avoidance or evasion." I.R.C. § 6707A(c)(1); *see also CIC Servs., LLC*, 593 U.S. at 213 (noting § 6707A(c)(1)'s express delegation). Because nondisclosure carries higher penalties, listed transactions (a subcategory of reportable

transactions) must be "specifically identified by the Secretary as a tax avoidance transaction for purposes of section 6011." I.R.C. § 6707A(c)(2).

In the Final Rule, Treasury did exactly what I.R.C. § 6707A authorizes it to do: it identified reportable transactions. It determined that one sub-set of micro-captive transactions had the potential to be tax avoidant, explained that determination, and identified those transactions as transactions of interest. Final Rule at 3,542, 3,546; Treas. Reg. § 1.6011-11(c). And it deemed a significantly smaller sub-set of micro-captive transactions to be tax avoidant for purposes of disclosure requirements and penalties, and thus specifically identified those transactions as listed transactions. Final Rule at 3,542, 3,546; Treas. Reg. § 1.6011-10(c). Those determinations are the precise actions I.R.C. § 6707A(c) empowers Treasury to take.

Plaintiffs contend the Final Rule paints with too broad a brush, using criteria that could sweep in legitimate transactions. D.E. 17-1 at 19. But the statute's text, which is tellingly absent from Plaintiffs' brief, uses categorical language. Treasury can require reporting of an entire "type" of transaction, so long as it determines that "type" of transaction has "a potential for tax avoidance or evasion." I.R.C. § 6707A(c)(2). Here, the Court need not determine how far up the ladder of abstraction the statute authorizes Treasury to climb, because Treasury did not identify all § 831(b) captives for reporting. Instead, Treasury opted to identify specific characteristics commonly present in transactions ultimately determined to be abusive, and required only participants of transactions bearing those characteristics to file disclosures. However broadly the statute authorizes Treasury to draw its lines, it is clear that by limiting disclosure requirements to those meeting criteria, Treasury is exercising *less* authority than the statute grants it, not more.

It is possible Treasury might exceed its broad, expressly delegated authority if it were to promulgate criteria with "no rational relationship" to a potential for tax abuse. *See Mayfield*, 117

16

F.4th at 619. Here however, as explained below, Treasury ably explained the predictive value of a closely held transaction with low loss ratios and related-party financing in identifying transactions likely to lack economic substance. The criteria are aimed at identifying potentially abusive transactions, and thus within the Treasury's authority to implement. Any argument that these relevant-to-tax-abuse criteria are imprecise, overbroad, or otherwise lacking would be an arbitrary-and-capricious challenge, not an exceeds-authority challenge. *E.g.*, *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 120 F.4th 163, 176 (5th Cir. 2024).

Plaintiffs make a slightly different argument regarding the smaller sub-set of micro-captive transactions that the Final Rule identifies as listed transactions. For the other four categories of reportable transactions, as explained, Treasury need only determine the transaction is of a type that has the potential for tax avoidance or evasion. I.R.C. § 6707A(c)(1). Listed transactions, in contrast, must be "specifically identified by the Secretary as a tax avoidance transaction." I.R.C. § 6707A(c)(2). This requirement for specific identification makes sense, because failure to disclose a listed transaction carries a higher penalty. I.R.C. § 6707A(b)(2)(A) (for participants); I.R.C. § 6707(b)(2) (for material advisors).[10]

Pointing to this additional language regarding listed transactions, Plaintiffs appear to contend that § 6707A(c)(2) requires Treasury to declare transactions substantively invalid to be authorized to deem them as listed and require their disclosure. D.E. 17-1 at 17–18. And by using criteria to specifically identify the transactions deemed avoidant (and thus substantively invalid), Treasury is effectively adding "nonstatutory criteria" to qualify for favorable tax treatment under

---

[10] The IRS also enjoys a longer statute of limitations to assess penalties for failure to disclose a listed transaction, I.R.C. § 6501(c)(10), and can assess an understatement penalty if a listed transaction is ultimately disallowed on its merits without having to show that "a significant purpose" of the transaction "is the avoidance or evasion of Federal income tax." I.R.C. § 6662A(b)(2)(A)–(B).

section 831(b), which no statute authorizes it to do. *Id.* at 19–20.

Plaintiffs misread the statute. Section 6707A requires the Secretary to specifically identify transactions as tax avoidant "*for purposes of section 6011*," not across the Code. I.R.C. § 6707A(c)(2) (emphasis added). The Final Rule does not deem any transaction "invalid," under § 831(b) or otherwise. The statute does not delegate that power, the regulations do not claim that power, and the Final Rule does not purport to exercise that power. Indeed, the opposite is true. Existing regulations explicitly state: "The fact that a transaction is a reportable transaction shall not affect the legal determination of whether the taxpayer's treatment of the transaction is proper." Treas. Reg. § 1.6011-4(a).

