Defendant
Exhibit
1

# DEPARTMENT OF THE TREASURY

## Internal Revenue Service

### 26 CFR Part 1

[TD 10029]

RIN 1545–BQ44

### Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Final rule.

**SUMMARY:** This document contains final regulations that identify transactions that are the same as, or substantially similar to, certain micro-captive transactions as listed transactions, a type of reportable transaction, and certain other micro-captive transactions as transactions of interest, another type of reportable transaction. Material advisors and certain participants in these listed transactions and transactions of interest are required to file disclosures with the IRS and are subject to penalties for failure to disclose. The final regulations affect participants in these transactions as well as material advisors.

**DATES:**

*Effective date:* These regulations are effective on January 14, 2025.

*Applicability date:* For dates of applicability, *see* §§ 1.6011–10(h) and 1.6011–11(h).

**FOR FURTHER INFORMATION CONTACT:** Allan H. Sakaue, (202) 317–6995 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## Authority

This document amends the Income Tax Regulations (26 CFR part 1) by adding final regulations under section 6011 of the Internal Revenue Code (Code) to identify certain micro-captive transactions and substantially similar transactions as listed transactions and certain other micro-captive transactions as transactions of interest, each a type of reportable transaction (final regulations). These regulations are issued pursuant to the authority conferred on the Secretary of the Treasury or her delegate (Secretary) under the following provisions of the Code:

Section 6001, which requires every taxpayer to keep the records, render the statements, make the returns, and comply with the rules and regulations that the Secretary deems necessary to demonstrate tax liability and prescribes, either by notice served or by regulations;

Section 6011, which requires every taxpayer to ''make a return or statement according to the forms and regulations prescribed by the Secretary'' and ''include therein the information required by such forms or regulations'';

Section 6707A(c)(1), which states that ''[t]he term 'reportable transaction' means any transaction with respect to which information is required to be included with a return or statement because, as determined under regulations prescribed under section 6011, such transaction is of a type which the Secretary determines as having a potential for tax avoidance or evasion''; and

Section 6707A(c)(2), which states that, ''[t]he term 'listed transaction' means a reportable transaction which is the same as, or substantially similar to, a transaction specifically identified by the Secretary as a tax avoidance transaction for purposes of section 6011.''

Reportable transactions are described in § 1.6011–4 and include listed transactions, confidential transactions, transactions with contractual protection, loss transactions, and transactions of interest. *See* § 1.6011–4(b)(2) through (6). Section 1.6011–4(b)(2) defines a ''listed transaction'' as a transaction that is the same as or substantially similar to one of the types of transactions that the IRS has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction. Section 1.6011–4(b)(6) defines a ''transaction of interest'' as a transaction that is the same as or substantially similar to one of the types of transactions that the IRS has identified by notice, regulation, or other form of published guidance as a transaction of interest.

The final regulations are also issued under the express delegation of authority under section 7805(a) of the Code.

## Background

### I. Section 831(b)

As enacted by section 1024 of the Tax Reform Act of 1986, Public Law 99–514, 100 Stat. 2085, 2405 (October 22, 1986), section 831(a) of the Code generally imposes tax on the taxable income (determined under the special rules for calculating taxable income of insurance companies in part II of subchapter L of chapter 1 of the Code) of every insurance company other than a life insurance company (nonlife insurance company), for each taxable year computed as provided in section 11 of the Code. However, certain small

nonlife insurance companies may elect to be subject to the alternative tax imposed by section 831(b).

Upon election by an eligible nonlife insurance company (eligible electing company) to be taxed under section 831(b), in lieu of the tax otherwise imposed by section 831(a), section 831(b) imposes tax on the company's income computed by multiplying the taxable investment income of the eligible electing company (determined under section 834 of the Code) for the taxable year by the rates provided in section 11(b) of the Code. Thus, an eligible electing company pays no tax on its underwriting income, including amounts paid as premiums, for taxable years for which its election is in effect.

Congress enacted section 333 of the Protecting Americans from Tax Hikes Act of 2015 (PATH Act), div. Q. of Public Law 114–113, 129 Stat. 2242, 3040 (December 18, 2015), to both tighten and expand the requirements for qualifying under section 831(b), effective for taxable years beginning after December 31, 2016. As amended by the PATH Act, section 831(b) requires an eligible electing company to be an insurance company (within the meaning of section 816(a) of the Code) having net written premiums or, if greater, direct written premiums, for the taxable year not exceeding $2.2 million as adjusted for inflation (net written premium limitation) and to meet the diversification requirements of section 831(b)(2)(B). The last sentence of section 831(b)(2)(A) provides that an election under section 831(b) applies to the taxable year for which it is made and all subsequent taxable years for which the net written premium limitation and the diversification requirements are met and may be revoked only with the Secretary's consent. In addition, section 831(d) requires every eligible insurance company that has a section 831(b) election in effect to furnish to the Secretary ''at such time and in such manner as the Secretary shall prescribe such information for such taxable year as the Secretary shall require with respect to'' the diversification requirements of section 831(b)(2)(B).

To qualify as an insurance company pursuant to section 816(a), a requirement to elect 831(b) taxation, more than half of the business of the entity during the taxable year must be the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies. An insurance contract must meet all four prongs of the test for insurance set forth by the courts: risk shifting, risk distribution, insurable risks, and insurance in the commonly

accepted sense. *See Helvering* v. *Le Gierse,* 312 U.S. 531, 539 (1941) (both risk shifting and risk distribution must be present); *Allied Fidelity Corp.* v. *Commissioner, 572 F.2d 1190, 1193 (7th Cir. 1978)* (the risk transferred must be risk of economic loss); *Commissioner* v. *Treganowan,* 183 F.2d 288, 290–91 (2d Cir. 1950) (the risk must contemplate the fortuitous occurrence of a stated contingency); *Rent-A-Center, Inc.* v. *Commissioner,* 142 T.C. 1, 13 (2014) (the arrangement must constitute insurance in the commonly accepted sense); *see also* Rev. Rul. 2007–47, 2007–2 C.B. 127 (the risk must be merely an investment or a business risk). To determine whether an arrangement is insurance in the commonly accepted sense, courts consider several non-exclusive factors including (1) whether the company was organized, operated, and regulated as an insurance company; (2) whether the company was adequately capitalized; (3) whether the policies were valid and binding; (4) whether premiums were reasonable and the result of arm's length transactions; (5) whether claims were paid; (6) whether the policies cover typical insurance risks; and (7) whether there was a legitimate business reason for acquiring insurance from the captive. *Avrahami* v. *Commissioner,* 149 T.C. 144, 191 (2017).

## II. Notice 2016–66 and Notice of Proposed Rulemaking (''NPRM'')

On November 21, 2016, the Treasury Department and the IRS published Notice 2016–66, 2016–47 I.R.B. 745, which identified certain micro-captive transactions as transactions of interest. On January 17, 2017, the Treasury Department and the IRS published Notice 2017–08, 2017–3 I.R.B. 423, which modified Notice 2016–66 by providing for an extension of time for participants and material advisors to file their disclosures.

Notice 2016–66 alerted taxpayers and their representatives pursuant to § 1.6011–4(b)(6) and for purposes of § 1.6011–4(b)(6) and sections 6111 and 6112, that the Treasury Department and the IRS identified as transactions of interest certain micro-captive transactions in which a taxpayer attempts to reduce the aggregate taxable income of the taxpayer, related persons, or both, using contracts that the parties treat as insurance contracts and a related company that the parties treat as an insurance company. Notice 2016–66 also alerted persons involved with the identified transactions that certain responsibilities may arise from their involvement.

The Treasury Department and the IRS issued proposed regulations under section 6011 (REG–109309–22) in an NPRM published in the **Federal Register** (88 FR 21547) on April 11, 2023 (proposed regulations). That NPRM obsoleted Notice 2016–66. The Treasury Department and the IRS considered comments received in response to Notice 2016–66 in developing the proposed regulations.

The proposed regulations would identify taxpayers who file returns reflecting the tax benefits of a transaction described at § 1.6011–10(a) as participants in a listed transaction (''Micro-captive Listed Transaction''). The proposed regulations would identify taxpayers who file returns reflecting the tax benefits of a transaction described at § 1.6011–11(a) as participants in a transaction of interest (''Micro-captive Transaction of Interest''). Generally, a Micro-captive Listed Transaction is a transaction in which an Owner (as defined in proposed § 1.6011–10(b)(6)) of an Insured (as defined in proposed § 1.6011–10(b)(4)) holds the necessary interest described in proposed § 1.6011–10(b)(1)(iii) (the ''20 Percent Relationship Test'') in Captive (as defined in proposed § 1.6011–10(b)(1)), Captive meets the definition provided in proposed § 1.6011–10(b)(1), and Captive provides financing as described in proposed § 1.6011–10(c)(1) (the ''Financing Factor''), determined over the Financing Computation Period defined in proposed § 1.6011–10(b)(2)(i), or has less than a 65 percent loss ratio (the ''Loss Ratio Factor'') as described in proposed § 1.6011–10(c)(2), determined over the Loss Ratio Computation Period defined in proposed § 1.6011–10(b)(2)(ii).

A Micro-captive Transaction of Interest is a transaction in which an Owner (as defined in proposed § 1.6011–11(b)(6)) of an Insured (as defined in proposed § 1.6011–11(b)(4)) holds the necessary interest in Captive (as defined in proposed § 1.6011–11(b)(1)), Captive meets the definition provided in proposed § 1.6011–11(b)(1), and Captive has less than a 65 percent loss ratio, as described in proposed § 1.6011–11(c), determined over the Transaction of Interest Computation Period defined in proposed § 1.6011–11(b)(2).

Participants in a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest, and material advisors with respect to Micro-captive Listed Transactions and Micro-captive Transactions of Interest, would be required file disclosure statements as set forth in proposed §§ 1.6011–10(f) and

1.6011–11(f). The Treasury Department and the IRS developed these objective factors to ensure administrability and clarity for taxpayers whose transactions are identified in the regulations, so taxpayers can clearly determine whether they are participants or material advisors, and thus be on clear notice of their obligations.

The Treasury Department and the IRS received 110 public comments in response to the proposed regulations and notice of public hearing that are the subject of this final rulemaking. The comments are available for public inspection at *https://www.regulations.gov* or upon request. A public hearing on the proposed regulations was held by teleconference on July 19, 2023, at 10 a.m. Eastern Time, at which six speakers provided testimony.

The Summary of Comments and Explanation of Revisions of these final regulations summarizes the proposed regulations, which are described in greater detail in the preamble to the proposed regulations. After full consideration of all the comments received and the testimony provided, these final regulations adopt the proposed regulations with the modifications described in this Summary of Comments and Explanation of Revisions.

## Summary of Comments and Explanation of Revisions

This Summary of Comments and Explanation of Revisions summarizes all significant comments addressing the proposed regulations, and describes and responds to comments concerning: (1) the authority to issue the proposed and final regulations generally; (2) the Loss Ratio Factor described in proposed §§ 1.6011–10(c)(2) and 1.6011–11(c); (3) the Financing Factor described in proposed § 1.6011–10(c)(1); (4) the exception for certain consumer coverage arrangements described in proposed §§ 1.6011–10(d)(2) and 1.6011–11(d)(2); (5) requests for safe harbors from either identification as a reportable transaction or from the reporting requirements upon identification as a reportable transaction; and (6) other matters including clarifications and changes not specifically related to the identified factors already addressed. This Summary of Comments and Explanation of Revisions also explains revisions adopted by the final regulations in response to those comments. Comments outside the scope of this rulemaking are generally not addressed.

As an initial matter, the final regulations incorporate non-substantive changes to the description of the

election under section 831(b) at proposed § 1.6011–10(b)(1)(i) (defining in part the term Captive) to better reflect the text of the statute. *See* § 1.6011–10(b)(1)(i) of the final regulations.

Furthermore, §§ 1.6011–10(e) and 1.6011–11(e) are added to the final regulations, to provide more clarity on when a transaction is considered substantially similar as defined in § 1.6011–4(c)(4) to the identified transactions. The term "Substantially Similar" has also been defined in the final regulations by cross-reference to § 1.6011–4(c)(4).

*I. Comments on Authority To Issue the Proposed Regulations*

A. The McCarran-Ferguson Act

Several commenters argued that the proposed regulations implicate "the business of insurance" under the McCarran-Ferguson Act, 15 U.S.C. 1011 *et seq.* ("McCarran-Ferguson"). In addition, commenters argued that sections 6011, 6111, and 6112 do not explicitly reference insurance, and thus McCarran-Ferguson prohibits the application of the proposed regulations thereunder. Commenters also asserted that the inclusion of a Loss Ratio Factor and a Financing Factor in the proposed regulations will invalidate, impair, or supersede State law governing insurance companies. For example, commenters contended that because State regulators must approve related-party financing transactions entered into by insurance companies, State law to that effect will preempt identification of a captive insurance transaction involving related-party financing as a reportable transaction. Similarly, commenters contended that because State regulators establish solvency requirements for insurers licensed in their domicile, State laws regarding premium pricing will preempt identification of a captive insurance transaction as a reportable transaction based on the Loss Ratio Factor. Commenters also asserted that the Loss Ratio Factor, by encouraging payment of policyholder dividends, impacts the insurer and policyholder relationship and therefore implicates McCarran-Ferguson.

Contrary to the commenters' arguments, and as discussed in more detail in the following paragraphs, McCarran-Ferguson does not apply to these regulations for two primary reasons: first, because the regulations do not invalidate, impair, or supersede State law, and second, because the regulations do not implicate the business of insurance.

First, the proposed regulations do not "invalidate, impair, or supersede" any State law. As relevant here, McCarran-Ferguson provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." 15 U.S.C. 1012(b). In other words, McCarran-Ferguson prohibits application of Federal law not specifically relating to the business of insurance if it would invalidate, impair, or supersede State laws enacted for the purpose of regulating the business of insurance. *Humana Inc.* v. *Forsyth,* 525 U.S. 299, 307 (1999). Courts have uniformly upheld Tax Code provisions pertaining to the taxation of insurance companies in the face of a McCarran-Ferguson challenge. *See, e.g., Modern Life & Acc. Ins. Co.* v. *Commissioner,* 420 F.2d 36, 37 (7th Cir. 1969) (*holding* that taxpayer did not show that Commissioner's determination of taxpayer's status under the Internal Revenue Code "will interfere with the choice made by [State]."); *Indust. Life Ins. Co.* v. *United States,* 344 F. Supp. 870, 875 (D.S.C. 1972), *aff'd,* 481 F.2d 609 (4th Cir. 1973) (*holding* that Congress did not give up the right to tax by passing McCarran-Ferguson); *Hanover Ins. Co.* v. *Commissioner,* 65 T.C. 715, 722 (1976) ("Congress did not, under the McCarran-Ferguson Act, surrender to the States the power of the Federal Government to tax insurance companies and to issue regulations implementing the taxing statute.").

Moreover, McCarran-Ferguson was enacted to prevent inadvertent Federal intrusion on the State's rights to regulate insurance. *See Barnett Bank of Marion Cty.* v. *Nelson,* 517 U.S. 25, 39. McCarran-Ferguson does not prevent the Federal Government from issuing insurance regulations. *Id.* The Supreme Court has stated that McCarran-Ferguson does not "cede the field of insurance regulation to the States, saving only instances in which Congress expressly orders otherwise." *Humana,* 525 U.S. at 308; *see also SEC* v. *Nat'l Sec., Inc.,* 393 U.S. 453, 459–60 (1969) ("The [McCarran-Ferguson Act] did not purport to make the States supreme in regulating all the activities of insurance companies."); *Modern Life & Acc. Ins. Co.,* 420 F.2d at 37–38; *Indust. Life Ins. Co.,* 344 F. Supp. at 875; *Hanover Ins. Co.,* 66 T.C. at 721–22. The Supreme Court also stated that "[t]he term 'invalidate' ordinarily means 'to render ineffective, generally without providing

a replacement rule or law . . . [a]nd the term 'supersede' ordinarily means 'to displace (and thus render ineffective) while providing a substitute rule.'" *Humana,* 525 U.S. at 307 (citations omitted). The Supreme Court relied on the dictionary definition of "impair," which is "[t]o weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner.'" *Humana,* 525 U.S. at 309–10 (*citing* Black's Law Dictionary 752 (6th ed. 1990)). Thus, "[w]hen federal law does not directly conflict with state regulation, and when the application of federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." *Humana,* 525 U.S. at 310.

The proposed regulations do not render ineffective any State law, nor do they displace or diminish any State regulator's ability to regulate the insurers within their jurisdiction. Rather, the proposed regulations run parallel to the State laws. Identification of a transaction as a listed transaction or a transaction of interest, solely for Federal tax purposes, does not in any way invalidate, impair, supersede, or affect State insurance laws. As in *United States* v. *Redcorn,* "state insurance regulations remain fully in force." 528 F.3d 727, 736 (10th Cir. 2008) (*holding* that prosecution under 18 U.S.C. 669 ("Theft or embezzlement in connection with health care") did not conflict in any way with state insurance law for purposes of McCarran-Ferguson); *see also United States* v. *Del. Dep't of Ins.,* 66 F.4th 114, 132 (3d Cir. 2023) (*holding* that Delaware State law prohibiting the Delaware Department of Insurance from disclosing certain information about captive insurance companies to anyone, including the Federal Government, did not, under McCarran-Ferguson, override the IRS's statutory authority to issue summonses to the Department and have them enforced).

Commenters cite to *United States Dep't of Treasury* v. *Fabe,* 508 U.S. 491 (1993), to support their argument that the proposed regulations violate the McCarran-Ferguson Act, but the proposed regulations can be readily distinguished from the Federal statute at issue in *Fabe.* In *Fabe,* a State preference for distributions to policyholders for claims and expenses incurred in the administration of insolvency proceedings was found to be the "business of insurance." The Supreme Court found that the Ohio statute at issue in *Fabe* was "aimed at protecting or regulating, directly or indirectly, the relationship between the

insurance company and its policyholders." *Fabe,* 508 U.S. at 491–92 (*citing SEC* v. *Nat'l Sec., Inc.,* 393 U.S. at 460). Considering the relationship between the insurer and the insured, the Supreme Court held that, to the extent (1) the State law at issue in *Fabe* protected policyholders and (2) the Federal priority statute under 31 U.S.C. 3713(a)(1)(A)(iii) would impair that relationship, Federal law did not preempt State law. The Court in *Fabe* had to choose between Federal and State statutes because they were in direct conflict. Conversely, the proposed regulations are not in conflict with any State regulations; the relationship between insurer and insured is in no way impacted. Taxpayers remain free to enter into captive insurance transactions in any State and to structure such transactions within the confines of State regulations, and States remain free to regulate such transactions. However, if such structure is described in § 1.6011–10 or § 1.6011–11, participants must disclose information about the arrangement to the IRS. In other words, the proposed regulations attach specific tax obligations (in the form of disclosure) to specific acts (in the form of participating in a transaction described in § 1.6011–10 or § 1.6011–11), but the proposed regulations do not change how those acts are done.

Second, the act of disclosing a transaction to the tax authorities is not the "business of insurance." The threshold question under 15 U.S.C. 1012(a), in determining whether the anti-preemption mandate of 15 U.S.C. 1012(b) applies, is whether the challenged conduct broadly constitutes the "business of insurance" in the first place. If the contested activities are wholly unrelated to the insurance business, then McCarran-Ferguson has no place in analyzing Federal regulation because only when "[insurance companies] are engaged in the 'business of insurance' does the act apply." *Sabo* v. *Metropolitan Life Ins. Co.,* 137 F.3d 185, 190 (3d Cir. 1998) (*citing SEC* v. *Nat'l Sec., Inc.,* 393 U.S. at 459–60); *see also United States* v. *Del. Dep't of Ins.,* 66 F.4th at 125 (reaffirming the threshold inquiry precedent set in *Sabo*). The "core of the business of insurance" is "[t]he relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation and enforcement." *United States* v. *Del. Dep't of Ins.,* 66 F.4th at 130 (*citing SEC* v. *Nat'l Sec., Inc.,* 393 U.S. at 460). The "business of insurance" is also understood to be "[an]other activity of insurance companies [that] relate[s] so closely to [their] status as reliable insurers that [it] must be placed in the same class." *Id.* The conduct at issue in the proposed regulations is the filing of disclosure statements upon identification as participants in or material advisors of a transaction that, for Federal tax purposes, either is a listed transaction or a transaction of interest. Like the information gathering conduct via the summonses at issue in the *United States* v. *Del. Dep't of Ins.,* the disclosure requirements in the proposed regulations are not "the business of insurance." The final regulations do not adopt any changes based on these comments.

**B. Federalism Implications**

Commenters also argued that the proposed regulations have federalism implications and fail to satisfy Executive Order 13132 (Federalism). Executive Order 13132 generally provides that an agency is prohibited from publishing any rule that has federalism implications if the rule imposes substantial, direct compliance costs on State and local governments, and is not required by statute, or if the rule preempts State law, unless the agency satisfies, among other things, the consultation and federalism summary impact statement requirements of section 6 of the Executive order.

The proposed regulations do not have federalism implications, and the requirements in section 6 of Executive Order 13132 to consult with State and local officials and issue a federalism impact statement do not apply. As described in this preamble, the proposed regulations do not preempt State law, nor do they impose substantial, direct compliance costs on State and local governments, as there is no obligation created by the regulations with which any State or local agency may need to comply. The final regulations do not adopt any changes based on these comments.

**C. Constitutionality, Fairness, and Retroactivity**

Commenters contended that the proposed regulations are unconstitutional for a number of reasons. First, commenters argued that requiring participants to disclose transactions they participated in, even if such taxpayers were examined for one or more years for which reporting would be required and for which the IRS did not make any adjustments to the taxpayers' returns, is unconstitutional and retroactive in nature. Second, commenters argued that the proposed regulations are intended to shut down the captive insurance industry and may constitute a "taking" under the Fifth Amendment of the U.S. Constitution, by restricting the rights of taxpayers to engage in captive insurance transactions.