If a taxpayer engages in a transaction that meets the listed transaction criteria, it must submit a disclosure. That is the effect of the Final Rule. The "non-statutory criteria" affect only whether a disclosure must be submitted, not whether the transaction will be held invalid. Much of Plaintiffs' brief rests on this misconception, and it is wrong. Taxpayers are free to enter micro-captive transactions and claim the tax benefits, whether the transaction qualifies for reporting under the Final Rule or not. And those tax benefits may be allowed or disallowed whether the transaction qualifies for reporting under the Final Rule or not. Taxpayers can enter the transactions as they choose; the stakes of this case are only whether they will need to tell the IRS when they do so. Treasury is authorized to identify transactions that must be reported, and that is what Treasury did in the Final Rule. Plaintiffs are not likely to succeed on the merits of Count I.

### 2. Plaintiffs are unlikely to succeed on their arbitrary-and-capricious claim.

Plaintiffs alternatively argue that the Final Rule is arbitrary and capricious. A reviewing court will "hold unlawful and set aside agency actions that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Rest. L. Ctr.*, 120 F.4th at 166 (quoting 5

U.S.C § 706(2)(A)). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action should be set aside if it "fails to account for relevant factors or evinces a clear error of judgment." *Shenzhen Youme Info. Tech. Co., Ltd. v. FDA*, --- F.4th ----, 2025 WL 2249610, at *3 (5th Cir. July 23, 2025). Thus, courts must ensure the agency "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021). But "the scope of review is narrow," and courts "must exercise appropriate deference to agency decisionmaking." *Shenzhen Youme Info. Tech. Co., Ltd.*, 2025 WL 2249610, at *3.

Plaintiffs level three specific objections to the Final Rule's analysis.[11] First, they contend the Final Rule fails to explain its decision to use loss ratios as a bright line for reporting. *See* D.E. 17-1 at 22–24. Second, they argue that Treasury supported its financing factor with only its "claimed experience," rather than evidence in the record. *See* D.E. 17-1 at 24–25. And third, they complain the Final Rule fails to "address reasonably the significant harmful effects that the Final Rule's non-statutory criteria will have on the micro-captive industry," which is an "important aspect of the problem." *See* D.E. 17-1 at 25–26. The Court need only read the Final Rule to conclude that none of these arguments are likely to succeed on their merits.

First, Treasury provided nearly six full pages of reasoning in support of its decision to adopt a loss ratio factor, addressing all objections raised in Plaintiffs' motion (and others). *See* Final Rule at 3,539–45. Plaintiffs argue that a loss ratio factor is an inappropriate metric for the

---

[11] Additionally, Plaintiffs complain generally about the sufficiency of the record. D.E. 17-1 at 21–22. It is unclear how Plaintiffs can declare the certified administrative record insufficient before we have produced it.

Final Rule because a low loss ratio is not inherently indicative of tax abuse. D.E. 17-1 at 22. Treasury addressed this concern. *See* Final Rule at 3,540 (explaining that a low loss ratio typically results from "excessive pricing of premiums and artificially low or nonexistent claims activity," which is "a strong indicator of tax avoidance"). Plaintiffs argue that a loss ratio factor is overbroad to identify tax abuse, because a low loss ratio is an "extremely common feature of micro-captives." D.E. 17-1 at 23. Treasury addressed this concern. *See* Final Rule at 3,540–41 (acknowledging that a legitimate arrangement could have a low loss ratio, clarifying that the loss ratio factor "is not intended to act as a proxy for the actuarial basis of premium pricing," noting a lack of a better alternative proposed by commenters, and concluding that the loss ratio remained a reasonable "administrable metric" to identify avoidant transactions). Plaintiffs argue that Treasury used an inapplicable dataset to set its thresholds, which was "not representative of the micro-captive industry." D.E. 17-1 at 24. Treasury addressed this concern. *See* Final Rule at 3,542 (explaining the NAIC data provided the best publicly available data set to use as a starting point because it "represents industry averages generally applicable to all nonlife insurers"). Finally, Plaintiffs argue Treasury violated the APA by failing to "aggregate any information specific to the micro-captive industry to inform its decisionmaking process." D.E. 17-1 at 24. Treasury addressed this concern, *see* Final Rule at 3,542, though it need not have, as precedent makes clear that Treasury need only have considered the data it had available. *See Prometheus Radio Project*, 592 U.S. at 427.