With respect to the first argument, commenters did not specify what provision of the Constitution is allegedly violated by the potential need to disclose participation in a transaction after an examination resulted in no change to the examined returns, and we are not aware of any Constitutional provision that would be violated. In addition, any such disclosure requirement in these regulations is not retroactive in nature; the final regulations will be effective January 14, 2025. To the extent the final regulations result in a disclosure obligation with respect to transactions occurring in prior taxable years for which the statute of limitations on assessment has not expired, such obligation is a current reporting obligation that arises after January 14, 2025.

With respect to the comment about reporting requirements for taxpayers whose returns have been examined, the reporting rules are outside the scope of these final regulations, which merely identify a listed transaction and a transaction of interest, respectively. The reporting rules for listed transactions and transactions of interest are found in § 1.6011–4, which was issued pursuant to notice and comment and finalized most recently on August 3, 2007, in TD 9350 (72 FR 43146), and which is not amended by these regulations. However, there are tax administration reasons to maintain these reporting requirements. Most importantly, initial disclosures of reportable transactions are filed with the Office of Tax Shelter Analysis (OTSA) to ensure that all information is collected in one place. The OTSA's mission is, among other things, to ensure that the IRS has the information necessary to detect abusive tax shelters and identify issues of significant compliance risk to tax administration. The OTSA collects and analyzes information about abusive tax shelters and reportable transactions to identify trends and disseminates the results to those in a position to take appropriate action. In order to identify participants and promoters of tax avoidance transactions, the OTSA needs to receive and review Forms 8886 in a timely and efficient manner. Limiting disclosure to a subset of transaction participants (such as taxpayers whose examinations have been closed) would provide an incomplete picture of the transaction and hinder the OTSA's efforts. Accordingly, the final regulations do not

**3538** **Federal Register** / Vol. 90, No. 8 / Tuesday, January 14, 2025 / Rules and Regulations

adopt any changes based on these comments.

The commenters' second Constitutional argument, under the Fifth Amendment, is also without merit. As relevant here, the Fifth Amendment provides, in addition to the other limitations on government power, that "private property [shall not] be taken for public use, without just compensation." The proposed regulations identify a transaction as a listed transaction or a transaction of interest for Federal tax purposes and require the filing of disclosures with the IRS and the OTSA. Requiring disclosure of participation in these transactions does not implicate the Fifth Amendment; no property interest is taken for public use by the government under the proposed regulations necessitating compensation.

Taxpayers remain free to engage in any captive insurance transaction, regardless of whether such transaction is identified in § 1.6011–10 or § 1.6011–11, respectively; however, there may be Federal tax consequences if the transaction is not a valid captive insurance transaction. As there is no limitation on participation in any transaction by operation of the proposed regulations, there is no "taking" for Fifth Amendment purposes.

### D. The Administrative Procedure Act

Commenters argued that the proposed regulations lack legal foundation and assert that the regulations will be challenged and set aside just as Notice 2016–66 was set aside in *CIC Services, LLC* v. *IRS,* 592 F.Supp.3d 677 (E.D. Tenn. 2022). In *CIC Services,* the district court followed the analysis in *Mann Construction, Inc.* v. *United States,* 27 F.4th 1138 (6th Cir. 2022), *rev'g* 539 F.Supp.3d 745 (E.D. Mich. 2021), which held that the identification of a listed transaction must follow the notice-and-comment procedures of the Administrative Procedure Act ("APA"). The district court in *CIC Services* held that Notice 2016–66 should be vacated because the IRS did not follow the APA's notice-and-comment procedures. The district court held in the alternative that the IRS acted arbitrarily and capriciously based on the administrative record. *CIC Services,* 592 F.Supp.3d at 687.

In light of the decision by the district court in *CIC Services* and other judicial decisions, the Treasury Department and the IRS published the proposed regulations and obsoleted Notice 2016–66. The NPRM provided for a comment period from April 11, 2023, through June 12, 2023, and more than 100 comment letters were received. The Treasury Department and the IRS conducted a public hearing on July 19, 2023, providing further opportunity for taxpayers to comment on the proposed regulations. The APA notice-and-comment procedures have been followed.

Some commenters suggested that the IRS's purpose for publishing the proposed regulations is to harass otherwise valid businesses, but the purpose is simply to require disclosures with respect to transactions described in §§ 1.6011–10 and 1.6011–11, in the interest of tax administration. Examinations of taxpayers and promoters have helped to clarify the Treasury Department's and the IRS's understanding of micro-captive transactions, including the scope of participation. The factors used to identify the Micro-captive Listed Transaction and the Micro-captive Transaction of Interest are neither arbitrary nor capricious. They reflect the IRS's long-standing positions with respect to abusive micro-captives as made public in annual Dirty Dozen tax schemes publications and case law. The factors are objective and reasonably determined, based on relevant factors in existing statutory provisions, on available industry data, and on a careful review of case law and examination information. The objectivity and reasonableness of each factor is discussed more fully throughout this Summary of Comments and Explanation of Revisions, notably in part II. (Loss Ratio Factor); part III. (Financing Factor); and part VI.B. (20 Percent Relationship Test). The existing case law with respect to micro-captives demonstrates the commonalities in the fact patterns in these transactions, which is relevant to the development of the transaction fact patterns identified in these regulations. The Tax Court has consistently determined in its section 831(b) decisions issued to date that taxpayers in the relevant micro-captive transactions remitted amounts treated as premiums for something other than insurance. *See Avrahami,* 149 T.C. at 197–98; *Syzygy* v. *Commissioner,* T.C. Memo. 2019–34, at *45; *Caylor Land & Dev., Inc.* v. *Commissioner,* T.C. Memo. 2021–30, at *48–49; *Keating* v. *Commissioner,* T.C. Memo. 2024–2, at *64; *Swift* v. *Commissioner,* T.C. Memo. 2024–13, at *44–45; *Patel* v. *Commissioner,* T.C. Memo. 2024–34, at *51–52, and *Royalty Mgmt. Ins. Co., Ltd.* v. *Commissioner,* T.C. Memo. 2024–87, at *49–50. Current examinations and litigation also are relevant, as they demonstrate consistency with the transaction fact patterns identified in these regulations.

Section 6707A(c) delegates to the IRS the authority to promulgate regulations pursuant to section 6011 identifying reportable transactions. Specifically, section 6707A(c)(1) states that "[t]he term 'reportable transaction' means any transaction with respect to which information is required to be included with a return or statement because, as determined under regulations prescribed under section 6011, such transaction is of a type which the Secretary determines as having a potential for tax avoidance or evasion." Section 6707A(c)(2) defines the term "listed transaction" as "a reportable transaction which is the same as, or substantially similar to, a transaction specifically identified by the Secretary as a tax avoidance transaction for purposes of section 6011." Section 6707A(a) provides that "[a]ny person who fails to include on any return or statement any information with respect to a reportable transaction which is required *under section 6011* to be included with such return or statement shall pay a penalty in the amount determined under subsection (b)" (*emphasis* added). Under section 6011(a), returns and statements, including disclosures, should be filed "according to the forms and regulations prescribed by the Secretary." The proposed regulations do not create any law that is contrary to any statute; rather, the proposed regulations identify transactions that must be disclosed per the existing rules under the Code with respect to reportable transactions, as sections 6707A(c) and 6011 prescribe.

In addition, the Secretary has general regulatory authority under section 7805(a) to "prescribe all needful rules and regulations for the enforcement of" the Code. The Treasury Department and the IRS have clear authority to issue the proposed regulations and have followed the procedural requirements of the APA. As explained more fully throughout this Summary of Comments and Explanation of Revisions, these final regulations are based on consideration of comments in response to the proposed regulations, case law, and the IRS's years of experience with abusive micro-captives.

### E. Definition of Insurance for Federal Tax Purposes

Commenters also argued that by identifying a micro-captive transaction as a listed transaction or a transaction of interest on the basis of a Loss Ratio Factor, a Financing Factor, or both, the proposed regulations define insurance for Federal tax purposes in a manner inconsistent with case law. Commenters cited a number of cases, including *Reserve Mech. Corp.* v. *Commissioner,*

34 F.4th 881 (10th Cir. 2022), *aff'g,* T.C. Memo. 2018–86; *United Parcel Service of America, Inc.* v. *Commissioner,* 254 F.3d 1014 (11th Cir. 2001); *Harper Grp.* v. *Commissioner,* 979 F.2d 1341 (9th Cir. 1992), *aff'g,* 96 T.C. 45 (1991); *Sears Roebuck & Co.* v. *Commissioner,* 972 F.2d 858 (7th Cir. 1992); *AMERCO* v. *Commissioner,* 96 T.C. 18 (1991); *Humana, Inc.* v. *Commissioner,* 881 F.2d 247 (6th Cir. 1989); *Caylor,* T.C. Memo. 2021–30; *Syzygy,* T.C. Memo. 2019–34; *Avrahami,* 149 T.C. 144 (2017); *R.V.I. Guar. Co.* v. *Commissioner,* 145 T.C. 209 (2015); *Rent-A-Center,* 142 T.C. 1 (2014); and *Securitas Holdings, Inc.* v. *Commissioner,* T.C. Memo. 2014–225. Additionally, several commenters pointed to the IRS's concession in *Puglisi* v. *Commissioner,* 2021 WL 7162530 (T.C. Oct. 29, 2021), as proof that the IRS has accepted facts similar to those described in the proposed regulations as insurance for Federal tax purposes, and therefore, the apparent attempt by the proposed regulations to redefine insurance for Federal tax purposes is contrary to established precedent.

The proposed regulations do not redefine insurance for Federal tax purposes by identifying the specific fact patterns set forth in §§ 1.6011–10 and 1.6011–11 as listed transactions or transactions of interest, respectively. The proposed regulations identify fact patterns that are consistently present in the micro-captive cases tried on their merits and the examined cases with respect to which the IRS has determined that the transaction at issue lacked the necessary characteristics, based on the specific facts in each case, to qualify as insurance for Federal tax purposes under existing caselaw. (Although section 6103 prohibits the IRS from disclosing specific taxpayer information, it does not preclude the IRS from identifying consistent fact patterns based on specific taxpayer information.)

For specific cases with respect to which the IRS received comments, section 6103 of the Code prohibits the IRS from discussing taxpayer return information. However, section 6103(b)(2) clarifies that the IRS is not prohibited from disclosing information to the extent it is ''in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer,'' such as, for example, fact patterns based on specific taxpayer return information. In general, there are a variety of reasons why certain examined cases may have conceded an otherwise valid challenge to the taxpayer's position, either by the

IRS Independent Office of Appeals (Appeals) or in litigation.

Several commenters incorrectly assumed that the proposed regulations declare all entities electing the alternative tax under section 831(b) as tax avoidant or potentially tax avoidant, contrary to Congressional intent to encourage the use of small captives by enacting section 831(b) and subsequent amendments thereof, including section 333 of the PATH Act. This assumption is incorrect for several reasons. First, the proposed regulations identify a specific fact pattern involving related parties, including a Captive, at least 20 percent of the voting power or the value of the outstanding stock or equity interest of which is owned, directly or indirectly, by an Insured, an Owner, or persons Related to Insured or an Owner (as such terms are defined in § 1.6011–10(b)). The definition of Captive includes the section 831(b) election, but there are several other factors that must be met before the transaction is described as a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest. The closely held nature of the arrangement coupled with the section 831(b) election and the use of premiums for personal investments or for related-party financing and not to pay losses are what renders these transactions appropriate subjects of disclosure as tax avoidance transactions or transactions of interest.

Second, Congress enacted section 831(b) in the interest of simplifying the Code, not to encourage the use of small captive insurance companies. H.R. Rep. No. 99–426, at 678 (1985) (''The present law applicable to small and certain ordinary mutual companies is inordinately complex and should be simplified.''). Congress amended section 831(b) to provide that the election may be revoked only with the consent of the Secretary, with the clear intent ''that the election not be used as a means of eliminating tax liability (*e.g.,* by making the election only for years when the taxpayer does not have net operating losses), but rather as a simplification for small companies.'' H.R. Rep. No. 100–795, at 121 (1988); S. Rep. 100–445, at 127 (1988). Nothing in the statutory language or the legislative history of section 831(b) suggests that Congress intended to provide the benefits of section 831(b) to companies that do not qualify as insurance companies for Federal tax purposes.

Third, the Code does not permit a current deduction for amounts set aside for self-funding of future losses. *See, e.g., Harper Grp,* 96 T.C. at 46 n.2 (1991) (''Losses incurred by the self-insured taxpayer are deductible (if at all) only in

the year paid out from the reserve fund.''), *aff'd,* 979 F.2d 1341 (9th Cir. 1992); *Stearns-Roger Corp.* v. *United States,* 774 F.2d 414, 415 (10th Cir. 1985) (''Payments [for self-insurance] are not deductible as insurance premiums''). The transactions described in § 1.6011–11 have many of the characteristics of self-insurance, and as such, taxpayers who deduct amounts paid to captives in such transactions may be engaged, as a matter of substance, in self-insurance, but more information is needed to determine if that is the case.

## F. Small and Mid-Sized Businesses and the Captive Industry

A number of commenters suggested that the proposed regulations discriminate against small and mid-sized businesses by designating certain micro-captive transactions as listed transactions, and certain other micro-captive transactions as transactions of interest. Commenters also stated that the proposed regulations will impermissibly chill the captive insurance industry. Although it may be the case that many small and mid-sized businesses utilize captive insurance entities that make an election under section 831(b), the proposed regulations do not discriminate against such businesses on the basis of their size by identifying their captive as a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest. Regarding Insureds, there is no specific size of company at issue; large and small businesses alike may engage in a captive insurance transaction, but if such transaction meets the description of a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest, the participants in and material advisors thereof must file disclosure statements. The Treasury Department and the IRS do not intend to discourage the use of section 831(b) by entities that qualify for the election, nor should these regulations be construed as intending to discourage the use of section 831(b) by such entities. These regulations do not hinder the formation of valid captive insurance companies, as discussed more fully at parts VI.C. and H. of the Summary of Comments and Explanation of Revisions.

## II. Comments and Changes Relating to the Loss Ratio Factors as Described in Proposed §§ 1.6011–10(c)(2) and 1.6011–11(c)

### A. Overview of Comments Relating to the Loss Ratio Factors

Commenters expressed a number of concerns about the Loss Ratio Factors

and Computation Periods. In response to these concerns, the final regulations significantly narrow the scope of the Micro-captive Listed Transaction description by providing that transactions are identified as listed transactions under the final regulations only if both the Financing Factor and the Loss Ratio Factor tests are met. The final regulations also lower the Loss Ratio Factors for both Micro-captive Listed Transactions and Micro-captive Transactions of Interest in response to comments. With respect to the proposed Loss Ratio Computation Period set forth at proposed § 1.6011–10(b)(2)(ii) and the proposed Transaction of Interest Computation Period set forth at proposed § 1.6011–11(b)(2) (collectively, the ''Computation Periods''), as further discussed in this part II. of the Summary of Comments and Explanation of Revisions, the final regulations make no substantive changes to the Loss Ratio Computation Period but do extend the Transaction of Interest Computation Period to a period of up to ten years.

Many of the comments related to the Loss Ratio Factors in the proposed regulations raised multiple concerns that were not clearly delineated from other comments or recommendations. For clarity, comments received with respect to the Loss Ratio Factors are addressed categorically in the remaining subparts of this part II. of the Summary of Comments and Explanation of Revisions.

### B. Tax Avoidance or Potential for Tax Avoidance Identified by Loss Ratio Factors

Several commenters suggested that the Loss Ratio Factors as set forth at proposed §§ 1.6011–10(c)(2) and 1.6011–11(c) are inappropriate metrics for the captive insurance industry and should not be determinative of whether a transaction is a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest. Some cited *Puglisi,* 2021 WL 7162530, for support, suggesting that the IRS conceded the case because the captive at issue, which had a loss ratio below 65 percent, was not participating in a tax avoidance transaction. Commenters also argued that the IRS is treating similarly situated taxpayers differently, by predicating whether a micro-captive transaction involving an entity electing the alternative tax under section 831(b) is a reportable transaction using the Loss Ratio Factors but not doing the same for entities that do not make the section 831(b) election. Other commenters asserted that the Loss Ratio Factors were inappropriate because captives may recover funds through reinsurance,

which would have the effect of lowering loss ratios.

In the context of closely held section 831(b) entities, the Loss Ratio Factors generally identify transactions involving circumstances inconsistent with insurance for Federal tax purposes, including excessive pricing of premiums and artificially low or nonexistent claims activity. The Loss Ratio Factor measures whether the amount of liabilities incurred for insured losses and claims administration expenses is significantly less than the amount of premiums earned, adjusted for policyholder dividends. The primary purpose of premium pricing is to ensure funds are available should a claim arise. The pricing of premiums should naturally reflect the economic reality of insurance operations, to ensure that policies are ''price[d] in such a way that the premiums brought in cover losses and the insurer's business expenses with enough profit left over to keep investors happy.'' *Avrahami,* 149 T.C. at 152. Typically, actuaries establish a policy rating scheme and classify risks '''to allow credible statistical inferences regarding expected outcomes.''' *Id.* (*quoting* Actuarial Standard of Practice No. 12: Risk Classification (for All Practice Areas), sec. 3.3 (Actuarial Standards Bd. 2005). The work should be reproducible and permit ''another actuary qualified in the same practice area [to] make an objective appraisal of the reasonableness of the actuary's work.'' Actuarial Standard of Practice No. 41: Actuarial Communications, sec. 3.2 (Actuarial Standards Bd. 2010), *https://www.actuarial standardsboard.org/standards-of-practice/* (last visited Jan. 6, 2025). Pricing premiums far in excess of what is reasonably needed to fund insurance operations results in a lower loss ratio and remains a strong indicator of tax avoidance. Further, while amounts paid for insurance may be deductible business expenses, amounts set aside in a loss reserve as a form of self-insurance are not. *See, e.g., Harper Grp.,* 96 T.C. at 46 n.2; *Stearns-Roger Corp.,* 774 F.2d at 415.

With respect to comments suggesting that the outcome of specific examined cases (such as *Puglisi,* 2021 WL 7162530) demonstrates the impropriety of using Loss Ratio Factors generally, or that determinations in such cases demonstrate that the Service is treating similarly situated taxpayers differently, section 6103 prohibits the IRS from disclosing specific taxpayer information. However, as discussed in part I.E. of this Summary of Comments and Explanation of Revisions, section

6103 does not preclude the IRS from identifying consistent fact patterns based on specific taxpayer information. The IRS's decision to concede or settle a given case in no way alters these findings and conclusions, nor are these findings and conclusions altered by the examination of entities that do not fit the identified fact pattern.

Further, commenters suggested that the inclusion of a section 831(b) election as an identifying factor in the proposed regulations but not doing the same for entities that do not make a section 831(b) election means similarly situated taxpayers are being treated differently. However, an entity that does not make a section 831(b) election is not similarly situated. An insurance company taxed under section 831(a) has a corresponding income recognition for amounts paid as insurance premiums, lessening the potential of ongoing tax deferral present in the transactions identified by these regulations.

In response to the commenters who asserted that reinsurance would have the effect of lowering loss ratios, the Treasury Department and the IRS respectfully disagree. Any reinsurance obtained by the Captive for risks attributable to direct written coverage would tend to reduce the premiums earned by the Captive (as most if not all amounts attributable to the reinsurance would typically be ceded to the reinsurer and deducted from premiums earned), thereby increasing the Captive's Loss Ratio Factor percentage and making it less likely that such transaction would be described in the regulations. The final regulations do not eliminate the Loss Ratio Factors based on these and similar comments.

### C. Potential To Capture Transactions That Are Not Tax Avoidance Transactions as Listed Transactions

Commenters asserted that micro-captive transactions that are not tax avoidance transactions may have loss ratios that fall below the threshold established by the Loss Ratio Factors. Commenters opined that a loss ratio factor of 65 percent leaves determination of whether a transaction is a listed transaction up to ''random chance,'' because future loss experience cannot be known when premiums are set, which makes the Loss Ratio Factors inappropriate for identifying tax avoidance transactions or transactions of interest. Commenters stated that premiums are intentionally set at high rates for long periods of time to ensure that there are adequate reserves to pay claims in case of catastrophic loss. Some suggested that transactions meeting the proposed 65 percent Loss Ratio Factor

using a ten-year Loss Ratio Computation Period be identified as Micro-captive Transactions of Interest instead of Micro-captive Listed Transactions. Commenters expressed concern that transactions that are not tax avoidance transactions would be captured if the Loss Ratio Factors are retained, arguing that limited loss history does not mean that risks are not present, or that premiums are overpriced. Commenters pointed to a governmental program that provides reimbursement coverage for certain losses attributable to acts of terrorism set forth in the Terrorism Risk Insurance Act of 2002 ("TRIA") as an example for why a loss ratio well below the proposed 65 percent is not inherently indicative of tax avoidance. Several commenters pointed to the Tax Court's holdings in *R.V.I. Guar. Co., Ltd. & Subs.* v. *Commissioner,* 145 T.C. 209 (2015), as support for why the proposed 65 percent for a loss ratio is too high.

With respect to concerns that transactions that are not tax avoidance transactions could be identified as Micro-captive Listed Transactions based on a ten-year Loss Ratio Computation Period and proposed 65 percent Loss Ratio Factor, the IRS recognizes that low loss ratios may be the result of coverage of low-frequency, high-severity risks. Inherent in insurance underwriting is the concept that by assuming numerous independent risks that will occur randomly, losses will become more predictable over time, and pricing should reflect those anticipated losses. *See, e.g., Clougherty Packing Co., Inc.* v. *Commissioner,* 811 F.2d 1297, 1306 (9th Cir. 1987) ("The likelihood that a loss will occur is of uncertain and predictable magnitude; the size of the loss is similarly uncertain but predictable."). This concept is notably absent from the micro-captive cases tried to date, as premiums were consistently priced to meet the target threshold under section 831(b) without regard to reasonable estimates for loss experience. *See Avrahami,* 149 T.C. at 194–198; *Syzygy,* T.C. Memo. 2019–34, at *33–34; *Caylor,* T.C. Memo. 2021–30, at *45–47; *Keating,* T.C. Memo. 2024–2, at *59–61; *Swift,* T.C. Memo. 2024–13, at *40–42; *Patel,* T.C. Memo. 2024–34, at *48–50; and *Royalty Mgmt.,* T.C. Memo. 2024–87, at *23, 46–48; *see also Reserve Mech.,* 34 F.4th at 891–94. The Loss Ratio Factor percentage is not intended to act as a proxy for the actuarial basis of premium pricing, as such a basis would be too fact specific to establish an administrable test that would adequately put all relevant taxpayers on notice of their obligations under the Code in accordance with every

taxpayer's right to be informed. *See Taxpayer Bill of Rights, https://www.irs.gov/taxpayer-bill-of-rights* (last visited Jan. 6, 2025).