Plaintiffs' second line of attack focuses on the financing factor. As with the loss ratio factor, Treasury reasonably responded to all the arguments raised in Plaintiffs' brief. Plaintiffs argue that Treasury failed to reasonably explain its use of related party financing as an indicator of tax avoidance. D.E. 17-1 at 24. Treasury addressed this concern. *See* Final Rule at 3,546

(explaining that related party financing is often present in abusive transactions because such arrangements allow the parties to indefinitely defer tax on income, while enjoying the beneficial use of that income). Plaintiffs argue that Treasury improperly relied exclusively on its "claimed experience," in concluding that "transactions with financing arrangements that create a tax-deferred circular flow of funds are indicative of tax avoidance." D.E. 17-1 at 25. Treasury addressed this concern. *See* Final Rule at 3,546 (pointing to specific Tax Court cases that inform its experience). Finally, Plaintiffs argue that the Final Rule fails to account for the fact that related-party financing is an expected characteristic of a micro-captive insurance arrangement, so all micro-captive arrangements will trigger reporting, regardless of whether they are in fact abusive. D.E. 17-1 at 25. Treasury addressed this concern. *See* Final Rule at 3,546 (acknowledging that a transaction can include related party financing without being abusive but explaining that such financing often features in transactions that are abusive and Treasury is not aware of an alternative that would be as effective in identifying such transactions).

Last, Plaintiffs claim Treasury "fails to address reasonably the significant harmful effects that the Final Rule's non-statutory criteria will have on the micro-captive insurance industry." D.E. 17-1 at 26. Specifically, Plaintiffs contend that the Final Rule fails to address a comment that explained that participants to § 831(b) micro-captive arrangements were likely to lower premium prices (and stop paying policyholder dividends) to "reduce the denominator in the Loss Ratio calculation," which would result in limited "surplus reserves," which would "jeopardize[e] their ability to pay future claims." *Id.* at 26. Treasury addressed comments regarding negative effects on the industry generally, Final Rule at 3,557, and Plaintiffs' comment specifically, *id.* at 3,545 (specifically addressing comments "that establishing a minimum loss threshold by application of the Loss Ratio Factors would negatively impact solvency for captives, by

requiring artificially low premiums or imprudent issuance of policyholder dividends"). Plaintiffs' suggestion that Treasury failed to respond to this concern or "ignored" an "important aspect of the problem" lacks any merit whatsoever. *Cf.* D.E. 17-1 at 26.

All of that to say, the text of the Final Rule addresses each of Plaintiffs' arguments and provides reasoned responses. "Arbitrary-and-capricious review requires that an agency 'has reasonably considered the relevant issues and reasonably explained the decision.'" *Huawei Techs. USA, Inc.*, 2 F.4th at 449 (quoting *Prometheus Radio Project*, 592 U.S. at 423). The agency need only show it "clearly thought about the commentors' objections and offered reasoned replies." *Id.* at 450. As outlined above, Treasury discussed each argument raised in Plaintiffs' brief and either explained that the Final Rule included a responsive change, or explained why, in its view, such change would not be appropriate. That is "all the APA requires." *Id.* at 450. Plaintiffs come nowhere close to their likelihood-of-success-on-the-merits burden to justify extraordinary preliminary injunctive relief.

### ii. Plaintiffs fail to plausibly allege irreparable harm that would be remedied by a preliminary injunction.

Because Plaintiffs cannot demonstrate a likelihood of success on the merits, the Court need not consider whether Plaintiffs have sufficiently shown a substantial threat of irreparable injury if the injunction is not issued. *See Palacios v. DHS*, 407 F. Supp. 3d 691, 697 (S.D. Tex. 2019). But to be clear, they have not.

Plaintiffs claim irreparable harm because Plaintiff SRA "will lose approximately 25 to 35 clients by the end of this year if the Final Rule remains in effect," but those clients "would continue to use their captives" if the Final Rule were enjoined. D.E. 17-1 at 27–28. These contentions are insufficient to justify preliminary relief. Potential loss of clients is unduly speculative, and, if such losses were to occur, they would not be caused by the reporting

22

requirement, so an injunction against the Final Rule would not remedy that harm.

"A showing of speculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (citation modified). It is speculative that Plaintiff SRA will lose "25 to 35 clients by the end of this year." D.E. 17-1 at 27 (emphasis removed). Any of SRA's clients who qualified for reporting under the Final Rule were required to submit their annual disclosure on July 31, 2025.[12] Notice 2025-24, 2025 WL 1135622; *see also* D.E. 17-1 at 7 (acknowledging that SRA's clients were subject to the July 31, 2025 disclosure deadline). If SRA's clients are opting out of captive insurance in the weeks *after* the disclosure deadline, the disclosure obligation cannot be the impetus for that decision. If the disclosure requirement (the thing sought to be enjoined) is not the cause of Plaintiffs' alleged irreparable harm (the lost clients), then a preliminary injunction could not plausibly prevent or mitigate that harm.