Commenters identifying loss ratios at issue in specific Tax Court cases did not specify what the loss ratios would be in those cases if computed as set forth in the proposed regulations over the proposed ten-year Loss Ratio Computation Period, nor did they specify an administrable metric that would enable better identification of tax avoidance transactions. The inclusion of a ten-year Loss Ratio Computation Period is intended to allow a Captive significant time to develop a reasonable loss history that supports the use of a micro-captive for legitimate insurance purposes. The final regulations retain the ten-year Loss Ratio Computation Period in the proposed listed transaction regulations, but in response to concerns that the proposed Loss Ratio Factors are nevertheless set too high and will capture transactions that are not tax avoidance transactions, the final regulations lower the Loss Ratio Factor for purposes of designating a listed transaction under § 1.6011–10 to 30 percent.

The percentage was selected in response to comments indicating that the Tax Court's holding in *R.V.I.* supports a lower loss ratio. *R.V.I.* is the one case cited by commenters that analyzed loss ratios for time periods corresponding to the Loss Ratio Computation Period for the Micro-captive Listed Transaction. In *R.V.I.,* the Tax Court listed the captive's loss ratios from 2000 through 2013. *R.V.I.,* 145 T.C. at 216. The listed loss ratios ranged from a low of 0.2 percent (2012) to a high of 97.9 percent (2008). *Id.* As the Tax Court found, when considered in their totality, these ratios reflect "significant claims and . . . . significant insurance losses." *Id.* at 215. The average loss ratio in *R.V.I.* for the five ten-year periods analyzed by the Tax Court (2000 through 2009; 2001 through 2010; 2002 through 2011; 2003 through 2012; and 2004 through 2013) themselves ranged from a low of 28 percent (2000 through 2009) to a high of 35 percent (2004 through 2013). Taking the average of those five ten-year periods, the average ten-year loss ratio in the *R.V.I.* case was 32 percent. This amount is rounded down to 30 percent in the final regulations.

Further, to better target those transactions that are properly identified as listed transactions rather than as transactions of interest, the final regulations require that the transaction meet both the Loss Ratio Factor and the Financing Factor (a conjunctive test) to

be designated as a listed transaction, as explained more fully in part III. of this Summary of Comments and Explanation of Revisions. This change to a conjunctive test, coupled with the lower Loss Ratio Factor percentage for Micro-captive Listed Transactions, significantly narrows the scope of the Micro-captive Listed Transaction in the final regulations and should provide adequate relief for taxpayers who suggested comparisons to specific business line loss ratios, as well as for taxpayers who expressed concerns about the breadth of the Micro-captive Listed Transaction under the proposed regulations or who requested that transactions that would have met the proposed 65 percent Loss Ratio Factor be identified as transactions of interest instead. Although the example of the TRIA's loss experience is not strictly relevant (that is, because the TRIA is a governmental relief program, not an insurance company) the significantly narrowed scope of the Micro-captive Listed Transaction is intended to respond to concerns that lower losses do not necessarily mean risks were not present or that premiums were overpriced.

For clarity, the proposed Loss Ratio Computation Period is retitled as the "Listed Transaction Loss Ratio Computation Period" and the proposed Transaction of Interest Computation Period is retitled as the "Transaction of Interest Loss Ratio Computation Period". The final regulations generally retain the substance of the proposed Computation Periods except the Transaction of Interest Loss Ratio Computation Period is increased in the final regulations from a Captive's nine most recent taxable years to its ten most recent taxable years (or all taxable years of the Captive's existence if it has been in existence for less than ten taxable years) as discussed more fully in part II.D. of this Summary of Comments and Explanation of Revisions. If an established transaction that is otherwise described in the final regulations has not had adequate time to develop a ten-year loss history, the transaction may only be designated as a transaction of interest rather than a listed transaction. In addition, the Loss Ratio Factor for identification as a transaction of interest is also lowered from 65 percent to 60 percent in the final regulations, as described in part II.D. of this Summary of Comments and Explanation of Revisions.

### D. Comparison to National Averages

The proposed Loss Ratio Factors were generally formulated by using the medical loss ratio in section 833 of the

Code, to inform the original loss ratio factor in Notice 2016–66, and by using national data for commercial property and casualty insurers, to inform the proposed regulations. A number of commenters contended that these metrics are inappropriate because section 831(b) captive insurers are materially different from commercial insurers due to the different types of coverage offered by commercial and captive insurers. For example, several commenters asserted that the inclusion in national averages of certain lines of coverage (identified by one commenter as private passenger auto liability, commercial auto liability, and accident and health coverage lines) that captives do not typically write, or may not be permitted to write, may tend to skew industry-wide loss ratios higher. Another commenter relatedly suggested that the Loss Ratio Factor's reliance on data from the National Association of Insurance Commissioners (NAIC) as a benchmark was inappropriate because the data does not include the experience of the vast majority of captive insurance companies, including those which have elected to be taxed under section 831(b). One commenter asserted that the national industry average relied upon in the proposed regulations lacks an actuarial basis, and another commenter stated that aggregated data of the U.S. property-casualty insurance industry would reflect more risk diversification and geographic diversity than would be present in a typical micro-captive arrangement.

As noted in the preamble to the proposed regulations, the Loss Ratio Factors are modified loss ratios spread out over the course of many years, unlike the single-year NAIC averages, and are also lower than the NAIC industry averages. The NAIC industry averages ranged between 67.2 and 76.2 percent per year from 2012 to 2021. *See Insurance Industry Snapshots and Analysis Reports, https:// naic.soutronglobal.net/Portal/Public/en-US/RecordView/Index/26555* (last visited Jan. 6, 2025). In the latest published NAIC industry report, national averages ranged between 69.0 and 76.4 percent per year from 2014 to 2023. *See 2023 Annual Property & Casualty Insurance and Title Insurance Industries Analysis Report, https:// naic.soutronglobal.net/Portal/Public/en-US/RecordView/Index/26555* (last visited Jan. 6, 2025). Accordingly, even a Captive electing the alternative tax under section 831(b) that has a loss ratio below the industry-wide average for property and casualty companies in a given year will not necessarily have a

loss ratio that causes it to be a participant to a transaction identified by the regulations.

With respect to concerns that the use of NAIC data as a benchmark for the Loss Ratio Factor is inappropriate because the NAIC does not capture micro-captive data, the commenter did not identify any alternative published data set that would capture the experience of "the vast majority of captive insurance companies, including micro-captive insurance companies," nor is the IRS aware of one. The commenter included a table illustrating the distribution of AM Best Company's average loss and loss administration expenses ratios for small insurance companies, described as insurers grouped by capital and surplus up to $10 million, but this data set is inappropriate. As the commenter noted, the AM Best Company's data set includes "vastly different claims characteristics than micro-captives" covering risks that micro-captives are not generally permitted to cover, such as personal automobile liability and homeowner's liability. The NAIC data, conversely, represents industry averages generally applicable to all nonlife insurers, and, accordingly, was relied upon in the proposed regulations as a starting point, which was modified by the inclusion of policyholder dividends in the computation and by the application of an extended Computation Period. Further, as previously discussed in part II.C. of this Summary of Comments and Explanation of Revisions, the threshold for the Loss Ratio Factor for identification of a Micro-captive Listed Transaction has been lowered significantly in the final regulations.

The comments regarding the lines of coverage included in the NAIC averages provide support for a reduction to the proposed Loss Ratio Factor for identification as a transaction of interest. The specific business lines identified by the commenters would, based on the NAIC Profitability Study provided by one of the commenters, result in an average nine-year loss ratio of approximately 59 percent. However, there are other high frequency, low severity coverages and other business lines that captives are unlikely to cover in the data provided by the commenter that the commenter failed to mention: private passenger auto physical damage, homeowners' multiple peril, and mortgage guaranty lines. Removing these lines from the data set provided by the commenter would reduce the average nine-year loss ratio percentage from 65 percent identified in the

proposed regulations to slightly over 60 percent.

However, this relies on the national average computation of loss ratios, which as commenters pointed out, is not the modified computation set forth in the proposed regulations. The modified computation ratio in the final regulations would potentially be lower, in part because policyholder dividend payments reduce the ratio. To determine what the average loss ratio would be using the modified loss ratio computation set forth in the proposed regulations, the IRS considered the annual NAIC Report on Profitability by Line by State for each year from 2013 through 2022 to understand a typical property and casualty company loss ratio. *See, e.g., 2013 Report on Profitability by Line by State,* Center for Insurance Policy & Research, *https:// naic.soutronglobal.net/Portal/Public/en-US/RecordView/Index/7008* (last visited Jan. 6, 2025). By removing the high frequency, low severity coverages that captives are unlikely to cover for each year from 2013 through 2022 from the annual data and computing the comparison of liabilities incurred for insured losses and claim administration expenses to premiums earned less policyholder dividends as set forth in the regulations, the average nine-year modified loss ratio is approximately 66 percent, which is slightly higher than the proposed 65 percent established in the proposed regulations. The average ten-year modified loss ratio is also slightly higher, at approximately 67 percent.

In light of commenters' concerns that the proposed 65 percent modified loss ratio is still too high, the Loss Ratio Factor percentage for identification of a transaction of interest in these regulations is lowered to 60 percent. This amount represents a discount from the lowest loss ratio supported by available data. The Loss Ratio Factor percentage for identification as a listed transaction has been reduced much more substantially to 30 percent, for other reasons, as described in part II.C. of this Summary of Comments and Explanation of Revisions. In the interest of ensuring all taxpayers can easily determine their status under the regulations, the Loss Ratio Factor remains based on the aggregated NAIC average as modified in the final regulations; although commenters were critical of the aggregated data provided by the NAIC, commenters did not point to, and the IRS is not aware of, an alternative publicly-available data set that would be more appropriate.

Further, the Treasury Department and the IRS considered alternative

Computation Periods and determined that a difference of one year in the Computation Periods between the Micro-captive Listed Transaction and the Micro-captive Transaction of Interest when the loss ratio thresholds are different adds unnecessary complexity and burden to affected taxpayers. The Transaction of Interest Loss Ratio Computation Period is accordingly increased to a period of up to ten years, or if the Captive has not been existence for ten full years, all years of the Captive's existence. This change will afford affected taxpayers more time to develop a loss history and will enable the computation of one ratio when affected taxpayers are considering if they need to report under § 1.6011–10 or § 1.6011–11.

## E. Proposed Alternatives to the Loss Ratio Factors

Commenters suggested alternatives to the Loss Ratio Factors including: (1) evaluating the methodology used to price premiums to ensure the premiums either are priced commensurate with commercial insurance market premiums, or are priced at arm's length, given that several Code sections (such as section 482) and the regulations thereunder place strict limitations on what may be considered arm's length in a given industry; (2) applying the definition of a qualified insurance company (QIC) set forth in the passive foreign investment company rules; (3) comparing micro-captives to commercial carriers and special markets, such as commercial excess and surplus lines ("E&S") carriers; (4) comparing micro-captives to county mutual insurance companies, which commenters said have loss ratios of 40 percent and frequently make section 831(b) elections; or (5) establishing variations of the Loss Ratio Factors for specific regions or States. These recommendations are addressed in turn in this part II.E. of the Summary of Comments and Explanation of Revisions.

### 1. Premium Pricing Methodology

Many commenters stated that they believe a better standard for assessing whether a micro-captive transaction should be identified as a listed transaction is to evaluate whether an independent, licensed actuary annually determines the premiums. Some commenters suggested that the IRS's real concern is whether premiums are priced fairly, and that if taxpayers can demonstrate that the premiums were priced by a credentialed actuary, employing actuarial techniques to establish premium rates that

appropriately reflect the risk of loss and applicable costs, the transaction should be of no concern to the IRS.

The determination of whether a transaction is insurance for Federal tax purposes is based on the totality of the circumstances, but these regulations are not defining insurance for either Federal or State law purposes. Rather, these regulations identify a set of recurring and consistent fact patterns indicating the lack of a non-tax business purpose in related-party transactions that purport to offer insurance for Federal tax purposes. In related party transactions, the lack of arm's length dealing is often a source of abuse. In the micro-captive cases tried to date, the participation of an actuary or other professional in the computation of the premiums (and the taxpayer's insistence that pricing was at arm's length) was not sufficient to make the premiums reasonable, as is necessary for a valid insurance transaction for Federal tax purposes. *See, e.g., Avrahami,* 149 T.C. at 196; *Syzygy,* T.C. Memo. 2019–34, at *34–36; *Caylor,* T.C. Memo. 2021–30, at *45–47; *Keating,* T.C. Memo. 2024–2, at *61–62; *Swift,* T.C. Memo. 2024–13, at *41–44; *Patel,* T.C. Memo. 2024–34, at *49–50; and *Royalty Mgmt.,* T.C. Memo. 2024–87, at *46–47; *see also Reserve Mech.,* T.C. Memo. 2018–86, at *55–56, 61; *cf. Harper Grp.,* 96 T.C. at 59 (premiums were stipulated to be priced at arm's length); *Securitas,* T.C. Memo. 2014–225, at *12 n.4 ("Respondent does not challenge the reasonableness of premiums.").

For example, in *Avrahami,* the premiums were priced by a credentialed actuary. The Tax Court was unpersuaded that the actuary's involvement resulted in reasonable premiums and found that the actuary's "calculations [were] aimed not at actuarially sound decision-making but at justifying total premiums as close as possible to $1.2 million—the target— without going over." 149 T.C. at 196. The Tax Court expressed similar skepticism in subsequent micro-captive cases. *See, e.g., Syzygy,* T.C. Memo. 2019–34, at *17–18, 34–36 (finding that premiums were not actuarially determined after concluding that there was no evidence demonstrating that actuarial methods were followed; that a feasibility study completed by an actuarial consulting firm and an actuarial review completed by the State of Delaware Department of Insurance were focused on solvency, not the reasonableness of premiums; and that the advice of a credentialed actuary was ignored regarding the allocation of premiums between layers in a layered reinsurance arrangement); *Caylor,* T.C.

Memo. 2021–30, at *45–47 (finding that a captive manager's pricing methodology was not actuarially sound); *Keating,* T.C. Memo. 2024–2, at *30 n.30 (actuary's opinion that pricing methodology was reasonable did not address specific policies). Further, while section 482 and the regulations thereunder provide standards for when a transaction between related parties is considered arm's length, such determination is wholly fact specific to each arrangement and thus inappropriate as a metric for identifying reportable transactions.

Accordingly, the final regulations do not adopt the commenters' recommendation to replace the Loss Ratio Factors with a metric evaluating pricing methodology. While commenters were critical of the Loss Ratio Factors and suggested that the IRS evaluate pricing methodology, they provided no specific pricing methodology or reliable commercial market source that would enable the IRS to better distinguish between transactions that are or may be tax avoidance transactions and those that are not. The final regulations do not adopt any changes based on this recommendation.

### 2. Qualified Insurance Company Rules

Section 1297 of the Code sets forth the rules for determining whether a foreign corporation is a passive foreign investment company (PFIC), which can result in adverse Federal tax consequences to a U.S. shareholder of that corporation. Generally, pursuant to section 1297(a), a foreign corporation is a PFIC if: (1) 75 percent or more of its gross income for the taxable year is passive income or (2) the average percentage of assets held by such corporation during the taxable year which produce passive income or which are held for the production of passive income is at least 50 percent. However, section 1297(b)(2)(B) provides that passive income does not include income derived in the active conduct of an insurance business by a QIC. Generally, to be a QIC, the foreign insurer must: (1) be a corporation that would be subject to tax under Subpart L if it were a domestic corporation and (2) have "applicable insurance liabilities" (AILs) that exceed 25 percent of its total assets, as provided in section 1297(f)(1), which is referred to as the "AIL test" in this preamble.

The commenter stated that QIC status creates a rebuttable presumption that the purported insurer is a bona fide insurance company and that applying the same QIC test to domestic insurers that have elected to be taxed under

section 831(b) should create a similar rebuttable presumption in these regulations.

The Treasury Department and the IRS have determined that QIC status is not appropriate for determining whether a micro-captive transaction is a tax avoidance transaction or has the potential to be a tax avoidance transaction. Foremost, QIC status does not create a rebuttable presumption that the foreign company is a bona fide insurance company. Rather, QIC status depends on the foreign company being a bona fide insurance company, as that is a prerequisite to satisfying the first prong of the QIC test, that it would be subject to tax under subchapter L (that is, would be taxable as an insurance company for Federal tax purposes) if it were a domestic corporation. The commenter's proposed test is unworkable because it is circular. Further, the entities identified as Captives by the proposed and final regulations claim eligibility to be taxed under section 831(b) of subchapter L and therefore would presumably take the position that they are subject to tax under subchapter L. However, as discussed more fully in parts I.E. and VI.C. of this Summary of Comments and Explanation of Revisions, litigation and audit experience demonstrate that many micro-captive transactions do not meet the requirements for taxation as insurance under the Code.

Nor is the second prong of the QIC test, the AIL test, suitable for determining whether a company is a bona fide insurance company or for identifying micro-captive listed transactions or transactions of interest. The AIL test is based on the ratio of a foreign corporation's applicable insurance liabilities to its total assets as reported on the foreign insurance company's applicable financial statement for a taxable year, as those terms are defined in § 1.1297–4.

The AIL test is appropriate in the PFIC context because the objective of the PFIC provisions generally, that is, independent of insurance considerations, is identifying foreign companies with U.S. shareholders that are predominately passive investment vehicles focused on holding investment assets and earning investment income. The AIL test achieves this objective by identifying foreign insurance companies that, though they are engaged in the active conduct of an insurance business, are nevertheless predominantly passive investment vehicles because they have a very large amount of total assets compared to their insurance liabilities. By failing the AIL test, such foreign insurance companies do not constitute

QICs and therefore do not qualify for the PFIC insurance exception under section 1297(b)(2)(B).

The AIL test is not part of the determination of whether a foreign corporation would be an insurance company taxable under subchapter L if it were a domestic company. Further, a foreign insurance company that fails the AIL test would still be a PFIC even if it is a bona fide insurance company and is engaged in the active conduct of an insurance business. It is thus inappropriate to use the AIL test in determining if a company is a bona fide insurance company or to identify micro-captive listed transactions or transactions of interest. Instead, the Loss Ratio Factors are appropriate for this purpose, in part because one indicium of tax avoidance in a micro-captive transaction is excessive premium payments (which taxpayers claim are deductible to the Insured and not taxable to the Captive pursuant to the section 831(b) election) when compared to liabilities incurred for insured losses and claim administration expenses.

### 3. Commercial and Special Markets Comparison

Commenters compared micro-captives to commercial carriers and special markets, such as commercial E&S (excess and surplus lines) carriers. Commenters pointed out that many commercial insurance business lines and geographical locations consistently have loss ratios of less than 65 percent, and some recommended the loss ratio percentage be based on each line of coverage written by the Captive or similar coverages written by commercial carriers. One commenter identified specific commercial lines of coverage, including Boiler & Machinery, Burglary & Theft, Earthquake, Fidelity, Surety, and Other Liability-Claims Made, as examples of lines of coverage that many micro-captives offer and stated that micro-captives therefore have similar loss and loss ratio distributions to these commercial lines.

Generally, commercial E&S carriers cover risks that are too uncommon, too large, or too unquantifiable to be insured by admitted carriers. In a commercial E&S market, multiple financial backers, grouped in syndicates, come together to pool and spread diversified risks that are placed with the syndicates through authorized brokers. Certain Captives may share some similarities with a commercial E&S carrier, but as a general matter, a typical micro-captive does not comport itself consistently with insurers operating in the commercial E&S market. For example, the risks covered

by a micro-captive are often those of relatively few insureds who are concentrated in a small geographic region. *See, e.g., Caylor,* T.C. Memo. 2021–30, at *38 (risks were concentrated in a group operating in a specific geographic location); *Swift,* T.C. Memo. 2024–13, at *31 (risks were concentrated in a specific industry in a small geographical area). Commenters did not explain what aspect of a commercial E&S carrier's loss ratio is substantially comparable to the average loss ratio for a typical micro-captive or how a more reliable metric to identify tax avoidant micro-captives can be derived from a commercial E&S carrier's loss ratio. Thus, loss ratio comparisons between micro-captives and commercial E&S carriers would not constitute an improvement over the current Loss Ratio Factors.

With respect to comments suggesting alternatives based on comparable commercial lines, the Treasury Department and the IRS have determined sufficient relief is afforded by the reductions to the Loss Ratio Factors for both Micro-captive Listed Transactions and Micro-captive Transactions of Interest, as discussed further in parts II.C. and II.D. of this Summary of Comments and Explanation of Revisions. With respect to comments suggesting comparison to certain business lines, the Treasury Department and the IRS are not persuaded that the few specific lines identified by the commenters better represent the variety of lines offered by micro-captives than the case law and national averages for property and casualty companies (excluding certain consumer and business lines), as discussed further in parts II.C. and II.D. of this Summary of Comments and Explanation of Revisions. The final regulations do not adopt any changes based on these recommendations.