In their submission, Plaintiffs fail to identify the next deadline by which SRA's clients will be required to submit disclosures, which is the date their 2025 tax returns will be due. For most taxpayers, and likely all SRA's clients, the next Forms 8886 will not be due until Fall 2026, because they can obtain a six-month extension as a matter of course. Plaintiffs' suggestion that this case warrants immediate injunctive relief is not credible.

### iii.  A preliminary injunction would harm the public interest.

Even if Plaintiffs could demonstrate a likelihood of success on the merits *and* could establish a plausible irreparable harm, a preliminary injunction would still be inappropriate. The equities and public-interest factors merge when a preliminary injunction is sought against the

---

[12] The first round of participant disclosures under the Final Rule were generally due April 14, 2025, but IRS issued guidance providing relief from failure-to-file penalties until July 31, 2025, which effectively extended the deadline. *See* Notice 2025-24, 2025 WL 1135622.

Government. *Tex. Trib. v. Caldwell Cnty.*, 121 F.4th 520, 525 (5th Cir. 2024). As to the equities, a movant must show its benefit from an injunction outweighs the harm to the nonmovant. *See Robinson v. Ardoin*, 37 F.4th 208, 228 (5th Cir. 2022). The analysis must also consider "the interests of the public at large." *Texas v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 700 F. Supp. 3d 556, 571 (S.D. Tex. 2023) (citation modified).

Granting a preliminary injunction would severely burden the IRS's ability to ensure compliance with tax laws and would harm the national fisc. Information reporting is an "essential element of tax administration and compliance in the United States." Joshua D. Blank & Ari Glogower, *The Tax Information Gap at the Top*, 108 Iowa L. Rev. 1598, 1599, n.1 (2023) (collecting authorities). This is not only because an information asymmetry exists between taxpayers and the IRS, but also because information reporting increases the likelihood a taxpayer complies with the tax laws. *See id.* at 1611 (observing that compliance increases from 84% to 93% when information reporting is required). In 2022, the "tax gap"—the difference between the amount of tax owed by taxpayers and the amount that is actually paid—was estimated to be $696 billion. *See IRS Releases 2022 Tax Gap Projections*, (https://perma.cc/2MGY-F763).

Enjoining the information reporting requirement at bar would exacerbate the tax gap by allowing abusive (and potentially abusive) microcaptives to avoid scrutiny. As the Fifth Circuit has noted, "the public is served when the law is followed." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013). So too is there "broad public interest in maintaining a sound tax system." *United States v. Lee*, 455 U.S. 252, 253 (1982). The balance of harms and public interest overwhelmingly favor denying an injunction.

**c. Any injunction should be limited in scope.**

Were the Court inclined to issue a preliminary injunction, it should be limited in scope

and explicit in mandate. An injunction can be no "broader than necessary to provide complete relief to each plaintiff with standing to sue." *CASA, Inc.*, 145 S. Ct. at 2562–63. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Only SRA has standing, *see* Section III.a.i, *supra*, and SRA's concrete, nonspeculative injury is compliance costs, D.E. 1 ¶ 26, 28. If SRA were not required to submit required Form(s) 8918 as a material advisor, it would incur no costs on its own behalf. Thus, if the Court were to enter a preliminary injunction, it should only prevent the IRS from enforcing the disclosure requirement against SRA. In no circumstance should an injunction extend to SRA's "affiliates," whatever that means. *Cf.* D.E. 17-3. And the Court should specifically articulate the relief necessary to remedy SRA's harms—an injunction against enforcement of the disclosure requirement—rather than enjoining the IRS from "enforcing the Final Rule in any respect" or ordering the IRS to "immediately ceases all implementation as to the Final Rule." *Id.*

Finally, if the Court enters a preliminary injunction, it should simultaneously require Plaintiffs to give security pursuant to Fed. R. Civ. P. 65(c).

## IV.   Conclusion.

"[T]he decision to grant a preliminary injunction is treated as the exception rather than the rule." *Lowery v. Mills*, 690 F. Supp. 3d 692, 706 (W.D. Tex. 2023), *appeal docketed at* 24-50879 (5th Cir. Nov. 5, 2024). This is not an exceptional case. Congress explicitly delegated discretionary authority to Treasury to identify reportable transactions. Treasury exercised that authority and designated micro-captive transactions bearing certain criteria for reporting. In so doing, Treasury complied with notice-and-comment formalities and thoroughly explained its reasoning. Treasury thus complied with the APA. Plaintiffs' motion for preliminary injunction should be denied.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of September, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered to receive it.

/s/ Moira E. Goodwin
MOIRA E. GOODWIN
Trial Attorney
U.S. Department of Justice, Tax Division