### 4. County Mutual Insurance Company Comparisons

A commenter suggested comparing micro-captives to county mutual insurance companies, which the commenter said have loss ratios of 40 percent and frequently make section 831(b) elections. Like commercial E&S and special markets, county mutual insurance companies are similarly inappropriate for comparison. Although they may also cover risks concentrated in a small geographical area, county mutual insurance companies are subject to different incentives and constraints compared to micro-captive insurance companies because they are wholly owned by their many unrelated policyholders in a manner that does not

resemble the closely held nature of micro-captive insurance companies. For example, if premiums collected by a county mutual insurance company are not used to pay claims, the unrelated policyholders would expect that the county mutual insurance company will reduce future premiums or return some portion of the excess funds to the owners as a dividend or return premiums. Micro-captive insurance companies, on the other hand, face no such expectation. The final regulations do not adopt any changes based on this recommendation. However, for the reasons described in part II.C. of this Summary of Comments and Explanation of Revisions, and consistent with the request by commenters regarding the loss ratios of county mutual insurance companies, the final regulations lower the Loss Ratio Factor for purposes of identification as a listed transaction under § 1.6011–10 to 30 percent.

5. Variations for Regions or States

Some commenters recommended establishing variations of the Loss Ratio Factors for specific regions or States. Accounting for disparities in loss experience from region to region would not be administrable, and, within a given region, different coverages would be subject to different disparities, which would further complicate the analysis. The final regulations do not adopt any changes based on this recommendation because the Treasury Department and the IRS have determined that sufficient relief is afforded by the changes to the Loss Ratio Factors described in parts II.C. and II.D. of this Summary of Comments and Explanation of Revisions.

F. Inclusion of Policyholder Dividends in Loss Ratio Factor Computation

Commenters expressed concerns about the inclusion of policyholder dividends in the computation, indicating that issuance of policyholder dividends may require regulatory approval and is not a common practice of micro-captives, thereby situating a micro-captive to fail the test for insurance in the commonly accepted sense. The Loss Ratio Factors are modified loss ratios, determined for Federal tax purposes, and the inclusion of policyholder dividends in the computation is intended to afford taxpayers a means of correcting inappropriately accumulated premiums, thereby avoiding characterization of their micro-captive arrangements as "transactions of interest" or "listed transactions." The Loss Ratio Factors have no other purpose or relevance and do not in any way affect or impede the

functioning of a Captive. Further, removing policyholder dividends from the computation would unfairly disadvantage Captives that choose to use policyholder dividends to correct overpriced policies. The Treasury Department and the IRS are not persuaded that the issuance of policyholder dividends by itself would cause a transaction to fail the commonly accepted sense prong of the four-prong test for insurance for Federal tax purposes described in part I. of the Background of this Preamble. Courts consider many factors to determine whether an arrangement constitutes insurance in the commonly accepted sense, including whether policies are valid and binding, whether premiums were reasonable and the result of arm's length transactions, and whether claims were paid, and no one factor within the commonly accepted sense prong is dispositive. *See, e.g., Avrahami,* 149 T.C. at 191–97; *Caylor,* T.C. Memo. 2021–30, at *41–48; and *Keating,* T.C. Memo. 2024–2, at *53–64. The final regulations do not modify the Loss Ratio Factors in response to these comments.

G. Solvency Concerns

Some commenters protested that establishing a minimum loss threshold by application of the Loss Ratio Factors would negatively impact solvency for captives, by requiring artificially low premiums or imprudent issuance of policyholder dividends. This concern is misplaced. Captive insurers would avoid insolvency in the same way they always have; that is, by insuring risks that are selected and duly reserved for in accordance with sound business judgement and the regulatory requirements of their domicile. Nothing in these regulations requires, encourages, or allows micro-captives to make contractual promises that exceed risk-bearing capabilities. The final regulations do not modify the Loss Ratio Factors in response to these comments.

H. Clarifications Regarding Computation of Loss Ratio Factors

Commenters argued that it may not be possible to calculate a loss ratio applicable to a given taxable year because losses under a policy may not be resolved for years (for example, long-tail coverage), and sought some clarification in the computation of the Loss Ratio Factors. For example, commenters asked whether the "liabilities incurred for insured losses" amount used in the Loss Ratio Factors computations includes losses incurred through participation in pooling arrangements, reinsurance agreements, and retrocession agreements, how

micro-captives should compute the applicable loss ratio for long-tail coverage, and whether the current taxable year is included in the number of years being counted for the Computation Periods.

The Computation Periods of ten years for Micro-captive Listed Transactions and up to ten years for Micro-captive Transactions of Interest, respectively, are intended to accommodate the existence of potential long-tail coverage. These commenters appear to contemplate situations in which a Captive incurs losses but for which claims have not been reported (incurred but not reported, or IBNR) or are undergoing further development (incurred but not enough reported, or IBNER). To clarify, the Loss Ratio Factor is computed using the amount of liabilities incurred for insured losses as such term is applied under the relevant accounting method used by the participant taxpayer, as of the end of the relevant taxable year(s). *See, e.g.,* § 1.446–1(c)(1)(ii) (defining when a liability is considered incurred for accrual method taxpayers). The final regulations do not adopt any changes based on these comments.

With respect to whether the Loss Ratio Factors include losses incurred through pooling arrangements, reinsurance agreements, and retrocession agreements, the final regulations place no limitation on the source of losses incurred by the Captive. The Computation Periods as set forth in §§ 1.6011–10(b)(2)(i) and (ii) and 1.6011–11(b)(2)(i) and (ii) include the most recent concluded taxable year in accordance with § 1.6011–4(e)(2), Rev. Proc. 2005–26, 2005–17 I.R.B. 965, and the Instructions to Form 8886.

III. Comments and Changes Relating to the Financing Factor as Described in Proposed § 1.6011–10(c)(1)

A few commenters argued that the Financing Factor should be removed as a factor for identifying listed transactions and transactions of interest. As proposed, such commenters assert that the Financing Factor fails to consider the circumstances for the financing, suggesting that a better measure of a transaction's potential for tax avoidance is whether the financing reflects an overconcentration in illiquid assets. One commenter stated that nothing in the Code or existing precedent treats related-party financing that is arm's length as abusive. Commenters noted that State regulators generally must approve financing in related-party transactions, and if approved by the State, financing should not be of concern to the IRS.

One of the key abuses seen in micro-captive transactions is the indefinite deferral of tax. Such abuses may be compounded by the use of tax-deferred income for the personal benefit of the related persons involved. *See, e.g., Avrahami,* T.C. 149 at 169–71 (portions of premiums paid made available as loans to related real estate holding company); *Swift,* T.C. Memo. 2024–13, at *18–19 (portions of premiums paid made available to invest in real estate and limited liability companies for the direct or indirect benefit of petitioners); and *Patel,* T.C. Memo. 2024–34, at *11 (portions of premiums paid made available to invest in life insurance for the direct or indirect benefit of petitioners). In an abusive micro-captive transaction, an Insured entity deducts amounts paid directly or indirectly to the Captive that the parties treat as insurance premiums in an arrangement that does not constitute insurance for Federal tax purposes. Captives then exclude those amounts from taxable income under section 831(b). When a financing arrangement is involved, such Captives return some portion of those tax-deferred amounts directly or indirectly to the Insured or related parties via a loan, capital contributions to a special purpose vehicle, or other financing arrangement for which a current tax does not apply. Thus, in a financing arrangement involving an abusive micro-captive transaction, amounts paid as premiums have not only avoided ordinary taxation but have continued to avoid tax while back in the hands of the related parties who caused the premiums to be paid and deducted. This deliberate, continuing avoidance of income tax using benefits to which the participants are not entitled is abusive and identifying transactions with similar fact patterns as listed transactions is consistent with the IRS's pronouncements with respect to micro-captives since before the publication of Notice 2016–66. *See, e.g.,* "Captive Insurance," IR–2015–19 (Feb. 3, 2015), *https://www.irs.gov/newsroom/abusive-tax-shelters-again-on-the-irs-dirty-dozen-list-of-tax-scams-for-the-2015-filing-season* (last visited Jan. 6, 2025.)

Several commenters noted that related-party financing such as the arrangements described by the Financing Factor can be subject to substantial scrutiny, to the extent that State insurance regulators will permit such financing only after an extensive approval process. *See, e.g., Avrahami,* 149 T.C. at 170 ("Insurance regulators often raise bureaucratic eyebrows at related-party dealings."). Even so, the IRS has seen multiple transactions for

which approval was required but not sought, or for which approval may have been granted but, nevertheless, the parties' treatment of the financing arrangement did not comport with industry standards. Based on its experience, the IRS maintains that, in transactions structured as described in the proposed regulations, financing arrangements that create a tax-deferred circular flow of funds are indicative of tax avoidance.

One commenter argued that inclusion of specific factors, such as the Loss Ratio Factor and the Financing Factor, improperly assumes insurance company status can be determined by reference to a single factor. However, the proposed regulations neither define insurance for Federal tax purposes nor identify transactions by a single factor. As discussed more fully in part I.E. of this Summary of Comments and Explanation of Revisions, these regulations do not presume to define insurance for Federal tax purposes; rather, the regulations identify fact patterns that are consistently associated with transactions that are or may be tax avoidance transactions. Regarding commenters' suggestions that the liquidity of a captive is a better measure than the Financing Factor, the commenters did not specify what potential measure of liquidity (such as the character of assets, amount of assets, or comparison of assets to Captive's liabilities) would better identify micro-captive transactions that are or may be tax avoidance transactions. Further, regardless of the specific measure of liquidity used, determinations thereof would be too fact-specific (and dependent upon individual policy terms and jurisdictional requirements) to be administrable. The use of amounts paid as premiums in a tax-preferred manner, and the return of such amounts directly or indirectly to the related parties who benefitted from the original tax deduction, is the tax avoidance addressed by the Financing Factor. While some participants may have obtained regulatory approval to issue the related-party financing, from a Federal tax perspective, the approval of a regulatory body does not answer the question of whether the transaction as a whole should be respected for Federal tax purposes. The final regulations therefore retain the Financing Factor.

However, the Treasury Department and the IRS agree that the presence of related-party financing in a micro-captive transaction by itself may not rise to the level of tax avoidance, as it may be that such financing was determined at arm's length or otherwise treated as a bona fide financing arrangement

between the related parties. *See Avrahami,* 149 T.C. at 199–204 (finding that the economic reality of the related-party financing at issue, while a close question, could be treated as a bona fide debt obligation, notwithstanding the court's determination that the Avrahami's captive transaction was not insurance for Federal tax purposes). The concern with respect to financing arrangements is the continuing deferral of tax. Such deferral should not be considered tax avoidance unless coupled with the continued accumulation of tax-deferred amounts in a transaction involving circumstances inconsistent with insurance for Federal tax purposes, including the excessive pricing of premiums and artificially low or nonexistent claims activity. Accordingly, the final regulations have revised the factors identifying a listed transaction to reflect a conjunctive test: taxpayers who are engaged in a transaction described by the regulations that meets the Financing Factor as described in § 1.6011–10(c)(1), in conjunction with the Loss Ratio Factor as described in § 1.6011–10(c)(2), are identified as listed transactions in the final regulations. This change, to require both the Financing Factor and the Loss Ratio Factor in the identification of Micro-captive Listed Transactions, should provide substantial relief to taxpayers participating in transactions with loss ratios below 30 percent but for which the Financing Factor is not met.

Because the potential for tax avoidance still exists when there is related-party financing, the final regulations include the Financing Factor in the identification of a Micro-captive Transaction of Interest. Taxpayers who are engaged in a transaction described by the regulations that meets the Financing Factor as described in § 1.6011–11(c)(1), the Loss Ratio Factor as described in § 1.6011–11(c)(2), or both, are identified as participating in a transaction of interest in the final regulations. The Financing Computation Period for Micro-captive Transactions of Interest is the same as the Financing Computation Period for Micro-captive Listed Transactions.

## IV. Comments and Changes Relating to the Consumer Coverage Exception as Described in § 1.6011–10(d)(2)

A "Consumer Coverage Arrangement" as described in the proposed regulations includes certain arrangements in which a service provider, automobile dealer, lender, or retailer ("Seller") sells contracts that the parties treat as insurance contracts ("Contracts" as defined in proposed § 1.6011–10(b)(3)) either issued or reinsured by a Captive

related to the Seller ("Seller's Captive") to its Unrelated Customers (as defined in proposed § 1.6011–10(b)(11)) in connection with the products or services being sold. As noted in the preamble to the proposed regulations, as a general matter, participation in this type of reinsurance arrangement is neither a Micro-captive Listed Transaction nor a Micro-captive Transaction of Interest under the proposed regulations because the insured is not sufficiently related to the Seller's Captive. Generally, in a Consumer Coverage Arrangement, the Insureds under the Contracts that are issued or reinsured by the Seller's Captive are Unrelated Customers of Seller, and these Unrelated Customers, their owners, and persons related to the Unrelated Customers or their owners do not directly or indirectly own at least 20 percent of the voting power or value of the outstanding stock of any entity issuing or reinsuring the Contract.

Nonetheless, the proposed regulations would provide relief from identification as either a Micro-captive Listed Transaction or as a Micro-captive Transaction of Interest under §§ 1.6011–10(d)(2) and 1.6011–11(d)(2) ("Consumer Coverage Exception") for certain Consumer Coverage Arrangements that would otherwise be Micro-captive Listed Transactions or Micro-captive Transactions of Interest. The proposed exception would apply to arrangements in which the following criteria are met: (1) the arrangement involves a Seller's Captive (meaning a Captive related to Seller as defined in proposed § 1.6011–10(b)(10)); (2) Seller's Captive insures or reinsures some or all of the Contracts sold by Seller; (3) 100 percent of the business of the Seller's Captive is insuring or reinsuring Contracts in connection with products or services sold by the Seller or persons related to Seller; and (4) commissions or remunerations paid for the sale of such Contracts, as a percentage of the premiums paid by the Seller's customers, is at least the greater of: (a) 50 percent; or (b) the unrelated commission percentage (meaning the highest commission for the sale of Contracts connected to Seller's products that are not issued or reinsured by Seller's Captive). Proposed § 1.6011–10(d)(2)(iv)(B) is referred to as the "Unrelated Commissions Test"; proposed § 1.6011–10(d)(2)(iv)(A) and (B) are collectively referred to as the "Commissions Test."

As further discussed in this part IV. of the Summary of Comments and Explanation of Revisions, commenters expressed appreciation for the inclusion of the Consumer Coverage Exception but

requested clarification of the Consumer Coverage Exception provisions and recommended changes to the exception, particularly with respect to the Commissions Test.

A. The Commissions Test

Several commenters recommended that the Commissions Test be eliminated from the Consumer Coverage Exception. One commenter recommended that if the Commissions Test is not eliminated from the Consumer Coverage Exception altogether, it should at least be eliminated for commercial insurers acting as Intermediaries (as such term is defined in proposed § 1.6011–10(b)(5)). Several commenters specifically requested the elimination of the Unrelated Commissions Test set forth at proposed § 1.6011–10(d)(2)(iv)(B), expressing concern about the ability of taxpayers to comply with the provision as written.

To explain why the Commissions Test should be eliminated, one commenter argued that commissions seemingly have no applicability to the validity of the insurance arrangement. Two commenters remarked on the lack of a basis for the 50 percent threshold in the Commissions Test, as set forth in proposed § 1.6011–10(d)(2)(iv)(A). The commenters suggested that use of this percentage to determine "abusiveness" of the transactions does not necessarily have any substantive connection to the economic realities of the transaction, which is negotiated at arm's length between customers and Sellers. Commenters noted that customers negotiate the purchase price of consumer coverage with Sellers without regard to the tax implications of Sellers' participation in the underwriting profit of the consumer coverage, and Sellers sometimes agree to lower prices and lower commissions, not for any tax-motivated reason, but because otherwise the customer will not buy the product. One of these commenters said that, as a result, the Commissions Test sets an "arbitrary" standard. The other commenter suggested that the proposed regulations would injure consumers by essentially requiring Sellers to caution their salespeople not to offer discounts, for fear of losing the Consumer Coverage Exception and triggering "transaction of interest" status. A third commenter noted that, for standard types of coverage written by commercial insurers, such as automobile service contracts, the market is strongly competitive, and the effect of the proposed regulations would be to reduce that competition by requiring consumers to pay a commission mark-

up on consumer coverage of at least 100 percent of the net premium charged by the insurer.

One of the commenters remarked that the 50 percent threshold in the Commissions Test would only make sense if the IRS had reason to believe that the sale of products at a lower rate is an indication of a non-market driven effort to artificially transfer otherwise taxable revenue to the micro-captive. The commenter asserted that, in over 30 years, the commenter had never seen this issue raised in examination, read cases of this happening, or heard that the IRS has actual evidence that it in fact occurs. The commenter further asserted that Consumer Coverage Arrangements "have already been examined, and deemed not to justify listed transaction treatment," as evidenced by the listing of certain consumer coverage transactions in Notice 2002–70, 2002–2 C.B. 765, and subsequent "de-listing" of those transactions in Notice 2004–65, 2004–2 C.B. 599. The commenter distinguished Consumer Coverage Arrangements from the micro-captive transactions determined by the Tax Court in recent cases not to be insurance for Federal tax purposes. To the extent the IRS has had successful Tax Court outcomes in the micro-captive area, the commenter asserted, those cases all concerned enterprise risk; none were concerned with unrelated third-party consumer risk arrangements.

Another commenter called the Commissions Test "vague, unworkable, anti-consumer and anti-competitive," asserting that the IRS should not be requiring, or even encouraging, payment of high commission rates as a condition of the exception. The commenter observed that the Commissions Test seems to be based upon section 482 of the Code transfer-pricing concerns rather than failure of risk transfer and risk distribution and lack of arm's-length dealing and sound business practices, the issues identified by the preamble to the proposed regulations as the focus of the proposed regulations. The commenter asserted that the real concern of the regulations should be to ensure that the net premiums paid to the Captive are not excessive. The commenter observed that commercial insurers writing consumer coverage for sale through dealers typically specify a schedule listing various products and the applicable net premium for each (that is, after the dealer's withheld commission) payable to the insurer for each, and that these net premiums are set by the commercial insurer based upon actuarial analysis of the risks to be covered. The commenter further

observed that the gross amount paid by the customer (including the amount above the specified net premium that the dealer retains as a commission) is subject to negotiation by each customer, and the commercial insurer may not be informed of the commission or who earns it.

To address this commercial insurer scenario, the commenter proposed a safe harbor from material advisor and participant status for commercial insurers acting as Intermediaries (as defined in proposed § 1.6011–10(b)(5)) in transactions that do not involve the payment of excessive premiums to the captive. However, because the proposed safe harbor would be for any commercial insurer acting as an Intermediary in a micro-captive transaction, unless the commercial insurer (or related company) retrocedes risks with respect to consumer products and pays a reinsurance premium in excess of an arm's length amount, the effect of this safe harbor would not be limited to Consumer Coverage Arrangements. Because the proposed safe harbor has implications beyond Consumer Coverage Arrangements, it is discussed in part V.B. of this Summary of Comments and Explanation of Revisions.

Commenters also remarked that elimination of the Commissions Test would make application of the Consumer Coverage Exception more streamlined and efficient and less burdensome. One of the commenters expressed concern that not all Sellers capture information about sales and commissions in a way that will facilitate calculation of "the fee, commission, or other remuneration earned by any person or persons, in the aggregate, for the sale of the Contracts, described as a percentage of the premiums paid by the Seller's customers." The commenter asserted that this additional cost and effort is not justified "to guard against a theoretical abuse in an industry where the Service has already found that insufficient evidence of abuse exists to justify listed transaction treatment."

After careful consideration of the comments received generally requesting the elimination of the Commissions Test and specifically requesting the elimination of the Unrelated Commissions Test, the Treasury Department and the IRS are persuaded that elimination of the Commissions Test in the Consumer Coverage Exception is appropriate. The tax avoidance or potential for tax avoidance that the Commissions Test intended to identify is distinguishable from the closely held arrangements associated with the fact patterns identified in

§§ 1.6011–10(a) and 1.6011–11(a); for example, the ultimate policyholders are commonly Unrelated Customers in Consumer Coverage Arrangements. Accordingly, the Commissions Test is eliminated from the Consumer Coverage Exception in the final regulations.

One commenter also sought clarification of certain aspects of the Commissions Test. However, because the Commissions Test is eliminated from the Consumer Coverage Exception in the final regulations, no further explanation is necessary.

### B. Restricting Consumer Coverage Arrangements Identified as Reportable Transactions Through Clarification of Defined Terms

The definition of "Insured" set forth in proposed § 1.6011–10(b)(4) and incorporated in proposed § 1.6011–11(b)(4) is "any person that conducts a trade or business, enters into a Contract with a Captive or enters into a Contract with an Intermediary that is directly or indirectly reinsured by a Captive, and treats amounts paid under the Contract as insurance premiums for Federal income tax purposes." One commenter on the Consumer Coverage Exception recommended that the final regulations clarify that this definition is not intended to include someone who is only covered by the policy for a momentary period of time during which the underlying sales transaction is being finalized. The commenter noted that the preamble appears to indicate that guaranteed asset protection (GAP) products are an example of a "dealer obligor" arrangement in which a Seller could be considered the Insured for a short transitory time period occurring between the time the covered product is delivered to the Unrelated Customer of Seller and the financing to purchase the product is finalized for the Unrelated Customer. The commenter asserted that such situations should not trigger a reporting obligation since this is a temporary condition arising solely from an administrative need to allow third parties to process paperwork.

Another commenter asked that the final regulations clarify that a Seller that only directly or indirectly reinsures Contracts that ultimately benefit Unrelated Customers, such as GAP contracts, is not an Insured, even if the Seller is technically a transitory or residual obligor under the contract. The commenter suggested that if this recommendation is not adopted, the definition of "Captive" set forth in proposed § 1.6011–10(b)(1) and incorporated in proposed § 1.6011–11(b)(1), should be modified to exclude any entity that only issues Contracts to

Insureds, where the ultimate beneficiaries of such contracts are Unrelated Customers, to the extent that the total percentage of issued and reinsured GAP and similar Contracts provided to Insureds of such entity do not exceed 25 percent of the total issued and reinsured Contracts for such entity. The commenter noted that this definition would remove burdensome compliance data collection from what is essentially a minority of the entity's contracts and would permit the IRS to focus on situations where there is greater potential for tax avoidance.

The final regulations make no change to the definitions of Insured and Captive in response to these comments. A Seller is an Insured only if it "enters into a Contract with a Captive or enters into a Contract with an Intermediary that is directly or indirectly reinsured by a Captive." A Seller is not an Insured if it facilitates an Unrelated Customer entering into a Contract with Seller's Captive or an Intermediary but is not itself a party to the Contract. A Seller is an Insured only if it treats amounts paid under the Contract as insurance premiums for Federal tax purposes. To the extent a Seller receives and makes payments under a Contract as an agent of a party or parties to the Contract, the Seller would not treat amounts paid under a Contract as insurance premiums for Federal tax purposes. As a general matter, therefore, a Seller that only facilitates the direct or indirect insurance or reinsurance of Contracts that ultimately benefit Unrelated Customers, such as GAP contracts, and does not reflect the tax benefits of participating in a purported insurance transaction in its filed returns, will not be an Insured that is a participant under these regulations. A Seller that satisfies all the requirements of the definition of Insured is appropriately considered an Insured. However, in recognition of concerns expressed by commenters that such situations could potentially arise, the final regulations retain the Consumer Coverage Exception, which may prevent a Consumer Coverage Arrangement in which a Seller (or related person) is an Insured from being identified as a Micro-captive Listed Transaction or Micro-captive Transaction of Interest.

### C. Revising Definition of Seller To Permit De Minimis Sales to Related Persons

The definition of "Seller" set forth in proposed § 1.6011–10(b)(9) and incorporated in proposed § 1.6011–11(b)(8) is "a service provider, automobile dealer, lender, or retailer that sells products or services to

Unrelated Customers who purchase insurance contracts in connection with those products or services.'' A commenter recommended modification of this definition to prevent an occasional sale of an automobile and insurance contract to a related party from disqualifying a Seller's Captive from the Consumer Coverage Exception. The commenter also stated it is important to clarify that it is not a requirement for all purchasers of insurance contracts to be Unrelated Customers for the dealer to be a Seller. The commenter asserted that there is a low risk of tax avoidance if a majority of the Contracts being insured or reinsured by a Seller's Captive are either directly sold to an Unrelated Customer or are for the ultimate benefit of an Unrelated Customer. The commenter suggested a de minimis exception for related party sales by establishing a five percent threshold for such transactions.

In response to these comments, § 1.6011–10(b)(9) of the final regulations clarify that a Seller is a service provider, dealer (including an automobile dealer), lender, wholesaler, or retailer that sells products or services to customers who purchase insurance contracts in connection with those products or services provided no more than five percent of all its sales of products or services to persons who purchase insurance contracts in connection with those products or services are to customers other than Unrelated Customers. Additionally, the Consumer Coverage Exception in §§ 1.6011–10(d)(2) and 1.6011–11(d)(2) of the final regulations is modified to require that no more than five percent of the Seller's Captive's business is issuing or reinsuring Contracts purchased by persons other than Unrelated Customers in connection with products or services sold by the Seller or persons Related (as defined in § 1.6011–10(b)(8) of the final regulations) to the Seller.

D. Other Requests for Clarification

A commenter asked for clarification of whether the Consumer Coverage Exception applies when the Seller's Captive neither assumes reinsurance from an unrelated fronting company, nor cedes reinsurance to an unrelated insurer. The Consumer Coverage Exception set forth in proposed § 1.6011–10(d)(2) and incorporated in proposed § 1.6011–11(d)(2) requires that ''Seller's Captive issue or reinsure some or all of the Contracts sold to Unrelated Customers in connection with the products or services being sold by the Seller,'' that ''100 percent of the business of the Seller's Captive is insuring or reinsuring Contracts in

connection with products or services being sold by the Seller or persons Related to the Seller,'' and that the Commissions Test set forth in proposed § 1.6011–10(d)(2)(iv) is met with respect to ''the Contracts issued or reinsured by the Seller's Captive.'' The involvement of an unrelated fronting company or other unrelated insurer is not required.

The commenter also asked if the Consumer Coverage Exception is intended to apply if Seller's Captive directly insures an entity related to or affiliated with Seller for certain contracts described in the proposed regulations but without fronting or reinsurance attached. The Consumer Coverage Exception set forth in the proposed regulations would not apply in these circumstances because the Seller's Captive is insuring an entity related to or affiliated with Seller (rather than Unrelated Customers of Seller). This would be the case whether or not a fronting company or reinsurer were involved. However, as discussed in part IV.C of this Summary of Comments and Explanation of Revisions, under §§ 1.6011–10(d)(2)(iv) and 1.6011–11(d)(2) of the final regulations, the Consumer Coverage Exception may apply when a Seller's Captive issues or reinsures Contracts purchased by persons other than Unrelated Customers in connection with products or services sold by the Seller or persons related to Seller, provided that no more than five percent of the Seller's Captive's business is issuing or reinsuring such Contracts. Accordingly, the Consumer Coverage Exception set forth in the final regulations would potentially apply in the circumstances described by the commenter.

A commenter suggested that ''coverage for incurring diminished value'' should be considered a type of consumer coverage. The preamble to the proposed regulations explains that a ''Consumer Coverage contract generally provides coverage for repair or replacement costs if the product breaks down or is lost, stolen, or damaged; coverage for the customer's payment obligations if the customer dies or becomes disabled or unemployed; coverage for the difference between all or a portion of the value of the product and the amount owed on the product's financing, including a lease, if the product suffers a covered peril; or a combination of one or more of the foregoing types of coverage.'' However, this is a non-exclusive list. The Consumer Coverage Exception may apply when a Seller's Captive issues or reinsures Contracts in connection with the products or services being sold by the Seller. Such Contracts could include

those providing coverage for incurring diminished value.

Another commenter noted that warranty products are also widely sold and reinsured outside the automotive space and often in the business-to-business environment, suggesting that this should be taken into account when drafting terminology in the final regulations related to consumer products and seller captive concepts. The description of the Consumer Coverage Exception and related definitions use generic terms intended to encompass a broad range of products and services, not limited to automotive products and services. Nonetheless, in response to this commenter's apparent concern that the Consumer Coverage Exception as proposed may exclude arrangements ''in the business to business environment,'' the final regulations clarify that the term Seller includes a wholesaler that sells products or services to customers who purchase insurance contracts in connection with those products or services.

Finally, one commenter asked that the final regulations apply prospectively to Seller's Captives, meaning reporting would be required with respect to Seller's Captives only for taxable years subsequent to the effective date of the final regulations, because otherwise a number of legitimate captives would be subjected to very burdensome information gathering, testing, and reporting for a very small amount of premium income per captive. The commenter suggested that changes such as a 50 percent commission threshold should be applied on a prospective basis only to provide notice to taxpayers. As discussed in the preamble to the proposed regulations, as a general matter, participation in Consumer Coverage Arrangements is neither a Micro-captive Listed Transaction nor a Micro-captive Transaction of Interest because the insured is not sufficiently related to the insurer or any reinsurer. The proposed regulations were not intended to change this, but nonetheless provide a potential exception for taxpayers considered to be participating in a reportable Consumer Coverage Arrangement. The clarifications and changes to the proposed regulations described in this part of the Summary of Comments and Explanation of Revisions are only intended to provide further reassurance that Consumer Coverage Arrangements generally do not give rise to a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest. Further, if the Consumer Coverage Exception for Seller's Captives applied only to taxable

years after the regulations are effective as suggested by the commenter, then the exception would not apply to otherwise open taxable years for which reporting would be required. This would disadvantage taxpayers who otherwise may have qualified for the Consumer Coverage Exception in open taxable years. Consequently, the final regulations do not adopt any changes in response to this comment.

*V. Comments and Changes Relating to Identification as Reportable Transactions and Reporting Requirements*

A. Comments Relating to Safe Harbors From Identification as Reportable Transactions

1. Proposed Safe Harbors for Amended Returns

A commenter requested a change to the proposed regulations that would allow taxpayers who file amended returns that remove tax benefits previously recognized from participation in the micro-captive transaction to not be designated as participating in a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest. Taxpayers who file amended returns after the due date, including extensions, are considered participants in the transaction if their transaction otherwise meets the description of a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest because their original return reflects the tax benefits of participation. In order for the IRS to obtain a complete picture of participation in these transactions, such taxpayers must file disclosures. However, a taxpayer whose timely-filed amended return is treated as the original return for the taxable year (that is, a superseding return) is not considered to have filed a return reflecting the tax benefits of participation in the transaction and would not be required to file disclosures under the final regulations. Further, whether amended returns determine participation is outside the scope of these regulations and the final regulations do not adopt any changes based on this request.

Several commenters expressed concern that the proposed regulations would require taxpayers to amend returns for approximately three to four taxable years prior to the promulgation of these regulations as final regulations. The regulations do not require taxpayers to file an amended return or an Administrative Adjustment Request (AAR) for certain partnerships. The proposed regulations would require taxpayers whose transactions are described in either § 1.6011–10(c) or § 1.6011–11(c) to file a disclosure statement in the form and manner prescribed by § 1.6011–4. The preamble to the proposed regulations acknowledged that because the IRS will take or may take a position that taxpayers are not entitled to the purported tax benefits, taxpayers who have filed tax returns taking such positions should consider filing an amended return or AAR. The preamble to the proposed regulations provided a method for filing such amended returns or AARs, if so desired. The final regulations do not adopt any changes pursuant to these comments.

2. Proposed Safe Harbors for Captives With Certain Features

Commenters requested that the IRS clarify whether taxpayers who issue premium refunds or policyholder dividends to meet the Loss Ratio Factor will be designated as participating in a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest. As described more fully in part II. of this Summary of Comments and Explanation of Revisions, the Loss Ratio Factors compare the amount of liabilities incurred for insured losses and claim administration expenses to the premiums earned less policyholder dividends paid by the Captive, over the course of the defined Computation Periods. Thus, if a taxpayer issues premium refunds or policyholder dividends, either of which would reduce the amount to which liabilities for insured losses and claim administration expenses over the relevant Computation Period are compared, the relevant loss ratio for purposes of identification as a Micro-captive Listed Transaction or Micro-captive Transaction of Interest will be higher. Further, as described more fully in parts II.B. and III. of this Summary of Comments and Explanation of Revisions and as clarified in the bright-line rules of § 1.6011–10(e) of the final regulations, only taxpayers participating in a transaction that (1) involves a Captive that elects under section 831(b) to include in taxable income only taxable investment income (defined in section 834) in lieu of the tax imposed under section 831(a) (that is, to exclude premiums from taxable income) and (2) meets both the Financing Factor and the Loss Ratio Factor, will be designated as participating in a Micro-captive Listed Transaction under the final regulations. That is, if Captive's loss ratio is 30 percent or more for the Listed Transaction Loss Ratio Computation Period, or if the Captive does not meet the Financing Factor, the transaction is not identified as a Micro-captive Listed Transaction. With respect to Micro-captive Transactions of Interest, if the taxpayer does not meet the Financing Factor, and has effectively lowered the percentage of premiums earned as compared to liabilities incurred for claims and administration by issuing policyholder dividends, the transaction is not identified as a Micro-captive Transaction of Interest under the final regulations. That is, if Captive's loss ratio is 60 percent or more for the Transaction of Interest Loss Ratio Computation Period as set forth in § 1.6011–11(b)(2) and Captive has not made Captive's capital available in a way that furthers the deferral of tax, the taxpayer is already not a participant in a Micro-captive Transaction of Interest. This is clarified in the final regulations setting forth the bright-line rules at § 1.6011–11(e).

One commenter recommended that a transaction should not be designated as a Micro-captive Listed Transaction or Micro-captive Transaction of Interest if the Captive has paid claims in any amount, there is an annual rate and reserve study conducted by a qualified actuary, and there is commercial coverage available for the risks covered by the Captive. The commenter indicated that all of these factors together should be sufficient to demonstrate that a micro-captive transaction was not entered into for tax avoidance purposes. Several other commenters asserted that taxpayers who can demonstrate that the premiums charged in their transaction were actuarially determined by a credentialed actuary should not be designated as participating in a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest. Additional commenters suggested that the existence of a feasibility study prepared by a credentialed actuary, or a third-party transfer pricing memorandum certifying the transaction, would provide better metrics for identification as a listed transaction or transaction of interest, and transactions for which such feasibility studies or third-party transfer pricing memoranda have been prepared should not be designated as participating in a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest.

With respect to proposed safe harbors involving claims, the Treasury Department and the IRS are aware of promoters encouraging the filing of claims under contracts that the parties treat as insurance contracts to establish the appearance of a legitimate insurance arrangement, regardless of business need. Because these transactions

involve closely held related entities, there is little to no barrier to the manufacture of claims in these arrangements. Further, in many of the micro-captive cases tried to date, the handling of claims was atypical of valid insurance arrangements, with claims paid despite lacking in substantiation and under the direction of the Insured or its Owners without regard to the validity of the claim. *See, e.g., Caylor,* T.C. Memo. 2021–30, at *42–43; *Keating,* T.C. Memo. 2024–2, at *63–64. The existence of paid claims in any amount is therefore not a viable metric for distinguishing between transactions that are or may be tax avoidance transactions and those that are not.

With respect to the involvement of an actuary or other professional in the transaction, as observed in *Avrahami* and discussed more fully at part II.E.1. of this Summary of Comments and Explanation of Revisions, such involvement does not establish that the arrangement is not, and does not have the potential to be, a tax avoidance transaction, and further is not dispositive of a valid transaction for Federal tax purposes.

Similarly, with respect to Captives covering risks for which commercial coverage is available, the presence of such risks is not dispositive of the validity of a transaction. Many abusive micro-captive transactions involve purported risks that would be a typical insurance risk for another company but would be inappropriate for the Insured to purchase given the nature of the Insured's business, such as construction coverage for an entity that ''wasn't constructing anything.'' *Avrahami,* 149 T.C. at *196.

In all micro-captive cases tried to date, courts have found the arrangement at issue not to be insurance for Federal tax purposes even though the factors identified by the commenters as appropriate for safe harbors were present—claims were paid; an actuary or other professional prepared pricing reports, feasibility studies, or the like in the transaction; and the captive covered some typical insurance-type risks. *See Avrahami,* 149 T.C. at *149–52, 167, 186–87, 195–97; *Syzygy,* T.C. Memo. 2019–34, at *15–17, 35, 44; *Caylor,* T.C. Memo. 2021–30, at *14, 19–23, 25–26, 48–49; *Keating,* T.C. Memo. 2024–2, at *14, 20–25, 30, 33, 35, 63–64; *Swift,* T.C. Memo. 2024–13, at *12, 15–17, 44; *Patel,* T.C. Memo. 2024–34, at *9, 14–22, 29–30, 50–51; *Royalty Mgmt.,* T.C. Memo. 2024–87, at *16–17, 21, 47; *see also Reserve Mech.,* T.C. Memo. 2018–86, at *9, 11–20, 47–48, 61. Accordingly, the final regulations provide no exclusion from identification

as a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest in response to these comments.

One commenter argued that if the following facts are present, the transaction should be excepted from identification as either a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest: (a) 90 percent of the coverage written is coverage that is commercially available, (b) Insureds purchase or have purchased such coverage from commercial carriers in a similar amount to what is now purchased from the Captive, (c) the commercial carrier has credible loss experience for the types of coverage in the Insured's location, and (d) commercial rates are used to extrapolate the Captive's premiums, taking into account the Captive's expenses and layers written.

As discussed in this part V.A.2. of the Summary of Comments and Explanation of Revisions, the coverage of risks for which commercial coverage is available does not guarantee the validity of the transaction. The Tax Court has held multiple arrangements did not qualify as insurance arrangements for Federal tax purposes despite purporting to cover such risks. *See, e.g., Avrahami,* 149 T.C. at 150, 153–56, 159, 197 (administrative actions and employee fidelity); *Keating,* T.C. Memo. 2024–2, at *20–27, 64 (workers' compensation); *Swift,* T.C. Memo. 2024–13, at *7–8, 12, 14–15, 44 (medical malpractice and terrorism); *Patel,* T.C. Memo. 2024–34, at *15–20, 51 (business interruption and regulatory). Further, Insureds' purchase of such coverage from commercial carriers in a similar amount to what is now purchased from the Captive does not guarantee the validity of the transaction. The availability of commercial coverage may indicate a lack of a business need for captive coverage. *See, e.g., Keating,* T.C. Memo. 2024–2, at *59–60 (petitioners provided no credible evidence of a business need for captive coverage in light of comprehensive commercial coverage). Additionally, the commenter did not clarify whether the purchase of coverage from commercial carriers in a similar amount to what is now purchased from the Captive would include duplicative coverage, coverage of different layers of risk, or both. The commenter did not specify what commercial markets or rates are relevant nor what constitutes a ''similar amount'' or a ''credible loss experience'' sufficient to exempt the participant's identification under these regulations. Nor did the commenter explain how the experience of a commercial insurer would be known to the participants in the micro-captive

transaction. The suggested factors are too subjective and complex to be administrable, and sufficient relief is afforded by the changes to the Loss Ratio Factors described in parts II.B. and II.C. of this Summary of Comments and Explanation of Revisions.

One commenter recommended that transactions with Captives that have been rated highly by an independent third-party credit or rating agency specializing in insurance should not be designated as a Micro-captive Listed Transaction or Micro-captive Transaction of Interest. In general, such agencies rate the financial strength of Captives, that is, the ability to pay claims should they arise. Thus, their ratings are not informative regarding the nature of an entity or a transaction for Federal tax purposes. This recommendation is not adopted in the final regulations.

A commenter suggested that transactions with Captives that are licensed or domiciled in a jurisdiction that regulates many Captives should not be designated as a Micro-captive Listed Transaction or Micro-captive Transaction of Interest. The commenter also suggested that taxpayers whose Captive uses template insurance policies accepted by the State regulator, or whose Captive offers coverage that has been accepted as adequate proof of insurance by other State or Federal agencies, should not be designated as a Micro-captive Listed Transaction or Micro-captive Transaction of Interest. Another commenter recommended a broader exception for all State-licensed domestic captives.

However, whether a captive is regulated in a given domicile does not determine whether a transaction is abusive or has the potential for abuse for Federal tax purposes. *See, e.g., Avrahami,* 149 T.C. at 192 (captive regulated in St. Kitts); *Syzygy,* T.C. Memo. 2019–34, at *38 (captive regulated in Delaware); *Caylor,* T.C. Memo. 2021–30, at *41 (captive regulated in Anguilla); *Keating,* T.C. Memo. 2024–2, at *53 (captive regulated in Anguilla); *Swift,* T.C. Memo. 2024–13, at *37 (captive regulated in St. Kitts); *Patel,* T.C. Memo. 2024–34, at *46 (captives regulated in St. Kitts and Tennessee, respectively); *cf. Royalty Mgmt.,* T.C. Memo. 2024–87, at *43–44 (no regulatory oversight in Tribal domicile). As each micro-captive case describes, whether a company is organized and regulated as an insurance company is not the end of the inquiry, as courts ''must look beyond the formalities and consider the realities of the purported insurance transaction.'' *Hospital Corp. of Am.* v. *Commissioner,*

T.C. Memo. 1997–482, 1997 WL 663283, at *24 (*citing Malone & Hyde, Inc.* v. *Commissioner,* 62 F.3d 835, 842–43 (6th Cir. 1995)). In the micro-captive transactions identified as transactions that are or may be tax avoidance transactions, the realities of the purported insurance transaction, including the closely held nature of the arrangement, the section 831(b) election, and the use of premiums primarily for investment or related-party financing (rather than to pay losses) indicate tax avoidance or the potential for tax avoidance. Further, a safe harbor identifying a specific domicile or specific domiciles would require the IRS to evaluate the manner in which the respective domicile regulates insurance, which would be administratively burdensome and inject uncertainty. Accordingly, the final regulations do not adopt these suggestions.

A commenter indicated that taxpayers whose Captive covers risks with a specified number of Insureds or risk units, or pools risk with a specified distribution of the risk of loss, should not be designated as participating in a Micro-captive Listed Transaction or Micro-captive Transaction of Interest. However, these aforementioned factors only relate to the degree to which a transaction distributes risk. Risk distribution is just one of the four prongs used by the courts in determining whether an arrangement qualifies as insurance for Federal tax purposes and does not alone establish that a transaction has no potential for tax avoidance. *See* part I. of the Background section of this Preamble for further explanation of the four-prong test. The final regulations do not adopt these suggestions.

### 3. Captives Providing Certain Types of Coverage or Serving Certain Industries

Other commenters suggested that taxpayers who can demonstrate that the Captive directly or indirectly reinsures contracts issued by a commercial carrier should not be designated as participants in a Micro-captive Listed Transaction or Micro-captive Transaction of Interest. The final regulations do not adopt this suggestion. First, as discussed in part V.A.2. of this Summary of Comments and Explanation of Revisions, the involvement of commercially covered risks in the transaction does not guarantee the validity of the transaction. The commenter did not specify what commercial carriers are relevant nor what portion of reinsurance would be sufficiently significant to exempt the participants from identification under these regulations. Second, if the entirety of a captive's business is the reinsurance

of a commercially rated program, it is less likely that the transaction would be described by these regulations, as the individuals or entities insured would not be sufficiently related to the captive to meet the 20 Percent Relationship Test. Accordingly, a safe harbor based on a Captive's direct or indirect reinsurance of contracts issued by a commercial carrier is not appropriate.

A commenter recommended that taxpayers who operate as risk retention groups pursuant to the Federal Liability Risk Retention Act (FLRRA), 15 U.S.C. 3901, *et. seq.,* should not be designated as participating in a Micro-captive Listed Transaction or Micro-captive Transaction of Interest because the FLRRA establishes that a risk retention group licensed in one State can transact business as an insurance company in every State, and the IRS does not have the authority to repeal the FLRRA. A risk retention group is "a group-owned insurer organized for the purpose of assuming and spreading the liability risks to its members." *NAIC Glossary of Insurance Terms, https://content. naic.org/glossary-insurance-terms* (last visited Jan. 6, 2025). Risk retention groups formed pursuant to the FLRRA are unlikely to be described by the proposed regulations as they would have too many member-owners to satisfy the 20 Percent Relationship Test. Further, the proposed regulations do not repeal the FLRRA. By identifying certain micro-captive transactions as reportable transactions, the proposed regulations impose disclosure requirements and provide notice that the tax treatment of the transactions will or may be challenged by the IRS. They do not in any way prevent any taxpayer from transacting business as an insurance company. The final regulations do not adopt this recommendation.

Commenters expressed concern that community banks in particular will be negatively impacted by the proposed regulations to the detriment of their communities. Commenters recommended that community banks as a whole be exempted from identification as a Micro-captive Listed Transaction. Regardless of the industry, taxpayers engaged in transactions identified as listed transactions or transactions of interest in the final regulations must disclose such participation. There is no one industry whose constituents should be categorically exempted from identification as a Micro-captive Listed Transaction or as a Micro-captive Transaction of Interest. Adverse impacts to individual taxpayers or specific industries consequent to implementation of these regulations are

limited to disclosure and recordkeeping requirements and are outweighed by the public interest in sound tax administration. Accordingly, the final regulations do not adopt any changes in response to this concern.

A commenter argued for an exception for any micro-captive that "writes 'deductible reimbursement' policies for the deductible or self-insured retention ('SIR') layer(s) underlying policies issued by Licensed Insurers and uses comparable rates taking into account the layer written and [the] micro-captive's expenses." The commenter did not provide any additional explanation, including why such an exception was appropriate. To the extent a transaction involving a Captive writing such policies otherwise falls within the description of Micro-Captive Listed Transaction or Micro-Captive Transaction of Interest, the transaction remains one that is or may be a tax avoidance transaction. The final regulations do not adopt any changes based on this comment.

### B. Comments Relating to Reporting Required Under Proposed §§ 1.6011–10(g) and 1.6011–11(g), Pursuant to § 1.6011–4(d) and (e)

With respect to Micro-captive Listed Transactions, proposed § 1.6011–10(g) would provide that participants must disclose their participation in the transaction pursuant to § 1.6011–4(d) and (e). Similarly, with respect to Micro-captive Transactions of Interest, proposed § 1.6011–11(g) would provide that participants must disclose their participation in the transaction pursuant to § 1.6011–4(d) and (e).

Section 1.6011–4(d) and (e) provides that the disclosure statement—Form 8886 (or successor form)—must be attached to the taxpayer's tax return for each taxable year for which a taxpayer participates in a reportable transaction. A copy of the disclosure statement must be sent to the OTSA at the same time that any disclosure statement is first filed by the taxpayer pertaining to a particular reportable transaction. Section 1.6011–4(e)(2)(i) provides that if a transaction becomes a listed transaction or a transaction of interest after the filing of a taxpayer's tax return reflecting the taxpayer's participation in the transaction and before the end of the period of limitations for assessment for any taxable year in which the taxpayer participated in the transaction, then a disclosure statement must be filed with the OTSA within 90 calendar days after the date on which the transaction becomes a listed transaction or transaction of interest. This requirement extends to an amended return and exists

regardless of whether the taxpayer participated in the transaction in the year the transaction became a listed transaction or transaction of interest.

Proposed §§ 1.6011–10(g)(2) and 1.6011–11(g)(2) would provide relief from disclosure for participants in Micro-captive Listed Transactions and Micro-captive Transactions of Interest, respectively, who have finalized settlement agreements with the IRS with respect to the transaction. Such taxpayers do not need to disclose their participation in the transaction for years covered by the settlement agreement. Proposed § 1.6011–11(g)(2) provides similar relief for participants in a Micro-captive Transaction of Interest who disclosed their participation in the transaction under Notice 2016–66 and file no more returns reflecting participation in the transaction after the final regulations are finalized.

One commenter expressed concern that settlements in litigation are not covered by the disclosure relief for taxpayers who have finalized settlement agreements that would be provided in proposed §§ 1.6011–10(g)(2) and 1.6011–11(g)(2). This provision in the proposed regulations is intended to cover settlement agreements with respect to the transaction reached in litigation or during the course of examination. The final regulations clarify this provision by explicitly referencing litigation. *See* §§ 1.6011–10(h)(2) and 1.6011–11(h)(2) of the final regulations.

Another commenter argued that excusing taxpayers from filing disclosure statements if they have finalized a settlement agreement with the IRS is an illusory reporting exemption because the IRS effectively requires Captives to wind up and liquidate as part of certain private settlement agreements. However, if this provision was removed from the regulations, taxpayers who had conclusively settled taxable years under audit that would otherwise be subject to the reporting requirements in the regulations would be forced to disclose for those years. It may not be clear that such disclosure would be unnecessary and, accordingly, the final regulations retain the exception.

One commenter stated that reporting more than once is unjust to taxpayers and suggested that Form 8886 should only have to be filed with the IRS once with respect to each Micro-captive Listed Transaction or Micro-captive Transaction of Interest. Consistent with § 1.6011–4, participation in a listed transaction that involves a purported insurance arrangement means that the taxpayer is claiming tax benefits each

year to which the taxpayer is not entitled. Similarly, participation in a transaction of interest that involves a purported insurance arrangement means that the taxpayer may be claiming tax benefits each year to which the taxpayer may not be entitled (that is, the IRS needs more information to determine whether the transaction is a tax avoidance transaction). As discussed in part I.C. of this Summary of Comments and Explanation of Revisions, the reporting rules for listed transactions and transactions of interest under § 1.6011–4 are outside the scope of these final regulations. The final regulations do not adopt any changes based on this comment; taxpayers must disclose their participation for each year in which such tax benefits are claimed unless otherwise relieved of the obligation in the regulations.

A commenter requested an expansion of the proposed safe harbors set forth at §§ 1.6011–10(e)(2) and 1.6011–11(e)(2) (''Disclosure Safe Harbor for Owners''), which provide that an Owner of an Insured is not required under § 1.6011–4 to file a disclosure statement with respect to a Micro-captive Listed Transaction or Micro-captive Transaction of Interest provided that person receives written or electronic acknowledgment that Insured has or will comply with its separate disclosure obligation under § 1.6011–4(a) with respect to the transaction. The preamble to the proposed regulations explained that the receipt of an acknowledgment that Insured has or will comply with its disclosure obligation does not relieve the Owners of Insured of their disclosure obligations if Insured fails to disclose the transaction in a timely manner. The commenter requested that an Owner that relies on an acknowledgment pursuant to this safe harbor should be allowed to rely solely on the acknowledgement and should not also need to confirm that the Insured actually timely disclosed the transaction. However, such a position could result in non-filing by both an Owner and the Insured. To ensure that Insureds file, or Owners file if the Insured fails to do so, the final regulations do not adopt this recommendation.

Commenters also requested that the final regulations expand the Disclosure Safe Harbor for Owners to all Insured entities for transactions in which the Captive entity reported, or to all Captive entities for transactions in which the Insured reported. The final regulations do not adopt this request because unlike Owners, who must only disclose the information required by § 1.6011–10(g)(1), Captives and Insureds must

also provide the information required by § 1.6011–10(g)(2) and (3), respectively. *See* §§ 1.6011–10(g) and 1.6011–11(g) of the final regulations.

Commenters suggested that transactions for which disclosure statements were filed under Notice 2016–66 should not be required to report under the proposed regulations. Proposed §§ 1.6011–10(g)(2) and 1.6011–11(g)(2) already limit the disclosure requirements to taxpayers who have filed a tax return (including an amended return) reflecting their participation in a Micro-captive Listed Transaction or Micro-Captive Transaction of Interest prior to January 14, 2025, and who have not finalized a settlement agreement with the IRS with respect to the transaction. Additionally, proposed § 1.6011–11(g)(2) already provides that taxpayers who have filed a disclosure statement regarding their participation in a transaction identified by the proposed regulations as a Micro-captive Transaction of Interest with the OTSA pursuant to Notice 2016–66, will be treated as having made the disclosure pursuant to the final regulations for the taxable years for which the taxpayer filed returns before the January 14, 2025. Similar relief should not be extended with respect to any transaction identified by the proposed regulations as a Micro-Captive Listed Transaction because disclosure statements filed under Notice 2016–66 do not identify participation in a listed transaction. The final regulations do not adopt any changes based on this comment.

One commenter stated that the requirement that taxpayers participating in transactions that become listed transactions under the proposed regulations must file again under the final regulations, even if they already filed Forms 8886 pursuant to Notice 2016–66, is duplicative and a waste of taxpayers' time because the IRS already has most of the necessary information about these transactions, and there is little marginal value to the IRS in obtaining another round of filings. The commenter suggested that there is no justification for this other than a transparent effort by the Treasury Department and the IRS to extend the applicable statute of limitations period under section 6501(c)(10) unilaterally for years where the limitations period has expired or is about to (such as 2021, for instance) and that requiring material advisors to file Forms 8918 with the OTSA, again irrespective of whether they previously filed under Notice 2016–66, is similarly unnecessary. The commenter asserts that both these duplicate filing requirements run contrary to the Paperwork Reduction

Act (44 U.S.C. 3507(c)) and are themselves abusive.

This additional disclosure for listed transactions is needed because Notice 2016–66 only identified transactions of interest, so disclosure pursuant to Notice 2016–66 does not disclose that a transaction meets the threshold for listed transactions under the proposed regulations. Further, for Micro-captive Transactions of Interest, there are differences between the proposed regulations and Notice 2016–66 in both the scope of transactions identified and the information required to be disclosed. The final regulations also significantly narrow the scope of transactions identified as Micro-captive Listed Transactions compared to the proposed regulations, as further discussed in part II. of this Summary of Comments and Explanation of Revisions. Accordingly, disclosure under the final regulations will provide the IRS with new information, including identifying transactions that are now listed, and will not create unnecessary duplicative reporting requirements. The final regulations do not adopt any changes based on this comment.

Commenters asserted that the requirement in § 1.6011–4(e)(2)(i) (to report to the OTSA) is unfair because it will require some taxpayers who were already subject to audits that closed without adjustment (to Captive) to report under this provision. Similarly, other commenters suggested that taxpayers who are under examination should not have to disclose because the IRS will have access to detailed taxpayer records through the examination process and should not need Form 8886 disclosures to identify participation in the transaction. The Form 8886 disclosure statements to the OTSA and the IRS are necessary, even if a taxpayer is in examination for the reporting year or was examined in an earlier year. While the IRS endeavors to resolve all tax issues in a given examination, examination may be specific to a given issue or return that does not clearly address the tax benefits of participating in a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest. The final regulations do not adopt these suggested changes.

A commenter requested that taxpayers who are commercial insurers acting as Intermediaries (as defined in proposed § 1.6011–10(b)(5)) and material advisors to such commercial insurers be excepted from reporting because commercial insurers ceding risks to a reinsurer need to be certain that the reinsurer will satisfy its financial obligations to the ceding company, a need that is generally met by requiring that the reinsurer provide security. With security in place, the commenter states that there is no business reason for the ceding company to investigate the reinsurer's ownership, tax status, overall loss ratio (including any other business the reinsurer may write), or financing practices. The final regulations do not adopt this suggestion. Commercial insurers acting as Intermediaries should know as part of their due diligence the nature of the entity with which they have contracted. The material advisors to such commercial insurers, similarly, should know as part of their due diligence the nature of the transaction about which they are providing advice. Also, as a general matter, the most likely type of micro-captive transaction involving a commercial insurer is a Consumer Coverage Arrangement. The final regulations have significantly broadened the reporting exception set forth in the proposed regulations for Consumer Coverage Arrangements to eliminate their possible identification as a Micro-captive Listed Transaction, as discussed more fully at part IV. of this Summary of Comments and Explanation of Revisions, which should afford sufficient relief to commercial insurers acting as Intermediaries.

## VI. Other Comments and Requested Changes to the Proposed Regulations

In addition to comments on the authority of the Treasury Department and the IRS to issue the proposed regulations, specific comments on the Loss Ratio Factor and the Financing Factor, comments on the Consumer Coverage Exception, and comments seeking safe harbors from identification as or disclosure of a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest, commenters expressed additional concerns, sought clarification, and recommended additional changes to the proposed regulations.

### A. Request for Clarification Regarding Effect on Cannabis Businesses

One commenter stated that because the sale of cannabis constitutes "trafficking in controlled substances" under section 280E, cannabis businesses may not claim deductions for amounts paid or incurred during the taxable year, including amounts paid for insurance premiums. The commenter asked for guidance on how the proposed regulations will impact the cannabis industry. A cannabis business that enters into a Contract with a Captive would be an Insured under the proposed regulations if it treats amounts paid under the Contract as insurance premiums for Federal income tax purposes, even if it cannot deduct such amounts. Accordingly, a transaction between a cannabis business and Captive may meet the definition of a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest under the proposed regulations. Any taxpayer engaged in such a transaction would be subject to the disclosure requirements set forth in the proposed regulations, except as otherwise provided therein, if their returns reflect the tax consequences of participation in the transaction. The tax return of an Insured that cannot deduct an amount paid or incurred for purported insurance payments by operation of section 280E is not likely to reflect the tax consequences of participation in a Micro-captive Listed Transaction or Micro-captive Transaction of Interest, and therefore, the Insured will likely not be a "participant" in the transaction under these regulations. However, others involved in the transaction, such as Captive, which generally will exclude amounts received as premiums from income based on the position that it is an insurance company, would therefore reflect the tax consequences of participation in their returns, and may nonetheless be considered "participants" subject to the disclosure requirements set forth in these regulations.

### B. Comments Regarding the 20 Percent Relationship Test

Some commenters suggested that the 20 Percent Relationship Test set forth in proposed § 1.6011–10(b)(1)(iii) and incorporated in proposed § 1.6011–11(b)(1) is inconsistent with the diversification requirements of section 831(b)(2)(B) as enacted pursuant to the PATH Act. One part of the PATH Act diversification requirements is based on the percentage of premiums from related insureds, requiring that no more than 20 percent of net written premiums (or if greater, direct written premiums) for a taxable year is attributable to any one policyholder. The other part is based on the relative concentration of ownership in an insurance company and its policyholders. An insurance company must meet one of the PATH Act diversification requirements to make a section 831(b) election. However, the PATH Act diversification requirements are not sufficient to eliminate the possibility that a transaction is or may be a tax avoidance transaction. The final regulations describe fact patterns that strongly indicate tax avoidance or the potential for tax avoidance by entities that make a section 831(b) election and share a concentration in ownership with

any policyholder that exceeds the 20 Percent Relationship Test. The final regulations do not adopt any changes based on these comments.

Another commenter requested clarification regarding what kinds of derivatives will cause a taxpayer to meet the 20 Percent Relationship Test. The commenter expressed concern that as risk management vehicles, derivatives are not comparable to ownership of an entity through stock. To be clear, any derivative that is derived from a direct or indirect interest in the assets held by the Captive or the Captive's stock is included in the definition of Owner for the Captive. Any derivative that is derived from a direct or indirect interest in the assets held by the Insured or the Insured's stock is included in the definition of Owner for the Insured. While the commenter asserted that derivatives are generally used for risk management, the Treasury Department and the IRS are aware of promoters of abusive micro-captive transactions using derivatives to replicate ownership interests, specifically in response to Notice 2016–66. For example, a taxpayer may enter into a derivative contract such as a tracking stock warrant with respect to a Captive's stock. Such a contract would lack the voting rights or equity interest considered ownership under Notice 2016–66, but the taxpayer is provided with the same or similar economic benefits as owning the Captive directly through its eligibility to exercise the warrant to obtain one or more shares in the Captive. The final regulations do not adopt any changes based on this comment.

One commenter argued that the 20 Percent Relationship Test is contrary to the micro-captive concept, asserting that micro-captives are typically structured with a single owner, who has a single business, that is also the sole policyholder of the micro-captive. The commenter appeared to suggest that section 831(b) was intended specifically for the benefit of such micro-captives, but this is not consistent with the history of section 831(b). Section 831(b) arose out of tax laws specific to certain small and mutual insurers, which are traditionally held by their members in a given geographical location "solely for the protection of their own property and not for profit." Revenue Act of 1914, Public Law 63–217, 38 Stat. 745, 762. These small insurers, including groups of farmers and fire associations, were exempt from ordinary income tax laws and were understood to collect funds only up to what was needed for losses and expenses. *See* H.R. Rep. No. 69–1, at 9 (1925). Under the current Code, these and other types of small insurers

use section 831(b) to exclude premiums from taxable income. Accordingly, while the Code does contemplate small insurers, such contemplation is not specific to a single captive covering a sole policyholder. The inclusion of the 20 Percent Relationship Test in the proposed regulations was intended to exclude entities such as the mutual insurers, which are more likely to have diversified ownership and thus have significantly reduced potential for tax avoidance. The final regulations do not adopt any changes based on this comment.

C. Recommendations To Eliminate or Delay Some or All of the Proposed Regulations

Commenters recommended that the proposed regulations identifying Micro-Captive Listed Transactions should not be finalized. Commenters noted that captive transactions can differ significantly from one transaction to the next and because the test for whether a transaction is insurance for Federal tax purposes is a totality of the circumstances inquiry, it is unreasonable to designate any category of transactions as transactions known to be abusive. The final regulations do not adopt this recommendation. However, the final regulations significantly narrow the scope of § 1.6011–10 to decrease the likelihood that transactions that are not tax avoidance transactions are identified as listed transactions. As commenters noted, the IRS has received information on micro-captive transactions, whether in response to Notice 2016–66 or as part of examinations or litigation, for many years. The IRS is confident from its review of examinations and case law that the fact pattern described in the final regulations is a fact pattern that consistently gives rise to tax avoidance.

Commenters recommended that finalization of these regulations be postponed until a decision is reached in *Loper Bright Enterprises* v. *Raimondo,* Sup. Ct. Dkt. No. 22–451 (*certiorari* granted on the question of "[w]hether the Court should overrule *Chevron* or at least clarify that statutory silence concerning controversial powers expressly but narrowly granted elsewhere in the statute does not constitute an ambiguity requiring deference to the agency"). The Supreme Court issued its decision in this case on June 28, 2024, and as such, this recommendation is moot. *Loper Bright Enterprises* v. *Raimondo,* 144 S.Ct. 2244 (2024). Further, as described more fully in the Authority section of this preamble, sections 6011 and 7805(a) provide express delegations of authority

to the Secretary to identify the form and manner of taxpayer filing requirements and make rules, respectively. Section 6707A provides an express delegation of authority to identify reportable transactions. The final regulations do not adopt any changes based on these comments.

Commenters recommended modification of Form 1120–PC, *U.S. Property and Casualty Insurance Company Tax Return,* to capture the information required to be reported by Captives in the proposed regulations, in lieu of finalizing the proposed regulations. This recommendation was not adopted for the reasons explained in the preamble to the proposed regulations. Changes to the Form 1120–PC would at a minimum impact all nonlife insurance companies that make section 831(b) elections, not only participants in the micro-captive transactions described in these regulations. Some of the requested information is not readily available from filed Forms 1120–PC, such as the descriptions of the types of coverages provided by a Captive and the name and contact information of any actuary or underwriter who assisted Captive in the determination of amounts treated as premiums. Additionally, limiting the collection of information to only those entities filing the Form 1120–PC would be insufficient to gather relevant information, including information regarding Insureds and promoters of the transactions. Reporting for the specific transactions identified in these regulations is best captured in the manner of all reportable transactions, by requiring disclosure on Form 8886, for consistency in enforcement of the reportable transaction regime.

Commenters expressed concern that the IRS should have sufficient information on micro-captives in the responses filed to Notice 2016–66 and thus the regulations are not needed. Commenters stated the IRS should not require any further reporting. As commenters also noted, the IRS has received information on micro-captive transactions for several years. The IRS is confident from its review of examinations and case law that the fact pattern described in the regulations is a fact pattern that consistently gives rise to tax avoidance or otherwise potentially gives rise to tax avoidance. However, promoters continue to promote participation in these transactions, and the IRS is aware of new entrants to these transactions. Thus, despite information collected to date, the IRS needs to continue collecting information to identify who the participants are and the nature of

their transactions. The final regulations do not adopt any changes based on these comments.

Commenters recommended that the proposed regulations be withdrawn in their entirety and that guidance be issued instead on what would make a micro-captive arrangement an insurance arrangement for Federal tax purposes in the IRS's estimation. As the Tax Court explained in *Syzygy,* ''[a]n inherent requirement for a company to make a valid section 831(b) election is that it must transact in insurance.'' T.C. Memo. 2019–34, at *28; *see also Reserve Mech.,* 34 F.4th at 904. Like any insurance transaction, a valid micro-captive arrangement for Federal tax purposes is one that meets the four-prong test of insurance as detailed by the courts in a significant body of case law. *See Le Gierse,* 312 U.S. at 539; *see also Avrahami,* 149 T.C. at 181 (*citing Rent-A-Center,* 142 T.C. at 13–14) (additional citations omitted); *Syzygy,* T.C. Memo. 2019–34, at *29; *Caylor,* T.C. Memo. 2021–30, at *31–32; *Keating,* T.C. Memo. 2024–2, at *51–52; *Swift,* T.C. Memo. 2024–13, at *27; *Patel,* T.C. Memo. 2024–34, at *37–38; *Royalty Mgmt.,* T.C. Memo. 2024–87, at *35. The IRS has issued guidance regarding what makes a captive insurance arrangement an insurance arrangement for Federal tax purposes that is applicable to all insurance companies, including those making section 831(b) elections. *See, e.g.,* Rev. Rul. 2002–89, 2002–2 C.B. 984; Rev. Rul. 2002–90, 2002–2 C.B. 985; Rev. Rul. 2002–91, 2002–2 C.B. 991; Rev. Rul. 2005–40, 2005–2 C.B. 4; Rev. Rul. 2007–47, 2007–2 C.B. 127; Rev. Rul. 2008–8, 2008–1 C.B. 340; and Rev. Rul. 2009–26, 2009–38 I.R.B. 366. Nonetheless, in many micro-captive transactions, the manner in which the contracts are interpreted, administered, and applied is inconsistent with arm's length transactions, actuarial standards, and sound business practices. The captive typically does not behave as an insurance company commonly would, indicating that the captive is not issuing insurance contracts and the transaction does not constitute insurance for Federal tax purposes. The final regulations therefore do not adopt any changes based on these comments.

D. Requests for Clarification Regarding Revoked or Inapplicable Section 831(b) Elections

Commenters requested clarification whether reporting is still required for years in which a Captive's section 831(b) election has been revoked or is otherwise inapplicable for a given taxable year. Under section 831(b)(2)(A), a section 831(b) election, once made,

may be revoked only with the consent of the Secretary. Once an election is made, the alternative tax under section 831(b) applies only if the net written premiums (or, if greater, the direct written premiums) for the taxable year do not exceed the threshold set forth in section 831(b)(2)(A)(i) (as adjusted for inflation) and if the electing entity meets the diversification requirements set forth in section 831(b)(2)(B), for that taxable year.

Under proposed §§ 1.6011–10(b)(1)(i) and 1.6011–11(b)(1), an entity would be a Captive only if it elects under section 831(b) to exclude premiums from taxable income. Under proposed §§ 1.6011–10(a) and 1.6011–11(a), a transaction would be a Micro-Captive Listed Transaction or Micro-captive Transaction of Interest only if it involves a Captive. Separately, pursuant to § 1.6011–4(a), the disclosure requirements for reportable transactions apply to a taxpayer that is a participant in a reportable transaction for taxable years in which the taxpayer's filed return reflects the tax consequences of participation in the transaction, as set forth in § 1.6011–4(c)(3)(i)(A).

An entity that revokes its section 831(b) election would not be a Captive under the proposed regulations beginning in the year of revocation. Similarly, for taxable years after a Captive has filed its final return, it has effectively revoked its section 831(b) election. *See* § 1.6011–10(b)(1)(i); *but see* §§ 1.6011–10(b)(2)(iv) and 1.6011–11(b)(2)(iii) (regarding successor corporations). Accordingly, for taxable years in which a Captive's section 831(b) election has been revoked or the Captive has previously filed its final return, the arrangement generally is not a Micro-Captive Listed Transaction or Micro-Captive Transaction of Interest under the proposed regulations in that taxable year.

However, if the alternative tax under section 831(b) is inapplicable (either because premiums exceed the threshold or the entity fails the diversification requirements set forth in section 831(b)(2)(B) for that year), because the section 831(b) election remains in effect, the entity may still be a Captive under the proposed regulations. Thus, in taxable years in which a Captive's section 831(b) election is inapplicable but has not been revoked, and the arrangement is otherwise described in the regulations, the arrangement would still be a Micro-Captive Listed Transaction or Micro-Captive Transaction of Interest under the proposed regulations. The potential of using of the section 831(b) election for tax avoidance is not eliminated until the

election is revoked. Taxpayers must disclose the transaction in such years if their returns reflect the tax consequences of participation.

The effect of revocation or inapplicability of the section 831(b) election, as described with respect to the proposed regulations, is retained in the final regulations. However, in the interest of limiting the reporting required by these regulations, the final regulations provide transition relief for section 831(b) revocations. Specifically, if the Captive in a transaction identified as a Micro-captive Listed Transaction or Micro-captive Transaction of Interest in §§ 1.6011–10(a) and 1.6011–11(a) of the final regulations requests the Secretary's consent to revoke its section 831(b) election on or before the date by which the participants' disclosures must be filed with the OTSA, the transaction will not be identified as a Micro-captive Listed Transaction or Micro-captive Transaction of Interest for taxable years ending before January 1, 2026, pursuant to §§ 1.6011–10(h)(1) and 1.6011–11(h)(1).

Additionally, the final regulations provide certainty regarding the disclosure obligations of taxpayers who have participated in a Micro-captive Listed Transaction or Micro-captive Transaction of Interest involving a Captive that has subsequently revoked its section 831(b) election and therefore ceased to be a Captive. With respect to taxable years in which the section 831(b) revocation is effective, §§ 1.6011–10(f)(3) and 1.6011–11(f)(3) of the final regulations provide taxpayers involved in the transaction with a safe harbor from identification as participants in that transaction.

Commenters also requested a streamlined method by which taxpayers could obtain the Secretary's consent to revoke section 831(b) elections. Currently, consent is obtained through the private letter ruling procedures, published annually. *See, e.g.,* Rev. Proc. 2024–1, 2024–1 I.R.B. 1. The IRS intends to issue a Revenue Procedure that describes a simplified process for revocation of section 831(b) elections.

E. Request for Clarification Regarding the Definition of Intermediary

A commenter requested clarification on whether the defined term ''Intermediary,'' as described in proposed §§ 1.6011–10(b)(5) and 1.6011–11(b)(5), includes fronting companies. Generally, ''fronting'' is ''an arrangement in which a primary insurer acts as the insurer of record by issuing a policy, but then passes the entire risk to a reinsurer in exchange for a commission. Often, the fronting insurer

is licensed to do business in a state or country where the risk is located, but the reinsurer is not." *NAIC Glossary of Insurance Terms, https://content. naic.org/glossary-insurance-terms* (last visited Jan. 6, 2025). The term "Intermediary" as defined in the proposed regulations means an entity that issues Contracts to an Insured, which are then reinsured, directly or indirectly, by a Captive. A "fronting" company would fall within the definition of "Intermediary" if it issues Contracts to an Insured, which are then reinsured, directly or indirectly, by a Captive.

## F. Recommendation To Limit the Effective Period of Section 831(b) Elections for Companies That Do Not Meet Loss Ratio Threshold

A commenter recommended that no loss ratio factor apply for the first five years of a section 831(b) election, after which any entity that elected the alternative tax under section 831(b) would automatically revert to an entity taxable under section 831(a) unless it meets a loss ratio threshold. The commenter did not specify what an appropriate loss ratio threshold would be, but implied that the loss ratio threshold should be lower than the Loss Ratio Factor percentages set forth in the proposed regulations.

An automatic conversion to a taxable insurance company under section 831(a) would be inconsistent with the statutory language of section 831(b). Valid insurers who rely on the section 831(b) election would be impermissibly harmed by this recommendation. To the extent the commenter intended to recommend a five-year grace period from formation of a Captive to identification as either a Micro-captive Listed Transaction or a Micro-captive Transaction of Interest, this could enable participants in micro-captive arrangements that are or may be tax avoidance transactions to permanently avoid reporting that would otherwise be required by, for instance, setting up a new Captive every five years. The final regulations do not adopt any changes based on this comment.

## G. Comments Regarding Constitutionality of Potential Adjustments if Transaction Examined

Commenters expressed concern that the potential adjustments applicable to abusive transactions, as described in the preamble to the proposed regulations, are unconstitutional as double tax. Specifically, the preamble to the proposed regulations noted that examinations may result in adjustments including full disallowance of claimed

micro-captive insurance premium deductions and the inclusion in income of amounts received by the Captive. These adjustments are consistent with the adjustments sustained against taxpayers in the relevant micro-captive court cases. *See Avrahami,* 149 T.C. at 199 (disallowed premium deductions), *Syzygy,* T.C. Memo. 2019–34, at *45–46 (disallowed premium deductions and required income inclusion by the Captive), *Caylor,* T.C. Memo. 2021–30, at *48–53 (disallowed premium deductions and penalties); *Keating,* T.C. Memo. 2024–2, at *65–66, 77 (disallowed premium deductions and penalties); *Swift,* T.C. Memo. 2024–13, at *44–50 (disallowed premium deductions and penalties); *Patel,* T.C. Memo. 2024–34, at *52 (disallowed premium deductions), and *Royalty Mgmt.,* T.C. Memo. 2024–87, at *49–50, 52–53 (disallowed premium deductions and required income inclusion by the Captive); *see also Reserve Mech.,* T.C. Memo. 2018–86, at *62–64 (income to a tax-exempt entity under section 501(c)(15)). Further, while the IRS may challenge the tax benefits claimed in these transactions, adjustments will be asserted only to the extent warranted by the facts, following examination by the IRS. The final regulations do not adopt any changes based on these comments.

## H. Comments Regarding Impact on the Captive Insurance Industry

Commenters expressed concern that the proposed regulations will negatively impact the captive insurance industry and would eliminate many benefits to its participants. Commenters stated that the benefits of captives include the following: providing coverage that is either unavailable or prohibitively expensive commercially, providing entry to reinsurance markets that are otherwise unavailable to participants, allowing for competition with commercial insurers, and serving to manage catastrophic risks for many businesses, such as the risks arising under the Coronavirus Disease 2019 (COVID–19) pandemic. These benefits are available to all section 831(a) captives and to those section 831(b) captives that are not engaged in transactions that are tax avoidance transactions. These regulations do not hinder the formation of valid captives. Accordingly, the final regulations do not adopt any changes based on these comments.

## I. Comments Regarding Compliance Concerns

Some commenters argued that the proposed regulations are retroactive in nature, that there would be no way for

an existing micro-captive to "come into compliance with the proposed regulation," and that there would be no way for a taxpayer to know whether they are entering into a reportable transaction. As previously stated in part I.C. of this Summary of Comments and Explanation of Revisions, the proposed regulations are not retroactive in nature; the final regulations will be effective as of January 14, 2025. Section 1.6011– 4(e)(2)(i) is clear that reporting is required for transactions entered into and reflected on a tax return for a year prior to the publication of guidance identifying a transaction as a listed transaction or a transaction of interest, if the statute of limitations is still open on the effective date of the listing. While the disclosures mandated by § 1.6011–4 may be with respect to prior periods, if the period of limitations on assessment for such periods has not expired, the disclosure obligation is itself not retroactive—it is a current reporting obligation. The comments regarding an impermissible retroactive burden are without merit and outside the scope of these final regulations.

Moreover, existing participants in transactions identified under the final regulations as a Micro-Captive Listed Transaction or a Micro-Captive Transaction of Interest may successfully comply by fulfilling their reporting obligations as set forth in the final regulations at §§ 1.6011–10(g) and 1.6011–11(g). Lastly, taxpayers are encouraged to make informed decisions and seek independent tax advice before entering into any transaction. Taxpayers have been placed on notice of the IRS's concern with abuse of the section 831(b) election since at least 2015 when the IRS first identified micro-captive transactions on its annual Dirty Dozen list. The final regulations do not adopt any changes based on these comments.

## J. Comment Expressing Concerns About Access to Administrative Appeals

Finally, a commenter expressed concern that taxpayers whose micro-captive transactions are examined do not have access to good faith administrative appeals. Appeals is an independent office of the IRS. Section 7803(e)(3) of the Code provides that it is the function of Appeals to resolve Federal tax controversies without litigation on a basis which is fair and impartial to both the Government and the taxpayer, and promotes a consistent application and interpretation of, and voluntary compliance with, the Federal tax laws. The Appeals resolution process is generally available to all taxpayers. Appeals endeavors to be consistent in its approach with the goal

of making a fair and reasoned determination on each case presented to it, considering the facts of the case and existing case law. Taxpayers concerned about their specific case and the handling thereof should raise the matter to the appropriate authorities within Appeals.

## Special Analyses

### I. Regulatory Planning and Review

Pursuant to the Memorandum of Agreement, Review of Treasury Regulations under Executive Order 12866 (June 9, 2023), tax regulatory actions issued by the IRS are not subject to the requirements of section 6 of Executive Order 12866, as amended. Therefore, a regulatory impact assessment is not required.

### II. Paperwork Reduction Act

The collection of information contained in the final regulations is reflected in the collection of information for Forms 8886 and 8918 that have been reviewed and approved by OMB in accordance with the Paperwork Reduction Act (44 U.S.C. 3507(c)) under control numbers 1545–1800 and 1545–0865. To the extent there is a change in burden as a result of these regulations, the change in burden will be reflected in the updated burden estimates for the Forms 8886 and 8918. The requirement to maintain records to substantiate information on Forms 8886 and 8918 is already contained in the burden associated with the control numbers for the forms and is unchanged.

An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection of information displays a valid control number assigned by OMB.

### III. Regulatory Flexibility Act

The Regulatory Flexibility Act (RFA) (5 U.S.C. part I, chapter 6) requires agencies to "prepare and make available for public comment an initial regulatory flexibility analysis," which will "describe the impact of the rule on small entities." 5 U.S.C. 603(a). Section 605(b) of the RFA allows an agency to certify a rule if the rulemaking is not expected to have a significant economic impact on a substantial number of small entities.

The Secretary of the Treasury hereby certifies that the final regulations will not have a significant economic impact on a substantial number of small entities pursuant to the RFA. The basis for these final regulations is Notice 2016–66, 2016–47 I.R.B. 745 (as modified by Notice 2017–08, 2017–3 I.R.B. 423). The

following chart sets forth the gross receipts of respondents to Notice 2016–66, based on data for taxable year 2022:

### NOTICE 2016–66—RESPONDENTS BY SIZE

| Receipts | Firms (%) | Filings (%) |
|---|---|---|
| Under 5M .................. | 74.45 | 70.87 |
| 5M to 10M ............. | 7.17 | 7.56 |
| 10M to 15M ........... | 4.36 | 4.76 |
| 15M to 20M ........... | 2.49 | 2.80 |
| 20M to 25M ........... | 1.87 | 2.24 |
| Over 25M ................ | 9.66 | 11.76 |
| Total ................ | 100 | 100 |

This chart shows that the majority of respondents to Notice 2016–66 reported gross receipts under $5 million. Even assuming that these respondents constitute a substantial number of small entities, the final regulations will not have a significant economic impact on these entities because the final regulations implement sections 6111 and 6112 and § 1.6011–4 by specifying the manner in which and time at which an identified Micro-captive Listed Transaction or Micro-captive Transaction of Interest must be reported. Accordingly, because the regulations are limited in scope to time and manner of information reporting and definitional information, the economic impact of the final regulations is expected to be minimal.

Further, the Treasury Department and the IRS expect the reporting burden to be low; the information sought is necessary for regular annual return preparation and ordinary recordkeeping. The estimated burden for any entity required to file Form 8886 (as revised Oct. 2022) is approximately 10 hours, 16 minutes for recordkeeping; 4 hours, 50 minutes for learning about the law or the form; and 6 hours, 25 minutes for preparing, copying, assembling, and sending the form to the IRS. The IRS's Research, Applied Analytics, and Statistics division estimates that the appropriate wage rate for this set of taxpayers is $73.48 (2022 dollars) per hour. Thus, it is estimated that a respondent will incur costs of approximately $1,581.05 per filing. Disclosures received to date by the Treasury Department and the IRS in response to the reporting requirements of Notice 2016–66 indicate that this small amount will not pose any significant economic impact for those taxpayers now required to disclose under the final regulations. The Treasury Department and the IRS have concluded that the cost of filing the disclosure statements required by these

regulations will not pose any significant economic impact.

Some commenters expressed concern that the cost of filing disclosure statements is too onerous for taxpayers. Specifically, commenters stated that they incurred significant costs in responding to Notice 2016–66 and will again face those costs if new disclosures are required. In response to comments on Notice 2016–66 and the proposed regulations, the final regulations narrow the scope of transactions described in §§ 1.6011–10(h) and 1.6011–11(h). New disclosures are needed to identify participants in these transactions, but the final regulations provide in § 1.6011–11(h)(2) that taxpayers who have filed a disclosure statement regarding their participation in a transaction that is the same as, or substantially similar to, the transaction described in § 1.6011–11(a) with the OTSA pursuant to Notice 2016–66, will be treated as having made the disclosure pursuant to the final regulations for the taxable years for which the taxpayer filed returns before January 14, 2025.

One commenter asserted that the reporting obligations would be particularly onerous for arrangements using a pooled reinsurance structure with numerous participants and likened the cost of filling out a Form 8886 to effectively imposing a tax on the entire community of captive insurers electing the alternative tax under section 831(b). Taxpayer compliance burden is not equivalent to a tax, and the Instructions to Forms 8886 and 8918 make clear that the time needed to complete and file such forms will vary depending on individual circumstances.

Two commenters indicated that the $77.50 (2020 dollars) wage rate per hour used to approximate the total cost of preparing and filing a Form 8886, as referenced in the proposed regulations, is too low. One of these commenters implied that the applicable average wage rate per hour is closer to $268.50. Given the availability of more recent data, the hourly rate estimate is revised in the final regulations to $73.48 (2022 dollars). This updated figure does not address the substantial difference from the commenter's estimate. The difference is likely attributable to the different methodologies used. The commenter likely used the hourly rate that an independent professional would charge a retail customer to prepare a Form 8886.

These commenters also expressed disagreement with the estimated average amounts of time required to complete Forms 8886 and 8918, as indicated in the instructions to each of those forms. One commenter described the estimate

of 21.5 hours to comply as "significantly underestimated." However, the commenter did not elaborate on the amount of time actually required for the commenter. Additionally, the Instructions to Forms 8886 and 8918 make clear that the time needed to complete and file such forms will vary depending on individual circumstances. One of the commenters stated that based on a survey of 2,397 respondents, the average amount of time spent by each respondent "for compliance" under Notice 2016–66 (using it as a proxy for these final regulations) was 50.97 hours, which the commenter noted is above the estimated average amounts of time for completion indicated in the instructions to each of those forms. However, based on the information provided by this commenter regarding the same survey, the total number of hours spent on "compliance" by all respondents was 121,755 hours, and the total number of Forms 8886 and 8918 completed by respondents for this "compliance" was 15,021. Consequently, the average amount of time spent per form by these respondents appears to be approximately 8.11 hours (that is, approximately 8 hours, 6 minutes). This amount falls below the estimated average time of 21 hours, 31 minutes for Form 8886 (as revised Oct. 2022) and 14 hours, 31 minutes for Form 8918 (as revised Nov. 2021) as provided in the instructions to those forms, respectively.

For the reasons stated, a regulatory flexibility analysis under the RFA is not required. Pursuant to section 7805(f)(1), the notice of proposed rulemaking preceding the final regulations was submitted to the Chief Counsel for the Office of Advocacy of the Small Business Administration for comment on its impact on small business, and no comments were received.

### IV. Unfunded Mandates Reform Act

Section 202 of the Unfunded Mandates Reform Act of 1995 (UMRA) requires that agencies assess anticipated costs and benefits and take certain other actions before issuing a final rule that includes any Federal mandate that may result in expenditures in any one year by a State, local, or Tribal government, in the aggregate, or by the private sector, of $100 million in 1995 dollars, updated annually for inflation. This final rule does not include any Federal mandate that may result in expenditures by State, local, or Tribal governments, or by the private sector in excess of that threshold.

### V. Executive Order 13132: Federalism

Executive Order 13132 (Federalism) prohibits an agency from publishing any

rule that has federalism implications if the rule either imposes substantial, direct compliance costs on State and local governments, and is not required by statute, or preempts State law, unless the agency meets the consultation and funding requirements of section 6 of the Executive order. This final rule does not have federalism implications and does not impose substantial direct compliance costs on State and local governments or preempt State law within the meaning of the Executive order. *See also* part I.B. of the Summary of Comments and Explanation of Revisions.

### VI. Congressional Review Act

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs has designated this rule as not a "major rule," as defined by 5 U.S.C. 804(2).

### Drafting Information

The principal author of these regulations is Allan H. Sakaue, Office of Associate Chief Counsel (Financial Institutions and Products), IRS. However, other personnel from the Treasury Department and the IRS participated in their development.

### Availability of IRS Documents

The notices cited in this preamble are published in the Internal Revenue Bulletin and are available from the Superintendent of Documents, U.S. Government Publishing Office, Washington, DC 20402, or by visiting the IRS website at *https://www.irs.gov.*

### List of Subjects in 26 CFR Part 1

Income taxes, Reporting and recordkeeping requirements.

### Amendments to the Regulations

Accordingly, the Treasury Department and the IRS amend 26 CFR part 1 as follows:

## PART 1—INCOME TAXES

■ **Paragraph 1.** The authority citation for part 1 is amended by adding entries for §§ 1.6011–10 and 1.6011–11 in numerical order to read in part as follows:

**Authority:** 26 U.S.C. 7805 * * *

* * * * *

Section 1.6011–10 also issued under 26 U.S.C. 6001 and 6011.

Section 1.6011–11 also issued under 26 U.S.C. 6001 and 6011.

* * * * *

■ **Par. 2.** Section 1.6011–10 is added to read as follows:

**§ 1.6011–10 Micro-captive listed transaction.**

(a) *Identification as listed transaction.* Transactions that are the same as, or Substantially Similar to, transactions described in paragraph (c) of this section are identified as listed transactions for purposes of § 1.6011–4(b)(2), except as provided in paragraph (d) of this section.

(b) *Definitions.* The definitions in this paragraph (b) apply for purposes of this section:

(1) *Captive.* The term *Captive* means any entity that is described in each of the paragraphs (b)(1)(i), (ii), and (iii) of this section.

(i) The entity elects under section 831(b) of the Internal Revenue Code (Code) to include in taxable income only taxable investment income (defined in section 834 of the Code) in lieu of the tax imposed under section 831(a).

(ii) The entity issues a Contract to an Insured, reinsures a Contract of an Insured issued by an Intermediary, or both.

(iii) At least 20 percent of the entity's assets or the voting power or value of its outstanding stock or equity interests is directly or indirectly owned, individually or collectively, by an Insured, an Owner, or persons Related to an Insured or an Owner. For purposes of this paragraph (b)(1)(iii), the rules of paragraph (b)(1)(iii)(A) or (B) of this section apply to the extent application of a rule (or rules) would increase such direct or indirect ownership.

(A) A person that holds a derivative is treated as indirectly owning the assets referenced by the derivative.

(B) The interest of each beneficiary of a trust or estate in the assets of such trust or estate must be determined by assuming the maximum exercise of discretion by the fiduciary in favor of such beneficiary and the maximum use of the trust's or estate's interest in the company to satisfy the interests of such beneficiary.

(2) *Computation periods*—(i) *Financing Computation Period.* The term *Financing Computation Period* means the most recent five taxable years (including the most recent concluded taxable year) of a Captive (or all taxable years of a Captive if the Captive has been in existence for less than five taxable years).

(ii) *Listed Transaction Loss Ratio Computation Period.* The term *Listed Transaction Loss Ratio Computation Period* is the most recent ten taxable years (including the most recent concluded taxable year) of Captive. A Captive that does not have at least ten taxable years cannot have a Listed

Transaction Loss Ratio Computation Period, and therefore is not described in paragraph (c)(2) of this section.

(iii) *Taxable years.* For purposes of paragraphs (b)(2)(i) and (ii) of this section:

(A) Each short taxable year is a separate taxable year.

(B) If the Captive is a successor to one or more other Captives, taxable years of each such other Captive are treated as taxable years of the Captive.

(iv) *Successors.* The term *successor* means any entity described in paragraph (b)(2)(iv)(A), (B), or (C) of this section.

(A) A successor corporation as defined in § 1.382–2(a)(5).

(B) An entity that, directly or indirectly, acquires (or is deemed to acquire) the assets of another entity and succeeds to and takes into account the other entity's earnings and profits or deficit in earnings and profits.

(C) An entity that receives (or is deemed to receive) any assets from another entity if such entity's basis in such assets is determined, directly or indirectly, in whole or in part, by reference to the other entity's basis in such assets.

(3) *Contract.* The term *Contract* means any contract that is treated by a party to the contract as an insurance contract or reinsurance contract for Federal income tax purposes.

(4) *Insured.* The term *Insured* means any person that conducts a trade or business, enters into a Contract with a Captive or enters into a Contract with an Intermediary that is directly or indirectly reinsured by a Captive, and treats amounts paid under the Contract as insurance premiums for Federal income tax purposes.

(5) *Intermediary.* The term *Intermediary* means any entity that issues a Contract to an Insured or reinsures a Contract that is issued to an Insured, and such Contract is reinsured, directly or indirectly, by a Captive. A transaction may have more than one Intermediary.

(6) *Owner.* The term *Owner* means any person who, directly or indirectly, holds an ownership interest in an Insured or its assets. For purposes of this paragraph (b)(6), the rules of paragraph (b)(6)(i) or (ii) of this section apply to the extent application of a rule (or rules) would increase such direct or indirect ownership.

(i) The interest of a person that holds a derivative must be determined as provided in paragraph (b)(1)(iii)(A) of this section.

(ii) The interest of each beneficiary of a trust or estate in the assets of such trust or estate must be determined as

provided in paragraph (b)(1)(iii)(B) of this section.

(7) *Recipient.* The term *Recipient* means any Owner, Insured, or person Related to an Owner or an Insured engaged in a transaction described in paragraph (c)(1) of this section.

(8) *Related.* The term *Related* means having a relationship described in one or more of sections 267(b), 707(b), 2701(b)(2)(C), and 2704(c)(2) of the Code.

(9) *Seller.* The term *Seller* means a service provider, dealer (including an automobile dealer), lender, wholesaler, or retailer that sells products or services to customers who purchase insurance contracts in connection with those products or services and at least 95 percent of sales of products or services by Seller for the taxable year to persons who purchase such insurance contracts are sales to Unrelated Customers.

(10) *Seller's Captive.* The term *Seller's Captive* means a Captive Related to Seller, an owner of Seller, or individuals or entities Related to Seller or owners of Seller.

(11) *Substantially Similar.* The term *Substantially Similar* is defined in § 1.6011–4(c)(4).

(12) *Unrelated Customers.* The term *Unrelated Customers* means persons who do not own an interest in, and are not wholly or partially owned by, Seller, an owner of Seller, or individuals or entities Related to Seller or owners of Seller.

(c) *Transaction description.* A transaction is described in this paragraph (c) if the transaction is described in both paragraphs (c)(1) and (2) of this section.

(1) The transaction involves a Captive that, at any time during the Captive's Financing Computation Period, directly or indirectly, engages in a transaction described in paragraph (c)(1)(i) of this section, taking into account paragraph (c)(1)(ii) of this section.

(i) The Captive made available as financing or otherwise conveyed or agreed to make available or convey to a Recipient, in a transaction that did not result in taxable income or gain to the Recipient, in whole or in part, any portion of the amounts received under a Contract, such as through a guarantee, a loan, or other transfer of Captive's capital, or made such financings or conveyances prior to the Financing Computation Period that remain outstanding or in effect at any point in the taxable year for which disclosure is required.

(ii) Any amounts that a Captive made available as financing or otherwise conveyed or agreed to make available or convey to a Recipient are presumed to

be portions of the amounts received under a Contract to the extent that such amounts, when made available or conveyed, are in excess of Captive's cumulative after-tax net investment earnings minus any outstanding financings or conveyances.

(2) The transaction involves a Captive for which the amount described in paragraph (c)(2)(i) of this section is less than 30 percent of the amount described in paragraph (c)(2)(ii) of this section.

(i) The amount of liabilities incurred for insured losses and claim administration expenses during the Listed Transaction Loss Ratio Computation Period.

(ii) The amount equal to premiums earned by the Captive during the Listed Transaction Loss Ratio Computation Period, less policyholder dividends paid by the Captive during the Listed Transaction Loss Ratio Computation Period.

(d) *Exceptions.* A transaction described in paragraph (c) of this section is not identified as a listed transaction for purposes of this section and § 1.6011–4(b)(2) if the transaction:

(1) Provides insurance for employee compensation or benefits and is one for which the Employee Benefits Security Administration of the U.S. Department of Labor has issued a Prohibited Transaction Exemption under the procedures provided at 29 CFR 2570.30 through 2570.52; or

(2) Is an arrangement in which a Captive meets all of the requirements described in this paragraph (d)(2).

(i) The Captive is a Seller's Captive.

(ii) The Seller's Captive issues or reinsures some or all of the Contracts purchased by Unrelated Customers in connection with the products or services being sold by the Seller.

(iii) 100 percent of the business of the Seller's Captive is issuing or reinsuring Contracts in connection with products or services being sold by the Seller or persons Related to the Seller.

(iv) At least 95 percent of the Seller's Captive's business for the taxable year is issuing or reinsuring Contracts purchased by Unrelated Customers in connection with products or services sold by Seller or persons Related to Seller.

(e) *Bright-line rules.* A transaction is not considered Substantially Similar (as defined in paragraph (b)(11) of this section) to the listed transaction identified in this section if the transaction:

(1) Does not involve an entity that has elected under section 831(b) to include in taxable income only taxable investment income (defined in section

834) in lieu of the tax imposed under section 831(a); or

(2) Involves a Captive for which the amount described in paragraph (c)(2)(i) of this section is 30 percent or more of the amount described in paragraph (c)(2)(ii) of this section.

(f) *Special participation rules*—(1) *In general.* Whether a taxpayer has participated in the listed transaction identified in paragraph (a) of this section, including Substantially Similar transactions, will be determined under § 1.6011–4(c)(3)(i)(A). Participants include, but are not limited to, any Owner, Insured, Captive, or Intermediary with respect to the transaction whose tax return reflects tax consequences or a tax strategy identified in paragraph (a), except as otherwise provided in paragraphs (f)(2) and (3) of this section.

(2) *Disclosure safe harbor for Owners.* An Owner who, solely by reason of the Owner's direct or indirect ownership interest in an Insured, has participated in the listed transaction described in this section will not be required to disclose participation in the transaction under section 6011(a) of the Code, notwithstanding § 1.6011–4(c)(3), if the Owner receives acknowledgement, in writing or electronically, from the Insured that the Insured has or will comply with the Insured's separate disclosure obligation under § 1.6011–4 with respect to the transaction and the Insured discloses the transaction in a timely manner. The acknowledgement can be a copy of the Form 8886, *Reportable Transaction Disclosure Statement* (or successor form), filed (or to be filed) by the Insured and must be received by the Owner prior to the time set forth in § 1.6011–4(e) in which the Owner would otherwise be required to provide disclosure. Owners who meet the requirements of the safe harbor in this paragraph (f)(2) will not be treated as having participated in an undisclosed listed transaction for purposes of § 1.6664–2(c)(3)(ii) or as having failed to include information on any return or statement with respect to a listed transaction for purposes of section 6501(c)(10) of the Code.

(3) *Disclosure safe harbor for taxpayers in transactions with revoked section 831(b) elections.* If the Captive has revoked its section 831(b) election, taxpayers who participated in the listed transaction with respect to that Captive, including any Insureds, Owners, and Intermediaries, will not be considered participants in the transaction under section 6011(a), notwithstanding § 1.6011–4(c)(3), for any taxable year in which the section 831(b) revocation is effective, provided that a successor

Captive has not been established as described in paragraph (b)(2)(iv) of this section. In addition, if the Captive has revoked its section 831(b) election, taxpayers who meet the requirements of this safe harbor, for any taxable year in which the section 831(b) revocation is effective, will not be treated as having participated in an undisclosed listed transaction for purposes of § 1.6664–2(c)(3)(ii) or as having failed to include information on any return or statement with respect to a listed transaction for purposes of section 6501(c)(10).

(g) *Disclosure requirements*—(1) *Information required of all participants.* Participants must provide the information required under § 1.6011–4(d) and the Instructions to Form 8886 (or successor form). For all participants, describing the transaction in sufficient detail includes, but is not limited to, describing on Form 8886 (or successor form) when, how, and from whom the participant became aware of the transaction, and how the participant participated in the transaction (for example, as an Insured, a Captive, or other participant). Paragraphs (g)(2) and (3) of this section describe additional information required of a Captive and an Insured, respectively.

(2) *Additional information required of a Captive.* For a Captive, describing the transaction in sufficient detail includes, but is not limited to, describing on Form 8886 (or successor form) the items described in each of the paragraphs (g)(2)(i) through (v) of this section.

(i) All the type(s) of policies issued or reinsured by the Captive during the year of participation or each year of participation (if disclosure pertains to multiple years).

(ii) The amounts treated by the Captive as premiums written for coverage provided by Captive during the year of participation or each year of participation (if disclosure pertains to multiple years).

(iii) The name and contact information of each and every actuary or underwriter who assisted in the determination of the amounts treated as premiums for coverage provided by the Captive during the year or each year of participation (if disclosure pertains to multiple years).

(iv) The total amounts of claims paid by the Captive during the year of participation or each year of participation (if disclosure pertains to multiple years).

(v) The name and percentage of interest directly or indirectly held by each person whose interest in the Captive meets the 20 percent threshold or is taken into account in meeting the

20 percent threshold under paragraph (b)(1)(iii) of this section.

(3) *Additional information required of Insured.* For Insured, describing the transaction in sufficient detail includes, but is not limited to, describing on Form 8886 (or successor form) the amounts treated by Insured as premiums paid for coverage provided to Insured, directly or indirectly, by the Captive or by each Captive (if disclosure pertains to multiple Captives) during the year or each year of participation (if disclosure pertains to multiple years), as well as the identity of all persons identified as Owners to whom the Insured provided an acknowledgment described in paragraph (f)(2) of this section.

(h) *Applicability date*—(1) *In general.* This section identifies transactions that are the same as, or Substantially Similar to, the transactions identified in paragraph (a) of this section as listed transactions for purposes of § 1.6011–4(b)(2), effective January 14, 2025, except as otherwise provided in this paragraph (h)(1). If, on or before the date prescribed for filing disclosure statements with the Office of Tax Shelter Analysis under § 1.6011–4(e), the Captive involved in the transaction has requested the consent of the Secretary to revoke its section 831(b) election, the transaction is not identified as a listed transaction for purposes of this section and § 1.6011–4(b)(2) for taxable years ending before January 1, 2026.

(2) *Obligations of participants with respect to prior periods.* Pursuant to § 1.6011–4(d) and (e), taxpayers who have filed a tax return (including an amended return) reflecting their participation in transactions described in paragraph (a) of this section prior to January 14, 2025, must disclose the transactions as required by § 1.6011–4(d) and (e) provided that the period of limitations for assessment of tax (as determined under section 6501, including section 6501(c)) for any taxable year in which the taxpayer participated has not ended on or before January 14, 2025, except as otherwise provided in this paragraph (h)(2). Taxpayers who have finalized a settlement agreement with the Internal Revenue Service with respect to the transaction, in examination or litigation, will be treated as having made the disclosure for years subject to that agreement.

(3) *Obligations of material advisors with respect to prior periods.* Material advisors defined in § 301.6111–3(b) of this chapter who have previously made a tax statement with respect to a transaction described in paragraph (a) of this section have disclosure and list

maintenance obligations as described in §§ 301.6111–3 and 301.6112–1 of this chapter, respectively. Notwithstanding § 301.6111–3(b)(4)(i) and (iii) of this chapter, material advisors are required to disclose only if they have made a tax statement on or after the date that is six years before January 14, 2025. Material advisors that are uncertain whether the transaction they are required to disclose should be reported under this section or § 1.6011–11 should disclose under this section and will not be required to disclose a second time if it is later determined that the transaction should have been disclosed under § 1.6011–11.

■ **Par. 3.** Section 1.6011–11 is added to read as follows:

**§ 1.6011–11  Micro-captive transaction of interest.**

(a) *Identification as transaction of interest.* Transactions that are the same as, or Substantially Similar to, transactions described in paragraph (c) of this section are identified as transactions of interest for purposes of § 1.6011–4(b)(6), except as provided in paragraph (d) of this section.

(b) *Definitions.* The definitions in this paragraph (b) apply for purposes of this section.

(1) *Captive. Captive* has the same meaning as provided in § 1.6011–10(b)(1).

(2) *Computation periods*—(i) *Financing Computation Period. Financing Computation Period* has the same meaning as provided in § 1.6011–10(b)(2)(i).

(ii) *Transaction of Interest Loss Ratio Computation Period.* The term *Transaction of Interest Loss Ratio Computation Period* means—

(A) The most recent ten taxable years of a Captive; or

(B) In the case of a Captive that has been in existence for less than ten taxable years, all taxable year(s) of the Captive.

(iii) *Rules for computation periods.* The rules provided in § 1.6011–10(b)(2)(iii) and (iv) for computation periods apply for purposes of this paragraph (b)(2).

(3) *Contract. Contract* has the same meaning as provided in § 1.6011–10(b)(3).

(4) *Insured. Insured* has the same meaning as provided in § 1.6011–10(b)(4).

(5) *Intermediary. Intermediary* has the same meaning as provided in § 1.6011–10(b)(5).

(6) *Owner. Owner* has the same meaning as provided in § 1.6011–10(b)(6).

(7) *Recipient. Recipient* has the same meaning as provided in § 1.6011–10(b)(7).

(8) *Related. Related* has the same meaning as provided in § 1.6011–10(b)(8).

(9) *Seller. Seller* has the same meaning as provided in § 1.6011–10(b)(9).

(10) *Seller's Captive. Seller's Captive* has the same meaning as provided in § 1.6011–10(b)(10).

(11) *Substantially Similar. Substantially Similar* has the same meaning as provided in § 1.6011–10(b)(11).

(12) *Unrelated Customers. Unrelated Customers* has the same meaning as provided in § 1.6011–10(b)(12).

(c) *Transaction description.* A transaction is described in this paragraph (c) if the transaction is described in paragraph (c)(1) of this section, paragraph (c)(2) of this section, or both.

(1) The transaction involves a Captive that, at any time during the Captive's Financing Computation Period, directly or indirectly, engages in a transaction described in paragraph (c)(1)(i) of this section, taking into account paragraph (c)(1)(ii) of this section.

(i) The Captive made available as financing or otherwise conveyed or agreed to make available or convey to a Recipient, in a transaction that did not result in taxable income or gain to the Recipient, in whole or in part, any portion of the amounts received under a Contract, such as through a guarantee, a loan, or other transfer of Captive's capital, or made such financings or conveyances prior to the Financing Computation Period that remain outstanding or in effect at any point in the taxable year for which disclosure is required.

(ii) Any amounts that a Captive made available as financing or otherwise conveyed or agreed to make available or convey to a Recipient are presumed to be portions of the amounts received under a Contract to the extent such amounts, when made available or conveyed are in excess of a Captive's cumulative after-tax net investment earnings minus any outstanding financings or conveyances.

(2) The transaction involves a Captive for which the amount described in paragraph (c)(2)(i) of this section is less than 60 percent of the amount described in paragraph (c)(2)(ii) of this section.

(i) The amount of liabilities incurred for insured losses and claim administration expenses during the Transaction of Interest Loss Ratio Computation Period.

(ii) The amount equal to premiums earned by the Captive during the Transaction of Interest Loss Ratio Computation Period, less policyholder dividends paid by the Captive during the Transaction of Interest Loss Ratio Computation Period.

(d) *Exceptions.* A transaction described in paragraph (c) of this section is not identified as a transaction of interest for purposes of this section and § 1.6011–4(b)(6) if the transaction:

(1) Is described in § 1.6011–10(d)(1);

(2) Is described in § 1.6011–10(d)(2); or

(3) Is identified as a listed transaction in § 1.6011–10(a), in which case the transaction must be reported as a listed transaction under § 1.6011–10.

(e) *Bright-line rules.* A transaction is not considered Substantially Similar (as defined in paragraph (b)(11) of this section) to the transaction of interest identified in this section if the transaction:

(1) Does not involve an entity that has elected under section 831(b) of the Internal Revenue Code (Code) to include in taxable income only taxable investment income (defined in section 834 of the Code) in lieu of the tax imposed under section 831(a); or

(2) Involves a Captive for which the amount described in paragraph (c)(2)(i) of this section is 60 percent or more of the amount described in paragraph (c)(2)(ii) of this section.

(f) *Special participation rules*—(1) *In general.* Whether a taxpayer has participated in the transaction of interest identified in paragraph (a) of this section, including Substantially Similar transactions, will be determined under § 1.6011–4(c)(3)(i)(E). Participants include, but are not limited to, any Owner, Insured, Captive, or Intermediary with respect to the transaction whose tax return reflects tax consequences or a tax strategy identified in paragraph (a), except as otherwise provided in paragraphs (f)(2) and (3) of this section.

(2) *Disclosure safe harbor for Owners.* An Owner who, solely by reason of the Owner's direct or indirect ownership interest in an Insured, has participated in the transaction of interest described in this section will not be required to disclose participation in the transaction under section 6011(a), notwithstanding § 1.6011–4(c)(3), if the Owner receives acknowledgment, in writing or electronically, from the Insured that the Insured has or will comply with Insured's separate disclosure obligation under § 1.6011–4 with respect to the transaction and the Insured discloses the transaction in a timely manner. The acknowledgment can be a copy of the Form 8886, *Reportable Transaction Disclosure Statement* (or successor

form), filed (or to be filed) by the Insured and must be received by the Owner prior to the time set forth in § 1.6011–4(e) in which the Owner would otherwise be required to provide disclosure.

(3) *Disclosure safe harbor for taxpayers in transactions with revoked section 831(b) elections.* If the Captive has revoked its section 831(b) election, taxpayers who participated in the transaction of interest with respect to that Captive, including any Insureds, Owners, and Intermediaries, will not be considered participants in the transaction under section 6011(a), notwithstanding § 1.6011–4(c)(3), for any taxable year in which the section 831(b) revocation is effective, provided that a successor Captive has not been established as described in paragraph (b)(2)(iii) of this section (referencing § 1.6011–10(b)(2)(iii) and (iv)).

(g) *Disclosure requirements.* Participants must provide the information required under § 1.6011–4(d) and the Instructions to Form 8886 (or successor form). For all participants, describing the transaction in sufficient detail includes, but is not limited to, describing on Form 8886 (or successor form) when, how, and from whom the participant became aware of the transaction, and how the participant participated in the transaction (for example, as an Insured, a Captive, or other participant). A Captive and an Insured must also provide the information required in § 1.6011–10(g)(2) and (3), respectively.

(h) *Applicability date*—(1) *In general.* This section identifies transactions that are the same as, or Substantially Similar to, the transaction identified in paragraph (a) of this section as

transactions of interest for purposes of § 1.6011–4(b)(6) effective January 14, 2025, except as otherwise provided in this paragraph (h)(1). If, on or before the date prescribed for filing disclosure statements with the Office of Tax Shelter Analysis under § 1.6011–4(e), the Captive involved in the transaction has requested the consent of the Secretary to revoke its section 831(b) election, the transaction is not identified as a transaction of interest for purposes of this section and § 1.6011–4(b)(6) for participants with respect to that Captive for taxable years ending before January 1, 2026.

(2) *Obligations of participants with respect to prior periods.* Pursuant to § 1.6011–4(d) and (e), taxpayers who have filed a tax return (including an amended return) reflecting their participation in transactions described in paragraph (a) of this section prior to January 14, 2025, must disclose the transactions as required by § 1.6011–4(d) and (e) provided that the period of limitations for assessment of tax (as determined under section 6501 of the Code, including section 6501(c)) for any taxable year in which the taxpayer participated has not ended on or before January 14, 2025, except as otherwise provided in this paragraph (h)(2). Taxpayers who have finalized a settlement agreement with the Internal Revenue Service with respect to the transaction, in examination or litigation, will be treated as having made the disclosure for years subject to that agreement. Taxpayers who have filed a disclosure statement regarding their participation in the transaction with the Office of Tax Shelter Analysis pursuant to Notice 2016–66, 2016–47 I.R.B. 745, will be treated as having made the

disclosure pursuant to the final regulations for the taxable years for which the taxpayer filed returns before January 14, 2025. If a taxpayer described in the preceding sentence participates in the Micro-captive Transaction of Interest in a taxable year for which the taxpayer files a return on or after January 14, 2025, the taxpayer must file a disclosure statement with the Office of Tax Shelter Analysis at the same time the taxpayer files their return for the first such taxable year.

(3) *Obligations of material advisors with respect to prior periods.* Material advisors defined in § 301.6111–3(b) of this chapter who have previously made a tax statement with respect to a transaction described in paragraph (a) of this section have disclosure and list maintenance obligations as described in §§ 301.6111–3 and 301.6112–1 of this chapter, respectively. Notwithstanding § 301.6111–3(b)(4)(i) and (iii) of this chapter, material advisors are required to disclose only if they have made a tax statement on or after the date that is six years before January 14, 2025. Material advisors that are uncertain whether the transaction they are required to disclose should be reported under this section or § 1.6011–10 should disclose under § 1.6011–10 and will not be required to disclose a second time if it is later determined that the transaction should have been disclosed under this section.

**Douglas W. O'Donnell,**

*Deputy Commissioner.*

    Approved: January 3, 2025.

**Aviva R. Aron-Dine,**

*Deputy Assistant Secretary of the Treasury (Tax Policy).*

[FR Doc. 2025–00393 Filed 1–10–25; 4:15 pm]

**BILLING CODE 4830–01–P**