IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
Houston Division

| | | |
|---|---|---|
| DRAKE PLASTICS LTD. CO., *et al.*, | ) | |
| | ) | Case No. 4:25-cv-2570 |
| Plaintiffs, | ) | |
| | ) | Judge Lee H. Rosenthal |
| v. | ) | |
| | ) | |
| INTERNAL REVENUE SERVICE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT**

Dated: January 30, 2026

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General
Tax Litigation Branch

MOIRA E. GOODWIN
DC Bar No. 1780293
S.D. Tex. No. 3924157
ADAM S. DOMITZ
NY Bar No. 6213896
S.D. Tex. No. 3926145
Trial Attorneys
Tax Litigation Branch
Civil Division, Department of Justice
P.O. Box 227
Washington, D.C. 20044
202-718-7056 (phone)
202-514-6866 (fax)
moira.e.goodwin@usdoj.gov
adam.s.domitz@usdoj.gov

**Table of Contents**

I.    Introduction. ............................................................................................................... 1

II.   Background. ................................................................................................................. 2

  A.  Captive insurance and I.R.C. § 831(b). ................................................................. 2

  B.  Reportable transactions. ........................................................................................ 6

  C.  Treasury identified certain § 831(b) captives as reportable transactions. ........... 7

III.  Standard. ..................................................................................................................... 8

IV.   Argument. ................................................................................................................... 8

  A.  Congress expressly delegated authority to Treasury to identify reportable
      transactions, which is what Treasury did in the Final Rule. ................................. 8

    1.  Treasury promulgated the Final Rule under an express delegation. ................. 9

    2.  The Final Rule does not exceed the bounds of the express delegation. ......... 10

  B.  All aspects of the Final Rule are reasonable and reasonably explained. ........... 13

    1.  Treasury reasonably concluded that certain arrangements could be
        mischaracterized as § 831(b) captives to be used for tax avoidance. ........... 15

    2.  Treasury reasonably employed objective factors to delineate the reportable
        transactions. .................................................................................................... 17

    3.  The factors Treasury chose reasonably correlate with tax avoidant, not-real
        insurance arrangements, such that they serve as reasonable, objective proxies. .......... 18

      a.  Treasury reasonably explained the modified loss ratio factor. ................. 19

      b.  Treasury reasonably explained the financing factor. ................................ 23

      c.  The administrative record sufficiently supports both factors. ................. 26

    4.  The thresholds within the objective factors are reasonable, and Treasury
        reasonably adjusted them in response to comments. ...................................... 29

      a.  The listed transaction thresholds are reasonable. ..................................... 30

      b.  The transaction of interest thresholds are reasonable. ............................. 31

  C.  Were the Court to identify a defect in the Final Rule, it should consider
      supplemental briefing on remedy, which should be tailored to the defect. ........ 33

V.    Conclusion. .............................................................................................................. 35

## Table of Authorities

**Page(s)**

**Cases**

*Arizona v. Biden*,
    40 F.4th 375 (6th Cir. 2022) ................................................................34

*Avrahami v. Comm'r*,
    149 T.C. 144 (2017)................................................................ *passim*

*Caylor Land & Dev. v. Comm'r*,
    T.C. Memo. 2021-30, 2021 WL 915613 (2021)................................4, 5

*CFM Ins. v. Comm'r*,
    T.C. Memo. 2025-83, 2025 WL 2207492 (2025)................................4

*Chamber of Com. of U.S. v. U.S. SEC*,
    85 F.4th 760 (5th Cir. 2023) ................................................................31

*CIC Servs., LLC v. IRS*,
    592 F. Supp. 3d 677 (E.D. Tenn. 2022), *as modified by* 2022 WL 2078036
    (E.D. Tenn. June 2, 2022) ................................................................7, 16

*CIC Servs., LLC v. IRS*,
    593 U.S. 209 (2021)................................................................ *passim*

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021)................................................................13, 14, 33

*Flyers Rts. Educ. Fund v. FAA*,
    864 F.3d 738 (D.C. Cir. 2017) ................................................................29

*Franciscan All., Inc. v. Becerra*,
    47 F.4th 368 (5th Cir. 2022) ................................................................34

*Gill v. Whitford*,
    585 U.S. 48 (2018)................................................................34

*Huawei Techs. USA, Inc. v. FCC*,
    2 F.4th 421 (5th Cir. 2021) ................................................................14, 22

*Huckaby v. U.S. Dep't of Treasury, IRS*,
    794 F.2d 1041 (5th Cir. 1986) ................................................................27

*Huntington Ingalls, Inc. v. Dir., Off. of Workers' Comp. Programs*,
    70 F.4th 245 (5th Cir. 2023) ................................................................26

*Jones v. Comm'r*,
   T.C. Memo. 2025-25, 2025 WL 1924077 (2025), *supplemented by*, T.C.
   Memo. 2025-78, 2025 WL 2078311 (2025) .............................................................4

*Kadau v. Comm'r*,
   T.C. Memo. 2025-81, 2025 WL 2181155 (2025) ....................................................4

*Keating v. Comm'r*,
   T.C. Memo. 2024-2, 2024 WL 50234 (2024) ..............................................4, 5, 27

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024).............................................................................................26

*Mayfield v. U.S. Dep't of Lab.*,
   117 F.4th 611 (5th Cir. 2024) ..............................................................................9

*Midship Pipeline Co., LLC v. FERC*,
   45 F.4th 867 (5th Cir. 2022) ..............................................................................11

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010).............................................................................................35

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*,
   463 U.S. 29 (1983)...............................................................................................19

*Nasdaq Stock Mkt. LLC v. SEC*,
   38 F.4th 1126 (D.C. Cir. 2022)............................................................................34

*Patel v. Comm'r*,
   T.C. Memo. 2024-34, 2024 WL 1270772 (2024), *supplemented by*, 165 T.C.
   No. 10, 2025 WL 3158814 (2025)..............................................................4, 5, 12

*Payne v. Levy*,
   35 F. Supp. 2d 951 (S.D. Tex. 1998) ..................................................................28

*Planned Parenthood Fed'n of Am., Inc. v. Heckler*,
   712 F.2d 650 (D.C. Cir. 1983) ............................................................................11

*Puglisi v. Comm'r*,
   2021 WL 7162530 (T.C. Oct. 29, 2021)..........................................................30, 31

*R.V.I. Guar. v. Comm'r*,
   145 T.C. 209 (2015).........................................................................................30, 32

*Royalty Mgmt. Ins. v. Comm'r*,
   T.C. Memo. 2024-87, 2024 WL 4200129 (2024) (AR 736–68), *appeal
   dismissed*, 2025 WL 512503 (10th Cir. Jan. 10, 2025)......................................4, 27

*Rsrv. Mech. Corp. v. Comm'r*,
  34 F.4th 881 (10th Cir. 2022) ................................................5

*Ryan, LLC v. IRS*,
  2025 WL 3089415 (N.D. Tex. Nov. 5, 2025) ...........................9, 11

*SEC v. Chenery Corp.*,
  332 U.S. 194 (1947).................................................................32

*Shenzhen Youme Info. Tech. Co., Ltd. v. FDA*,
  147 F.4th 502 (5th Cir. 2025) .............................................13, 14

*Swift v. Comm'r*,
  144 F.4th 756 (5th Cir. 2025) ............................................ *passim*

*Swift v. Comm'r*,
  T.C. Memo. 2021-13, 2024 WL 378671 (2024), *aff'd*, 144 F.4th 756 (5th Cir.
  2025) .......................................................................................4

*Syzygy Ins. v. Comm'r*,
  T.C. Memo. 2019-34, 2019 WL 1559540 ...............................2, 4

*Texas v. United States*,
  497 F.3d 491 (5th Cir. 2024) .....................................................11

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) .....................................................34

*Trump v. CASA, Inc.*,
  145 S. Ct. 2540 (2025)...............................................................35

*Turnham v. Comm'r*,
  979 F.3d 1322 (11th Cir. 2020) .................................................10

*United States v. Texas*,
  599 U.S. 670 (2023)...................................................................34

*VanDerStok v. Garland*,
  86 F.4th 179 (5th Cir. 2023), *rev'd on other grounds*, *Bondi v. VanDerStok*,
  145 S. Ct. 857 (2025)...........................................................9, 11

*Wages & White Lion Invs. v. FDA*,
  90 F.4th 357 (5th Cir. 2024) (*en banc*), *vacated on other grounds*, *FDA v.
  Wages & White Lion Invs.*, 604 U.S. 542 (2025)) ......................29

*Yogi Metals Grp. Inc. v. Garland*,
  567 F. Supp. 3d 793 (S.D. Tex. 2021) ........................................8

**Statutes**

5 U.S.C. § 706(2) ....................................................................................8, 13, 35

I.R.C. § 831(a) ........................................................................................................3

I.R.C. § 831(b) ...............................................................................................*passim*

I.R.C. § 6011 .................................................................................................*passim*

I.R.C. § 6103 ...............................................................................26, 27, 28, 31

I.R.C. § 6501(c)(10) .........................................................................................30

I.R.C. § 6662A(b)(2)(A) ...................................................................................30

I.R.C. § 6707A ..............................................................................................*passim*

I.R.C. § 7421(a) ............................................................................................7, 10

**Other Authorities**

Charlene D. Luke, *Captivating Deductions*, 46 Hofstra L. Rev. 855, 857 (2018) ........................4

*Governmental Attempts to Stem the Rising Tide of Corporate Tax Shelters*, 117 Harv. L. Rev. 2249, 2252 (May 2004)....................................................................12

*Technical Explanation of the Tax and Pension Provisions of H.R. 3108, the "Pension Stability Act," as Passed by the Senate on January 28, 2004*, JCX-12-04 (Feb. 9, 2004)........................................................................12, 13

*Corporate Tax Shelters: Hearing Before the S. Comm. on Finance*, 107th Cong. 2 (2002)..........................................................................................6

Instructions for Form 8886 (https://perma.cc/HS9T-MPH9) ........................22

Notice 2016-66, 2016 WL 6462459 ........................................................7, 16, 30, 31

Reuven S. Avi-Yonah, *A New Tax Shelter Wave*, https://perma.cc/KB5R-37YQ ........................4

Roger Mceowen, *Captive Insurance*, 49 Est. Plan. 03 (July 2022)................................2

Treas. Reg. § 1.162-1(a) ....................................................................................3

Treas. Reg. § 1.6011-4 ................................................................................*passim*

Treas. Reg. § 1.6011-10 ...................................................10, 11, 19, 20, 23, 29, 34

Treas. Reg. § 1.6011-11 ...................................................................9, 19, 29, 34

## I.    Introduction.

In a typical (if oversimplified) micro-captive transaction, Company A owns a separate but related Company B, that exists to insure the risks of Company A (and any related entities). When Company A pays "insurance premiums" to Company B, Company A can take a § 162 business-expense deduction for the payments, and if Company B makes an § 831(b) election, it need not include those payments in its taxable income. The result is neither company pays immediate tax on the would-be income (Company B by the exclusion, and Company A by using the deductions to offset an equal amount of its other would-be income). Company B may then return the economic benefit of the income to Company A, either through a loan, a dividend (taxed at a lower rate), or by using the income for Company A's benefit, such as by purchasing property to be used by Company A.

The transaction described above may be completely legitimate. If Company B is a legitimate insurance company, then there is no *improper* tax avoidance, even though no tax is immediately paid on the premiums. "That much, for better or worse, is a congressional choice." *CIC Servs., LLC v. IRS*, 593 U.S. 209, 213 (2021). But if the "insurance premiums" paid from Company A to Company B are "not really for insurance," then the transaction is improperly tax avoidant. *Id.* And as recent Fifth Circuit precedent confirms, *Swift v. Comm'r*, 144 F.4th 756 (5th Cir. 2025), "some micro-captive transactions are of that kind," *CIC Servs.*, 593 U.S. at 213.

Congress authorized Treasury to require various disclosures from taxpayers, including for transactions with a potential for abuse. I.R.C. §§ 6011; 6707A. When Treasury identifies a "reportable transaction," taxpayers participating in the identified arrangement (and their advisors) must file an information return, disclosing that participation. Treas. Reg. § 1.6011-4. A reportable transaction is "of a type which the Secretary determines as having a potential for tax avoidance or evasion." I.R.C. § 6707A(c)(1).

Pursuant to express delegations under §§ 6011 and 6707A, Treasury promulgated a notice-and-comment regulation identifying certain micro-captive arrangements as reportable transactions. *See* Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest, 90 Fed. Reg. 3,534 (Jan. 14, 2025) (codified at Treas. Reg. § 1.6011-10 and § 1.6011-11) (full text filed at D.E. 21-1) (hereinafter "Final Rule"). Plaintiffs challenge the Final Rule under the APA, claiming Treasury lacked authority to issue it, failed to adequately explain it, and, in drafting it, failed to respond to meaningful comments. Because Congress expressly delegated authority to Treasury to issue precisely this type of regulation, the disclosure criteria is both reasonable and reasonably explained, and Treasury considered all significant comments, the Court should reject Plaintiffs' challenge and enter judgment for the Government.[1]

## II.     Background.

### A.  Captive insurance and I.R.C. § 831(b).

In a captive insurance transaction, a parent company owns a separate but related entity (a "captive"), whose purpose is to insure the risks of the parent company and its associated entities (the "insureds"). *See* Roger Mceowen, *Captive Insurance*, 49 Est. Plan. 03, at *3 (July 2022). Captive insurance, like most aspects of insurance, is created and regulated by state law.[2] *See* Captive Insurance Companies, 0110 REGSURVEYS 6 (July 2025). The Code contains no definition of (or reference to) captive insurance. *Cf. Syzygy Ins. v. Comm'r*, T.C. Memo. 2019-34, 2019 WL 1559540, at *28–29 ("Neither the Code nor the regulations define insurance.").

---

[1] All references to "I.R.C." or "the Code" are to the Internal Revenue Code of 1986, codified at Title 26 of the United States Code (26 U.S.C.), as amended and in effect for the relevant period. Unless otherwise indicated, all section references are to the I.R.C. All citations to "AR" are to the administrative record.

[2] A company may also locate its captive in a foreign jurisdiction. *E.g.*, *Swift*, 144 F.4th at 761 (captives incorporated in the Federation of Saint Christopher and Nevis). Regardless, captive insurance is not created, defined, or regulated by U.S. federal law.

The Code does, however, govern the tax treatment of insurance, however insurance is defined. *See* I.R.C. §§ 801–848. For instance, non-life insurance companies are generally taxed on all income at the corporate rate. I.R.C. § 831(a). And entities paying insurance premiums in connection with a trade or business can deduct amounts paid as an ordinary and necessary business expense under § 162(a). *See* Treas. Reg. § 1.162-1(a).

While the Code does not define or regulate the "captive" piece of micro-captive insurance, it does define the "micro." That is the function of § 831(b), which is central to Plaintiffs' claims. If any non-life insurance company has "net written premiums (or, if greater, direct written premiums) for the taxable year" that "do not exceed $2,200,000" (indexed for inflation), and meets one of two diversification requirements, it can elect under § 831(b) to be taxed on only its taxable investment income. I.R.C. § 831(b). The result is the amount received as premium income, which is deducted as a business expense from the entity paying those premiums, is excluded from the recipient's taxable income and altogether exempt from current tax. *Avrahami v. Comm'r*, 149 T.C. 144, 179 (2017).

Congress enacted § 831(b) as part of the Tax Reform Act of 1986, AR 1429–30, to simplify the taxation of small insurance companies, *id.* at 5657. Section 831(b) eliminated the previous distinction between mutual companies and other companies and extended "the benefit of the small company provision to all eligible small companies, whether stock or mutual." *Id.* at 5657, 5667. Section 831(b), by its terms, can apply to *all* non-life insurance companies—it is not a captive insurance provision. *See* I.R.C. § 831(b)(2)(A). While Plaintiffs suggest that Congress enacted § 831(b) to "incentivize small captives that meet statutory criteria," D.E. 59 at 7, that is not reflected in the history, *e.g.*, AR 5657, 3597. Captives are only ever explicitly referenced when Congress notes that they can be misused for estate planning. AR 3809 n.657, 3810.

Sections 831(b) and 162(a) combine to allow qualifying insurance companies—not just captives—to avoid tax on certain income. The availability of potential tax benefits provides an incentive to characterize an arrangement as insurance, even if it does not qualify as insurance for federal tax purposes. *See* AR 13102; Charlene D. Luke, *Captivating Deductions*, 46 Hofstra L. Rev. 855, 857 (2018) ("As a result of the difference in treatment between savings and premiums, businesses have an incentive to create structures that take the form of insurance but that have the substantive features of an ordinary investment."). So long as the small insurance company provides insurance for federal tax purposes, the exclusion of certain income from tax is not improper—it is the congressional design. *CIC Servs.*, 593 U.S. at 213. But the §§ 831(b) and 162(a) tax benefits require that the company "transact[s] in insurance," and that the insurance premiums are "truly payments for insurance." *Syzygy Ins.*, 2019 WL 1559540, at *10. As recent cases show, however, taxpayers are structuring companies to claim tax benefits for § 831(b) captive arrangements that fail to qualify as insurance for federal tax purposes.[3] Reuven S. Avi-Yonah, *A New Tax Shelter Wave*, at 3 n.23, https://perma.cc/KB5R-37YQ (identifying captive insurance arrangements as part of the current "third tax shelter wave").

---

[3] *E.g.*, *Avrahami v. Comm'r*, 149 T.C. 144 (2017) (AR 31–67) (micro-captive failed to distribute risk and did not act as insurer commonly would); *Syzygy Ins. v. Comm'r*, T.C. Memo. 2019-34, 2019 WL 1559540 (2019) (AR 855–75) (same); *Caylor Land & Dev. v. Comm'r*, T.C. Memo. 2021-30, 2021 WL 915613 (2021) (AR 111–63) (same); *Patel v. Comm'r*, T.C. Memo. 2024-34, 2024 WL 1270772 (2024) (AR 555–90) (same), *supplemented by*, 165 T.C. No. 10, 2025 WL 3158814 (2025); *Royalty Mgmt. Ins. v. Comm'r*, T.C. Memo. 2024-87, 2024 WL 4200129 (2024) (AR 736–68) (same), *appeal dismissed*, 2025 WL 512503 (10th Cir. Jan. 10, 2025); *Jones v. Comm'r*, T.C. Memo. 2025-25, 2025 WL 1924077 (2025) (same), *supplemented by*, T.C. Memo. 2025-78, 2025 WL 2078311 (2025); *Keating v. Comm'r*, T.C. Memo. 2024-2, 2024 WL 50234 (2024) (AR 405–51) (not insurance in commonly accepted sense); *Swift v. Comm'r*, T.C. Memo. 2021-13, 2024 WL 378671 (2024) (AR 823–54) (same), *aff'd*, 144 F.4th 756 (5th Cir. 2025); *Kadau v. Comm'r*, T.C. Memo. 2025-81, 2025 WL 2181155 (2025) (same); *CFM Ins. v. Comm'r*, T.C. Memo. 2025-83, 2025 WL 2207492 (2025) (same), *appeals docketed*, 26-1067 (7th Cir. Jan. 13, 2026)) (insureds) and 26-9001 (10th Cir. Jan. 21, 2026) (captive).

While any type of structure could theoretically be employed to abuse § 831(b) under the guise of so-called insurance, captives provide more opportunity than others because the captive and the insured are related entities. *Caylor Land & Dev. v. Comm'r*, T.C. Memo. 2021-30, 2021 WL 915613, at *10 (2021). That proximity raises three distinct concerns. First, payments made for insurance premiums are deductible under § 162, but "amounts set aside in a loss reserve as a form of self-insurance are not." *Avrahami*, 149 T.C. at 174. A captive *can* provide insurance—by shifting risk, processing claims, etc.—but its closely-held nature creates higher risk that what the taxpayer is characterizing as insurance functions more like a savings account. *E.g.*, *Keating v. Comm'r*, T.C. Memo. 2024-2, 2024 WL 50234, at *26 (2024).

Second, if the captive and the insured are parties to a financing agreement, it is possible for the insured to "pay" premiums to the captive and obtain a *tax* benefit without losing the *economic* benefit of the funds. *See Rsrv. Mech. Corp. v. Comm'r*, 34 F.4th 881, 885 (10th Cir. 2022). If a company pays $2 million to a third-party commercial insurer, for instance, it might enjoy a $2 million § 162(a) deduction, but so long as the applicable tax rate is anything less than 100%, that tax deduction is less valuable than the two million actual dollars that went out the door. In a captive, in contrast, the $2 million goes from Company A to Company B, then, often, immediately *back* to Company A. *Avrahami*, 149 T.C. at 179. There is more opportunity for abuse if a taxpayer can enjoy a tax loss without having to suffer a corresponding economic loss. *Patel v. Comm'r*, 165 T.C. No. 10, 2025 WL 3158814, at *13 (2025).

Third, in a captive, unlike with a commercial insurer, the taxpayer is on both sides of the transaction. So the taxpayer could cause the parties to administer the "insurance" contract in a manner inconsistent with arm's length transactions and sound business practices. *See Rsrv. Mech.*, 34 F.4th at 884–85. For example, the captive could charge premiums right at the § 831(b)

5

threshold, pay few (if any) claims, and loan surplus funds back to the insureds, in a way a commercial insurer would not. *Id.*; *Avrahami*, 149 T.C. at 179.

All of that to say, the Code includes an incentive to mischaracterize arrangements as insurance, and the nature of micro-captives offers an opportunity. Together, the *incentive* for tax avoidance and the *opportunity* for tax avoidance result in the *potential* for tax avoidance. Thus, using the express authority delegated by Congress in § 6707A, Treasury identified certain § 831(b) captive transactions as "reportable transactions."

### B. Reportable transactions.

Section 6011 requires taxpayers to "make a return or statement according to . . . regulations prescribed by the Secretary." I.R.C. § 6011. With that express delegation of rulemaking authority, Treasury created the existing reportable transaction regime. *See* Tax Shelter Regulations, 68 Fed. Reg. 10,161 (Mar. 4, 2003) (codified at Treas. Reg. § 1.6011-4). There are five types of reportable transactions, all of which trigger a disclosure obligation. Treas. Reg. § 1.6011-4(b). Two are relevant here: "listed transactions" and "transactions of interest." *Id.* A listed transaction is "a transaction that is the same as or substantially similar to one of the types of transactions that the IRS has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction." Treas. Reg. § 1.6011-4(b)(2). A transaction of interest is "a transaction that is the same as or substantially similar to one of the types of transactions that the IRS has identified by notice, regulation, or other form of published guidance as a transaction of interest." Treas. Reg. § 1.6011-4(b)(6).

Initial compliance with Treas. Reg. § 1.6011-4 was, "to put it bluntly, a joke." *Corporate Tax Shelters: Hearing Before the S. Comm. on Finance*, 107th Cong. 2 (2002) (statement of Max Baucus, Chairman, S. Comm. on Finance). Thus, in 2004, at the height of Congress's efforts to equip the IRS to combat ever-evolving tax shelters, Congress enacted § 6707A, which codified

the reportable transaction framework and created an enforcement mechanism—the failure-to-disclose penalty. AR 3445–61. Under the statute, all reportable transactions must be "of a type which the Secretary determines as having a potential for tax avoidance or evasion," I.R.C. § 6707A(c)(1), and listed transactions must be "specifically identified by the Secretary as a tax avoidance transaction for purposes of section 6011," I.R.C. § 6707A(c)(2). If a participant fails to disclose a reportable transaction, the IRS can assess a penalty under § 6707A(a), and if a material advisor fails to disclose connection to a reportable transaction, the IRS can assess a penalty under § 6707(a).

### C.  Treasury identified certain § 831(b) captives as reportable transactions.

In 2016, Treasury identified certain § 831(b) captive transactions as transactions of interest. See Notice 2016-66, 2016 WL 6462459. A material advisor challenged Notice 2016-66 under the APA. *CIC Servs.*, 593 U.S. at 214–15. The District Court for the Eastern District of Tennessee dismissed that challenge under the Anti-Injunction Act, but the Supreme Court reversed. *Id.*; *see also id.* at 228 (Kavanaugh, J., concurring) (noting the case carved out a "new exception" to the AIA). On remand, the district court vacated Notice 2016-66 under the APA for failure to comply with notice-and-comment procedures. *See CIC Servs., LLC v. IRS*, 592 F. Supp. 3d 677, 683 (E.D. Tenn. 2022), *as modified by* 2022 WL 2078036 (E.D. Tenn. June 2, 2022). The court further held that Notice 2016-66 was arbitrary and capricious because the administrative record did not include sufficient "facts and data showing that micro-captive insurance arrangements have a potential for tax avoidance or evasion." *Id.* at 687.

The Government responded reasonably—Treasury underwent notice-and-comment procedures to identify the relevant § 831(b) captive transactions as reportable transactions by regulation, building a thorough record to explain such transactions' potential for tax avoidance. The Final Rule is the result.

The Final Rule immediately drew three functionally identical APA challenges (including this one).[4] Here, Plaintiffs claim the Final Rule exceeds Treasury's statutory authority (Count I), is arbitrary and capricious for lack of reasoned justification (Count II), and is arbitrary and capricious for failure to adequately respond to comments (Count III). *See* D.E. 1. Plaintiffs moved for a preliminary injunction on Counts I and II, D.E. 17, which the Court took under advisement following an oral argument, D.E. 33.

### III.     Standard.

Plaintiffs challenge the Final Rule under the APA, so summary judgment provides the appropriate mechanism for judicial review. *See Yogi Metals Grp. Inc. v. Garland*, 567 F. Supp. 3d 793, 798 (S.D. Tex. 2021). Rather than applying the traditional standard under Fed. R. Civ. P. 56, the Court must "determine whether as a matter of law the evidence in the administrative record permitted the agency's decision." *Id.* The Court "reviews the record only to determine whether the agency acted within its authority, whether the agency explained its decision, whether the record supports the facts on which the agency relied, and whether the agency relied on the factors intended by Congress." *Id.*; *see also* 5 U.S.C. § 706(2).

### IV.     Argument.

#### A.     Congress expressly delegated authority to Treasury to identify reportable transactions, which is what Treasury did in the Final Rule.

Plaintiffs first contend that Treasury exceeded its statutory authority because the Final Rule frustrates the policy judgment Congress made in § 831(b), thereby exceeding Treasury's disclosure authority created by § 6707A. D.E. 59 at 19–24. Plaintiffs' theory cannot overcome the plain text of § 6707A.

---

[4] The other challenges are *CIC Servs., LLC v. IRS*, Case No. 3:25-cv-146 (E.D. Tenn.) (filed Apr. 9, 2025) and *Ryan, LLC v. IRS*, Case No. 3:25-cv-78 (N.D. Tex.) (filed Jan. 10, 2025).

To determine whether an agency exceeded its statutory authority, courts look to the "plain language" of the "statute under which the agency purports to act." *VanDerStok v. Garland*, 86 F.4th 179, 188 (5th Cir. 2023), *rev'd on other grounds*, *Bondi v. VanDerStok*, 145 S. Ct. 857 (2025). When the authorizing statute includes an express delegation of discretionary authority, "the question is whether the Rule is within the outer boundaries of that delegation." *Mayfield v. U.S. Dep't of Lab.*, 117 F.4th 611, 617 (5th Cir. 2024).

**1. Treasury promulgated the Final Rule under an express delegation.**

Treasury issued the Final Rule pursuant to §§ 6011 and 6707A, the latter of which incorporates and codifies the reportable transaction framework set out in Treas. Reg. § 1.6011-4. Under that framework, taxpayers participating in "reportable transactions" must disclose that participation. Treas. Reg. § 1.6011-4(a). Section 6707A confers broad discretionary authority to Treasury to identify reportable transactions, requiring only that the Secretary "determine[]" that the transaction "ha[s] a potential for tax avoidance or evasion." I.R.C. § 6707A(c)(1); *see also CIC Servs.*, 593 U.S. at 213 (noting § 6707A(c)(1)'s express delegation); *Ryan, LLC v. IRS*, 2025 WL 3089415, at *10 (N.D. Tex. Nov. 5, 2025) (same). Because nondisclosure carries higher penalties, listed transactions (a subcategory of reportable transactions) must be "specifically identified by the Secretary as a tax avoidance transaction for purposes of section 6011." I.R.C. § 6707A(c)(2).

In the Final Rule, Treasury did exactly what § 6707A authorizes it to do: it identified reportable transactions. *See Ryan*, 2025 WL 3089415, at *10–11. It determined that one sub-set of micro-captive transactions had the potential to be tax avoidant, explained that determination, and identified those transactions as transactions of interest. Final Rule at 3,542, 3,546; Treas. Reg. § 1.6011-11(c). And it deemed a significantly smaller sub-set of micro-captive transactions to be tax avoidant for purposes of disclosure requirements and penalties, and thus specifically

identified those transactions as listed transactions. Final Rule at 3,542, 3,546; Treas. Reg.
§ 1.6011-10(c).

### 2. The Final Rule does not exceed the bounds of the express delegation.

Despite this straightforward textual analysis, Plaintiffs maintain that the Final Rule
exceeds the authority granted to Treasury by §§ 6011 and 6707A. Plaintiffs appear to contend
that by subjecting certain § 831(b) captives to an annual disclosure requirement—based on
criteria different than the eligibility criteria included in § 831(b)—the Final Rule "effectively
rewrites Section 831(b)" and generally frustrates Congress's intent to incentivize micro-captives.
D.E. 59 at 22. Plaintiffs' theory fails for three reasons.

First, as Plaintiffs' counsel conceded at the preliminary injunction hearing, the Final Rule
simply enacts a disclosure requirement. D.E. 61, Tr. at 4:1–11; 14:14–20 (Oct. 8, 2025). It does
not alter a taxpayer's entitlement to tax benefits on the merits, and it does not change or
"rewrite" criteria to qualify for § 831(b) treatment in any way.[5] Existing regulations explicitly
state: "The fact that a transaction is a reportable transaction *shall not affect the legal
determination of whether the taxpayer's treatment of the transaction is proper*." Treas. Reg.
§ 1.6011-4(a) (emphasis added); *see also Turnham v. Comm'r*, 979 F.3d 1322, 1326 (11th Cir.
2020). The Final Rule creates a disclosure obligation, which is precisely what §§ 6707A
and 6011 authorize Treasury to do.

Even identification as a listed transaction does not mean the claimed tax benefits will be
disallowed after audit. Section 6707A requires the Secretary to specifically identify listed

---

[5] If the Final Rule *did* alter the criteria for the substantive tax benefits under §§ 831(b) and
162(a), then this suit to enjoin that Rule would violate the Anti-Injunction Act. *See* I.R.C.
§ 7421(a); *CIC Servs.*, 593 U.S. at 219 (allowing suit to proceed because "CIC's complaint asks
for injunctive relief from the Notice's reporting rules, *not from any impending or eventual tax
obligation*" (emphasis added)).

transactions as tax avoidant "*for purposes of section 6011*," not across the Code. I.R.C. § 6707A(C)(2) (emphasis added). That is why the Final Rule repeatedly emphasizes that "[t]axpayers remain free to engage in any captive insurance transaction, regardless of whether such transaction is identified in § 1.6011-10 or § 1.0611-11." Final Rule at 3,538; *accord id.* at 3,539.

Recognizing the Final Rule imposes a "reporting requirement" and nothing more, another district court dismissed the exceeds-authority and contrary-to-law counts of a parallel APA challenge to the Final Rule. *Ryan*, 2025 WL 3089415, at *11. That court correctly held that the Final Rule "does not preclude captive insurance companies—and [micro-captives] in particular—from existing or obtaining preferential tax treatment; it merely sets disclosure obligations for transactions involving a subset of those entities." *Id.*

Second, Plaintiffs' theory, which focuses on Congress's intent behind § 831(b), lacks relevant precedent. Plaintiffs begin their exceeds-authority section with a string of quotations, purporting to support a rule that an agency exceeds authority under the APA if it takes an action that "frustrates the congressional policy which underlies a statute." D.E. 59 at 19–20. But none of those quotations appear in opinions of the Fifth Circuit. While other circuits, at least in the past, looked to "congressional purposes underlying the *authorizing* statute," *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 655 (D.C. Cir. 1983) (emphasis added), this Circuit looks only to the plain language of the statute under which the agency acted, *e.g.*, *VanDerStok*, 86 F.4th at 188; *Texas v. United States*, 497 F.3d 491, 500–01 (5th Cir. 2024); *Midship Pipeline Co., LLC v. FERC*, 45 F.4th 867, 876 (5th Cir. 2022). Whatever policy choices Congress made in § 831(b) have no bearing on whether Treasury was authorized to issue the Final Rule under § 6707A. *See Ryan*, 2025 WL 3089415, at *10–11.

11

And third, even were the Court willing to look to implicit congressional policy underlying §§ 6707A or 831(b), it would find no conflict. As to the former, Congress enacted § 6707A due to growing concern about tax shelters stemming from widespread abuses in the early 2000s. *See, e.g.*, *Governmental Attempts to Stem the Rising Tide of Corporate Tax Shelters*, 117 Harv. L. Rev. 2249, 2252 (May 2004) (collecting estimates of tax losses related to tax shelters, ranging from $14 to $50 billion annually). As the House Ways and Means Committee explained, "the best way to combat tax shelters is to be aware of them." AR 3446. Thus, the Final Rule, which requires disclosure of transactions that Treasury determined can be abused to shelter income, is consistent with the legislative intent behind § 6707A.

As to § 831(b), Plaintiffs are wrong when they suggest Congress intended tax benefits to flow to any taxpayer purporting to satisfy § 831(b)'s eligibility requirements. The purpose of § 831(b) is to offer tax benefits to *legitimate* small insurance companies, not to any taxpayer putting forth an arrangement it labels insurance. *See Swift v. Comm'r*, 144 F.4th 756, 764, 769 (5th Cir. 2025) (confirming that, for taxpayers to claim § 162(a) deductions, premiums paid to a captive "must have been 'really for insurance'" and affirming that, despite a captive purporting to provide insurance, payments made to it were "not for insurance" (citing *CIC Servs.*, 593 U.S. at 213)), *petition for cert. filed*, No. 25-680 (Dec. 11, 2025); *see also Patel*, 2025 WL 3158814, at *13  ("The Patels do not direct us to any congressional inducement to claim deductions for premiums for purported insurance that is not, in fact, insurance.").

Congress was clear when it enacted § 831(b): its intent was not that it "be used as a means of eliminating tax liability . . . but rather as a simplification for small companies." AR 3183. Congress only intended that the benefits of § 831(b) apply to legitimate insurance companies. *Technical Explanation of the Tax and Pension Provisions of H.R. 3108, the "Pension*

12

*Stability Act," as Passed by the Senate on January 28, 2004*, JCX-12-04 at 24 (Feb. 9, 2004). In fact, Congress specifically directed Treasury to issue regulations providing "anti-abuse rules so as to prevent improper use of [§ 831(b)], including, for example, by attempts to characterize as premiums any income that is other than premium income." *Id.* at 25. "A company that does not meet the definition of an insurance company is not eligible to be exempt from Federal income tax" under the Code. *Id.* at 24; *accord CIC Servs.*, 593 U.S. at 213 ("[N]o tax benefit should accrue if the money is not really for insurance—if the insurance contract is a sham, which the affiliated companies have entered into only to escape tax liability.").

In sum, with the Final Rule, Treasury acted within the bounds of an express delegation.

### B.  All aspects of the Final Rule are reasonable and reasonably explained.

Assuming Treasury *can* identify potentially tax avoidant transactions for reporting, the question becomes whether it did so reasonably. Plaintiffs contend that even if Treasury can identify reportable transactions, the Final Rule should still be set aside because it is arbitrary and capricious. Specifically, Plaintiffs claim Treasury failed to adequately explain its decision to use a modified loss ratio as a factor in its reportable transaction definitions, D.E. 59 at 26, failed to adequately explain and support the 30% and 60% thresholds selected, *id.* at 27–33, failed to adequately explain and support its reliance on related-party financing, *id.* at 34–36, and failed to meaningfully respond to significant comments, *id.* at 37–39. Because the Final Rule is "reasonable and reasonably explained," the Government is entitled to summary judgment. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

The Court must uphold the Final Rule unless it finds it "arbitrary, capricious, or an abuse of discretion." 5 U.S.C. § 706(2). Agency action can be set aside only if it "fails to account for relevant factors or evinces a clear error of judgment." *Shenzhen Youme Info. Tech. Co. v. FDA*, 147 F.4th 502, 509 (5th Cir. 2025). The Court's role is to "ensure[] that the agency has acted

within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423. Thus, courts should ensure the agency "articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021). But "the scope of review is narrow," and courts "must exercise appropriate deference to agency decisionmaking." *Shenzhen Youme Info. Tech. Co.*, 147 F.4th at 509.

Treasury made four distinct decisions in the Final Rule, each subject to its own reasonableness review. First, Treasury determined certain § 831(b) captive arrangements have a potential for tax avoidance. Treasury explained its view that the following transaction is tax avoidant: closely-related parties (a "captive" and "insureds") enter into a contract they characterize as an insurance contract; the captive makes an election under § 831(b); the insureds make payments to the captive, which the parties characterize as premiums; the captive excludes the payments from its income under § 831(b) while the insureds deduct the payments from their incomes under § 162(a); the payments are used for personal investments or returned to the insureds via financing agreements; and the captive fails to provide insurance for federal tax purposes (under current caselaw). Final Rule at 3,539. This type of arrangement can be used for tax avoidance (indeed, it *is* improperly tax avoidant), so Treasury's decision to identify it as a reportable transaction is reasonable.

Second, Treasury decided to select objective factors to capture the just-described reportable transaction. This decision is reasonable because whether a transaction is insurance for federal tax purposes—a key piece of the transaction described above—is based on the totality of the circumstances, but a disclosure requirement should not require fact-intensive analysis

14

specific to each arrangement. Treasury thus reasonably opted for objective, bright-line factors that provide all taxpayers clear notice of their disclosure obligations. By using objective metrics, rather than attempting to craft a facts-and-circumstances standard, the Final Rule conceivably carries a marginal risk of over-inclusivity—arrangements that might satisfy individualized, facts-and-circumstances review could, in theory, be included. But that risk is substantially outweighed by considerations of administrability and fairness, so Treasury's use of factors is reasonable.

Third, for bright-line, objective metrics, Treasury identified two factors consistently present in purported § 831(b) captive arrangements that fail to provide insurance for federal tax purposes: a low loss ratio over an extended period and the presence of a related-party financing agreement. To select its factors, Treasury considered all available information from taxpayer and promoter audits, litigated cases, and industry and third-party sources. When present in closely-held arrangements claiming tax-preferential treatment, both factors assist to identify arrangements that fail to provide insurance for federal tax purposes because they directly relate to the ways such arrangements are known to have been misused, namely excessive pricing of premiums, artificially low or nonexistent claims activity, and circular flow of funds.

Fourth, Treasury drew reasonable, objective lines to identify which arrangements must be disclosed as a listed transaction and which arrangements must be disclosed as a transaction of interest. Both the listed transaction criteria and the transaction of interest criteria were reasonably set, reasonably explained, and reasonably adjusted in response to comments.

### 1. Treasury reasonably concluded that certain arrangements could be mischaracterized as § 831(b) captives to be used for tax avoidance.

To start, Treasury determined that § 831(b) captive arrangements could be used for tax avoidance. Because seven cases contained in the administrative record show exactly that, Treasury's conclusion is reasonable.

Every § 831(b) captive reviewed on its merits by the Tax Court has been disallowed. *See supra* n.3. In 2016, when the IRS promulgated Notice 2016-66, it lacked the litigation track record to prove the arrangement's potential for abuse solely by reference to then-existing caselaw. *See CIC Servs.*, 592 F. Supp. 3d at 686. But in the nine years since, the IRS has swept the board on challenges to § 831(b) captives, *see supra* n.3—ten cases to date, all of which find misuse of an § 831(b) captive and seven of which are included in the administrative record. *Cf. CIC Servs.*, 592 F. Supp. 3d at 686 n.4. This is a fundamentally different record than the one presented to the district court in support of Notice 2016-66. Now, Treasury need not speculate on a transaction's potential for tax avoidance, because seven cases show exactly that reality.[6]

Treasury also went beyond the cases, explaining why § 831(b) captives have the potential to be used for tax avoidance. *See* Final Rule at 3,540 (describing the tax deferral, which creates the incentive), 3,546 (describing the lack of arm's length dealing, which provides the opportunity). The tax benefits create an incentive, the nature of captives provides an opportunity, and incentive and opportunity combine to create a potential. Treasury also relied on hundreds of pages of statistical materials, articles, and background sources about micro-captives. *See* AR 5255–5281, 13102–07, 13444–13714, 14180–14607; *see also* AR 5255–68 (industry practitioner noting in a 2014 ABA article that captives are being sold as a tax mitigation tool and not as a risk reduction method, that those "tax shelter captives" are "mostly" § 831(b) captives, and that some advisors promise captives will never "have to make claims").

---

[6] To clarify, Treasury specifically determined that the arrangement *is* tax avoidant—for purposes of § 6011—if, based on the facts and circumstances, it fails to provide insurance for federal tax purposes. The cases show both that § 831(b) captives *can be* used for tax avoidance, *and* that arrangements characterized as insurance *are* tax avoidant if they fail to transfer risk, fail to pay out claims, charge excessively high premiums, establish a circular flow of funds, or otherwise fail to act as an insurer ordinarily would. *See, e.g.*, *Avrahami*, 149 T.C. 144 (2017).

16

And, when pressed by the Court, even Plaintiffs admitted § 831(b) captives have the

potential to be used for tax abuse:

> The Court: Well, they are potentially tax-abusive. There's lots of things that are potentially tax-abusive.
>
> Ms. O'Donnell: Sure. Sure, Your Honor. And I think that the fact that there are some Tax Court cases out there finding that some micro-captives are tax-abusive show that there is a potential for tax abuse.

D.E. 61, Tr. at 14:21–25, 15:1 (Oct. 8, 2025).

Thus, Treasury's conclusion that § 831(b) captives can be used for tax avoidance is

reasonable, correct, and uncontested.

### 2. Treasury reasonably employed objective factors to delineate the reportable transactions.

Moving to the second reasonable decision Treasury made in the Final Rule, as explained

above, the transaction identified in the Final Rule as tax avoidant for purposes of the disclosure

regime is an arrangement that its participants characterize as micro-captive insurance, but which

is not, in substance, insurance. As explained, under existing caselaw, the subject arrangements do

not constitute insurance for income tax purposes because they fail to transfer and distribute risk,

fail to pay out claims, charge excessively high premiums, establish a circular flow of funds, or

otherwise fail to act as an insurer ordinarily would. *See, e.g.*, *Avrahami*, 149 T.C. 144 (2017).

Treasury reasonably concluded that a disclosure test that required facts-and-

circumstances analysis would not be administrable for the IRS or fair to taxpayers. It explained

in the Final Rule: "The Treasury Department and the IRS developed these objective factors to

ensure administrability and clarity for taxpayers whose transactions are identified in the

regulations, so taxpayers can clearly determine whether they are participants or material

advisors, and thus be on clear notice of their obligations." Final Rule at 3,535.

Treasury thus devised objective, bright-line factors that correlate with tax avoidant, not-real insurance arrangements, but which do not themselves control whether any given transaction is improperly avoidant. Treasury did not determine, and does not contend, that every transaction with a modified loss ratio below a certain threshold (with or without related-party financing) is tax avoidant on its merits. Treasury determined that arrangements are tax avoidant if they are characterized as insurance by their participants, and the small insurance tax benefits are claimed, but they are not, in substance, insurance. Then *separately* decided—reasonably—to use objective metrics, which, when combined, reasonably identify the not-real insurance transactions.

Treasury understood that its factors may be overinclusive, and it acknowledged repeatedly that a transaction may still be legitimate even if it satisfies one or more factors. Final Rule at 3,541 (requiring conjunction of all factors for listed transactions to better target tax avoidant transactions), 3,545 (noting financing factor alone "may not rise to the level of tax avoidance"). If the import of the Final Rule were to disallow transactions on their merits, over-inclusivity may raise concerns. But the Final Rule is simply a disclosure requirement—the bright-line factors *correlate* with potentially avoidant transactions, but the factors do not *control* whether any given transaction will ultimately be deemed invalid on its merits. *Id.* at 3,538.

> ### 3. The factors Treasury chose reasonably correlate with tax avoidant, not-real insurance arrangements, such that they serve as reasonable, objective proxies.

In the Final Rule, Treasury explained the methodology it used to select the objective factors. Treasury reviewed transactions—both examined by the IRS and litigated in the courts—in which a captive insurance arrangement was determined to be illegitimate, and distilled those cases into consistent, descriptive characteristics. Final Rule at 3,538–39. Treasury then determined that those descriptive characteristics carry sufficient predictive value to be the best available proxies for potentially tax avoidant transactions. *Id.* at 3,554 (stating the factors

"strongly indicate tax avoidance or the potential for tax avoidance"), 3,555 (explaining these factors "consistently give[] rise to tax avoidance"). That predictive judgment is "precisely the type of issue which rests within the expertise of [Treasury], and upon which a reviewing court must be most hesitant to intrude." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 53 (1983).

Employing its discretion, and relying on the materials discussed below, Treasury identified the captive's modified loss ratio and the presence of a financing agreement between the captive and the insureds (or related parties) as two bright-line, administrable metrics that, when present in a closely-held arrangement claiming tax-preferential treatment, are consistently found in arrangements that do not provide insurance for federal income tax purposes.[7]

### a. Treasury reasonably explained the modified loss ratio factor.

The modified loss ratio factor "measures whether the amount of liabilities incurred for insured losses and claims administration expenses is significantly less than the amount of premiums earned, adjusted for policyholder dividends" over the course of a ten-year computation period (for listed transactions, *see* Treas. Reg. § 1.6011-10(b)(2)(ii)) or an up-to-ten-year computation period (for transactions of interest, *see* Treas. Reg. § 1.6011-11(b)(2)(ii)). Final Rule at 3,540. The modified loss ratio is a fraction: the numerator is the claims and expenses

---

[7] Additionally, a captive need only be disclosed if at least 20 percent of its assets or equity is owned by an insured or related entity (*i.e.*, if it is "closely held"). Treas Reg. § 1.6011-10(b)(1)(iii). The Final Rule explains that this requirement serves to *exclude* arrangements less likely to be tax avoidant, such as small mutual insurers with diversified ownership. Final Rule at 3,555. Plaintiffs suggest that the "20% Relationship Test . . . effectively renders any closely held captive subject to enhanced scrutiny." *Cf.* D.E. 59 at 36. That is wrong. A closely-held captive must still satisfy all other elements to be identified as a reportable transaction. But participants to an arrangement that otherwise meets the reportable transaction requirements need not submit a disclosure if it is not closely held.

paid out, while the denominator is premiums paid in (minus policyholder dividends).[8] Treas. Reg. § 1.6011-10(c)(2).

If an arrangement *is* tax avoidant, one would expect it to have a low loss ratio, which would reflect high premiums paid in from insured to captive (to get the tax benefits of §§ 162(a) and 831(b)) and low amounts of claims paid out from captive to insured (because the captive is not insuring legitimate risks or not paying claims as an insurance company would).

Plaintiffs contend a loss ratio is an inappropriate metric to gauge whether a captive, specifically, provides legitimate insurance because many captives are designed to insure low frequency, high severity risks. D.E. 59 at 21, 27. The theory behind the loss ratio is simple: in an arm's length transaction with rational actors, premiums will be priced to reflect the economic realities of the insurance operations. Final Rule at 3,540. If an insured is paying millions of dollars in premiums to its captive and the captive is rarely (if ever) paying out claims, that would be an irrational financial decision for the insured—unless the tax benefits were the primary motivator. *Id.* Not so, Plaintiffs say, if the captive is not *designed* to pay out frequent claims. A company may rationally create a captive to cover low frequency, high severity claims, Plaintiffs say, because when the infrequent risks *do* arise, they are of significant enough magnitude to justify the years of what look like excessive premiums. D.E. 59 at 27, 38.

Treasury did not fail to consider this concern—it expressly accounted for it within its loss ratio formula. The loss ratio is calculated over *ten years*. Treas. Reg. §§ 1.6011–10(b)(2)(i) (listed transactions), 1.6011–11(b)(2)(ii) (transactions of interest). The Final Rule explains that the purpose of this long computation period is to "allow a Captive significant time to develop a

---

[8] The Final Rule refers to a "modified" loss ratio because it accounts for multiple years and includes an adjustment for policyholder dividends.

reasonable loss history that supports the use of a micro-captive for legitimate insurance." Final Rule at 3,541. It is reasonable for Treasury to conclude—solely for purposes of requiring disclosure—that an "insurance company" is potentially illegitimate if it is only insuring risks that are *so* infrequent there will be no evidence of them for an entire decade.

Similarly, Plaintiffs criticize the modified loss ratio factor because "a lack of loss is not evidence of a lack of risk." D.E. 59 at 26. As explanation, Plaintiffs say "a homeowner could go years without needing to file a homeowners insurance claim," which "does not suggest that the home was not at risk." *Id.* Plaintiffs fundamentally misunderstand the concept of insurance and the function of the modified loss ratio. The relevant party in Plaintiffs' hypothetical is not one individual homeowner, it is the homeowners insurance provider. If an insurance provider says it is providing homeowners insurance to various homeowners but goes an entire decade without paying out a single claim, that *does* at least "*suggest*" that the covered homes were "not at risk" or that the underlying policies are "illegitimate." *Cf. id.* (emphasis added); *see also Swift*, 144 F.4th at 765 (explaining the law of large numbers).

Plaintiffs also argue Treasury failed to consider comments claiming that the modified loss ratio would have "substantially harmful effects . . . on the micro-captive insurance industry at large." D.E. 59 at 38. According to Plaintiffs, numerous comments posited that to avoid identification as a reportable transaction, taxpayers will "lower premium prices and pay policyholder dividends" to "reduce the denominator in the Rule's loss ratio calculation." D.E. 59 at 38–39. Those foreseeable responses, Plaintiffs say, will result in limited "surplus reserves," which will "jeopardize[]" captives' "ability to pay future claims." *Id.* at 39.

As the Government explained in its opposition to Plaintiffs' motion for preliminary injunction—which Plaintiffs fail to address—Treasury responded to comments regarding

negative effects on the industry generally, Final Rule at 3,557, and Plaintiffs' comment specifically, *id.* at 3,545 (specifically addressing comments "that establishing a minimum loss threshold by application of the Loss Ratio Factors would negatively impact solvency for captives, by requiring artificially low premiums or imprudent issuance of policyholder dividends"). To survive arbitrary-and-capricious review, an agency need only show it "clearly thought about the commentors' objections and offered reasoned replies." *Huawei Techs. USA, Inc.*, 2 F.4th at 450. Plaintiffs' insistence that Treasury failed to address relevant comments is difficult to understand, as Treasury explicitly addressed the precise concern Plaintiffs raise.

And as the Final Rule explains, the concern is misplaced. Final Rule at 3,545. Insurance companies set premium prices to reflect economic realities of the insured risks. *Id.* at 3,540. The Final Rule does not "require[], encourage[], or allow[] micro-captives to make contractual promises that exceed risk-bearing capabilities." *Id.* at 3,545. And it strains credulity to think a legitimate insurance company would alter its premium pricing to avoid the "onerous disclosure obligations" that attach to reportable transactions.[9] *Cf.* D.E. 59 at 7, 12, 15. Indeed, "sound business judgment" would not allow it.[10] Final Rule at 3,545.

Treasury is not alone in considering an arrangement's loss ratio a relevant metric. The Fifth Circuit recently considered a captive's loss ratio in analyzing whether an arrangement provided insurance for federal income tax purposes. *See Swift*, 144 F.4th at 768. And the expert reports in the administrative record routinely emphasize the low loss ratio in captives determined

---

[9] For participants, the "onerous disclosure obligations" Plaintiffs reference throughout their brief is a two-page annual information report that the IRS estimates will take approximately 6 hours and 25 minutes to prepare. *See* Instructions for Form 8886 (https://perma.cc/HS9T-MPH9).

[10] Contrary to Plaintiffs' assertion, the modified loss ratio does not account for policyholder dividends to incentivize captives to pay policyholder dividends. *Cf.* D.E. 59 at 38–39. Companies may pay policyholder dividends to correct mispriced premiums. Final Rule at 3,545. The modified loss ratio appropriately accounts for that possibility. *Id.*

to be tax avoidant. *E.g.*, AR 17035–37 (discussing loss ratios and stating that the "industry benchmark loss ratio is 65%"); *id.* at 17774 (discussing loss ratios, noting that the captive's average loss ratio was over 30 times lower than the insurance industry's average of 70.2%, and stating this could only be true "if the captive charged excessive premiums"); *id.* at 17041 ("The fact that the loss ratio is typically very close to zero is a strong indication that the company is not relying on the law of large numbers" and is thus not likely a legitimate insurance company); *id.* at 21947–48 (stating the industry loss ratio ranges between 65–75% but the captive averaged a rate of 5.315% "indicating either remarkably good fortune or premiums that are out of line with the exposure to loss"); *see also id.* at 14625–26, 14790, 18015, 18073–74.

Finally, when asked at oral argument what criteria Plaintiffs would propose as an alternative, Plaintiffs' counsel responded that a loss ratio of 5% or 10% may be permissible. D.E. 61, Tr. at 11:6–23 (Oct. 8, 2025). In other words, when asked what criteria Plaintiffs contend Treasury should have used in the Final Rule, Plaintiffs' counsel *identified an arrangement's loss ratio*. To be sure, Plaintiffs contend that the Final Rule set the loss ratio *thresholds* too high, but that is an objection to the line drawn (discussed below), not the factor selected.

Thus, Treasury reasonably concluded that "the Loss Ratio Factors generally identify transactions . . . inconsistent with insurance for Federal tax purposes." Final Rule at 3,540. And explained its reasoning: because a low loss ratio is indicative of "excessive pricing of premiums" or "artificially low or nonexistent claims activity." *Id.*

### b. Treasury reasonably explained the financing factor.

A transaction satisfies the financing factor if the captive and insured are parties to a contract or other agreement under which the premiums paid from the insured to the captive can be returned from the captive to the insured without the insured realizing taxable income, "such as through a guarantee, a loan, or other transfer of Captive's capital." Treas. Reg. § 1.6011-

10(c)(1)(i). As the Final Rule explains, the result of such financing arrangements between an insured and captive is that "amounts paid as premiums have not only avoided ordinary taxation but have continued to avoid tax while back in the hands of the related parties who caused the premiums to be paid and deducted." Final Rule at 3,546; *accord Avrahami*, 149 T.C. at 179 (explaining that related-party financing in an § 831(b) arrangement could "generate nearly $1.2 million in tax deductions while arguably only moving money from one pocket to another").

Plaintiffs object that the financing factor lacks predictive value. *See* D.E. 59 at 35 ("The fact that a few captives that have been found to be abusive also made related-party loans does not suggest that related-party financing is indicative of tax abuse.") Treasury acknowledges that a legitimate insurance arrangement may include related-party financing. Final Rule at 3,546. But Treasury accounted for that critique—as explained below, the financing factor is insufficient alone to qualify an arrangement as a listed transaction. *Id.* However, Treasury explained that it retained financing as *a* factor because related-party financing is central to § 831(b) captives' potential for tax avoidance. *Id.* (explaining that financing arrangements allow taxpayers to manufacture deductions, despite the economic benefit of the money remaining "in the hands of the related parties who caused the premiums to be paid and deducted"); *accord* AR 13106 (letter from Nebraska dated September 30, 2005 explaining increased potential for abuse in arrangements with loans from captives to insureds).

In Treasury's experience, which, as explained below, is informed by and consistent with the fact patterns reflected in Tax Court opinions and expert reports, a tax avoidant § 831(b) captive will near always have a financing agreement with its insured. This consistency makes sense—without the ability to return the purported premiums from the captive to the insured, an § 831(b) captive arrangement would be less attractive to a would-be tax avoider (in other words,

24

the transaction would have less potential for tax avoidance). Thus, an arrangement that includes a related-party financing agreement has greater potential to be used for tax avoidance than an arrangement without one, making the presence of such an agreement a reasonable proxy for potentially avoidant transactions. *Cf.* AR 13304 (interested law firm recommending that related-party investments be altogether prohibited), 13357 (same).

When Plaintiffs respond that related-party financing is an expected feature in legitimate § 831(b) captives, they are wrong. *Cf.* D.E. 59 at 34–35. Insurers are frequently discouraged from committing their investments in dubious related-party financing arrangements. *Avrahami*, 149 T.C. at 193 (emphasizing related-party financing arrangements can be illiquid investments atypical of normal insurance companies). In Treasury's experience, such a circular flow of funds is most often seen in arrangements devised for tax avoidance, not insurance. Final Rule at 4,546.

And the expert reports included in the administrative record routinely identify a circular flow of financing—akin to the Final Rule's financing factor—as indicative of captives being tax avoidant. *E.g.*, AR 21977 (observing that where majority of investment returned to a parent company, the "circular flow of funds" indicated that the "arrangement has no economic substance and was not created for the transfer of insurance risk at arm's length"); *id.* at 14627 ("There was, therefore, a complete circular flow of premiums . . ."); *id.* at 17828–29 (noting the circular flow of funds "do not remotely approach the economics of any insurance company of which" the expert was aware); *see also id.* at 18074 (reasoning the insurance was not "an arm's length transaction" where the insureds "seemed more interested in funding the captive with $1.2 million in premium than obtaining insurance in a cost effective manner"); *id.* at 22556, 22859.

25

### c.  The administrative record sufficiently supports both factors.

Treasury relied on all the materials at its disposal to settle on the modified loss ratio factor and the financing factor and included those materials in the administrative record, except taxpayer-specific materials protected from disclosure under § 6103.

As a starting point, Treasury relied on its expertise and the knowledge it has gained from years of examinations and litigation, which reveal how some taxpayers could employ § 831(b) captives to provide legitimate insurance, while others structured arrangements to *look* like § 831(b) captives just to claim tax benefits, without providing legitimate insurance. A core function of Treasury is to identify and enforce the lines between legitimate tax planning on the one hand, and illegitimate tax avoidance on the other. *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) (stating an agency interpretation "may be especially informative to the extent it rests on factual premises within the agency's expertise" (quotation modified)); *Huntington Ingalls, Inc. v. Dir., Off. of Workers' Comp. Programs*, 70 F.4th 245, 256 (5th Cir. 2023) ("An agency is at its strongest when the interpretation is within the bounds of its ordinary duty and implicates technical matters."). The legitimate § 831(b) captive and the illegitimate § 831(b) captive may look the same on paper. They both purport to comply with the Code's provisions. But in Treasury's experience, as it explained in the Final Rule, the illegitimate § 831(b) captive can consistently be distinguished from its legitimate cousin by its low loss ratio (over a significant period of time) and the circular flow of funds facilitated by the financing agreement it typically shares with its insureds (or related parties). Final Rule at 3,546.

But Treasury did not rely solely on its institutional knowledge and intuition. *See* Final Rule at 3,538 ("The factors are objective and reasonably determined, based on relevant factors in existing statutory provisions, on available industry data, and on a careful review of case law and examination information."). For one, it considered "existing case law with respect to micro-

captives," and observed "the commonalities in the fact patterns in these transactions." *Id.* For instance, *Avrahami* instructs courts to consider when analyzing whether a captive provides insurance for federal income tax purposes, among other factors, whether the captive is adequately capitalized, whether premiums are reasonable, and whether claims were paid. *See* Final Rule at 3,535 (discussing *Avrahami*, 149 T.C. at 191). The caselaw emphasizes inadequate capitalization due to funds being returned from the captive to the insureds, by means of a related-party financing agreement. *See, e.g.*, *Royalty Mgmt. Ins. v. Comm'r*, T.C. Memo. 2024-87, 2024 WL 4200129, at *23 (2024). And many cases examine the loss ratio, because it captures a mismatch between premiums paid in and claims paid out. *See, e.g.*, *id.* at *29–30; *Keating*, 2024 WL 50234, at *32; Final Rule at 3,541 (noting that the law of large numbers, which typically informs premium pricing, "is notably absent from the micro-captive cases tried to date, as premiums were consistently priced to meet the target threshold under section 831(b) without regard to reasonable estimates for loss experience").

Treasury also reviewed taxpayer-specific audit materials, of both participants and promoters, to confirm its understandings. *See* Final Rule at 3,538 ("Current examinations and litigation also are relevant, as they demonstrate consistency with the transaction fact patterns identified in these regulations."). Treasury cannot include the individual taxpayer-specific materials in the administrative record.[11] D.E. 34-1 ¶¶ 5–6 ("[M]ore than one hundred documents that were considered in connection with the promulgation of [the Final Rule] are not included

---

[11] Treasury specified in its certification the types of materials it considered but could not include. *See* D.E. 34-1 ¶¶ 5–6. These materials include information collected from promoters of § 831(b) captive transactions, as well as the files of taxpayers whose § 831(b) captive transactions were subject to audit. *Id.* All such information meets the definition of "return information" under § 6103(b)(2)(A), which means it cannot be disclosed without an exception. I.R.C. § 6103(a); *Huckaby v. U.S. Dep't of Treasury, IRS*, 794 F.2d 1041, 1046–47 (5th Cir. 1986). This litigation does not provide an exception. *See generally* I.R.C. § 6103.

because disclosure of these documents is prohibited by I.R.C. § 6103."). But, as referenced above, Treasury can—and did—include expert reports filed in litigated cases, which reflect the type of facts that Treasury could not otherwise disclose under § 6103. *Cf. Payne v. Levy*, 35 F. Supp. 2d 951, 952 (S.D. Tex. 1998). The facts described in the expert reports filed in litigated cases are illustrative of the facts Treasury reviewed in taxpayers' audit files. *Cf.* D.E. 20-1 ¶ 6.c.

Treasury can also include a summary of the § 6103-protected materials it reviewed, which it did in the preamble. *Cf.* Final Rule at 3,539 ("Although section 6103 prohibits the IRS from disclosing specific taxpayer information, it does not preclude the IRS from identifying consistent fact patterns based on specific taxpayer information."); D.E. 59 at 33–34. As the Final Rule explains, when reviewing taxpayer materials, Treasury saw a consistent fact pattern among purported § 831(b) captives that failed to provide insurance for federal income tax purposes. *Id.* at 3,539. Treasury summarized what it learned: the tax avoidant, not-real insurance arrangements were "closely held," the captive "made an § 831(b) election," and the amounts purportedly paid as premiums were used "for personal investments or for related-party financing and not to pay losses." *Id.* The arrangements reflected "excessive pricing of premiums and artificially low or nonexistent claims activity," *id.* at 3,540, as well as "[t]he use of amounts paid as premiums in a tax-preferred manner, and the return of such amounts directly or indirectly to the related parties who benefitted from the original tax deduction," *id.* at 3,546.

Plaintiffs suggest Treasury should have included taxpayer examination data in an anonymized, aggregated form. D.E. 59 at 33–34. The fact pattern included in the Final Rule *is* the anonymized, aggregated summary of the information seen in audit files. To the extent Plaintiffs imagine a more formal aggregated dataset, it does not exist. Treasury did not create or rely on any sort of aggregated dataset when it drafted the Final Rule. It reviewed audit files—in

the form of audit files. *Cf.* D.E. 34-1 ¶¶ 5–6. If Treasury had included an aggregated dataset in the administrative record, that dataset would have been created only after this matter was referred to the DOJ for litigation. But an "agency is not free to defend its decision by supplying new, *post hoc* rationalizations for it when sued." *Wages & White Lion Invs. v. FDA*, 90 F.4th 357, 371 (5th Cir. 2024) (*en banc*), *vacated on other grounds*, *FDA v. Wages & White Lion Invs.*, 604 U.S. 542 (2025). The Government may not *post hoc* construct a new record for purposes of litigation. Treasury included "as much information publicly as it can." *Flyers Rts. Educ. Fund v. FAA*, 864 F.3d 738, 745 (D.C. Cir. 2017).

### 4. The thresholds within the objective factors are reasonable, and Treasury reasonably adjusted them in response to comments.

Finally, Treasury reasonably drew the lines defining the reportable transactions. Because the lines are reasonable and reasonably explained—and because those lines were reasonably adjusted in response to comments—the Final Rule is neither arbitrary nor capricious.

To qualify as a listed transaction, the captive must be closely held, exist for at least ten years, and satisfy *both* the financing factor *and* the 30% loss ratio factor. Treas. Reg. § 1.6011-10(c). To qualify as a transaction of interest, the captive must be closely held and satisfy *either* the financing factor *or* the 60% loss ratio factor. Treas. Reg. § 1.6011-11(c).

In the NPRM, Treasury proposed a 65% loss ratio threshold for both the listed transaction and the transaction of interest. *See* Micro-Captive Listed Transactions and Micro-Captive Transactions of Interest, 88 Fed. Reg. 21,547, 21,557 (proposed Apr. 11, 2023) (hereinafter "NPRM"). Treasury received many comments objecting to the breadth of the listed transaction designation, specifically. *E.g.*, AR 4300, 4305, 4347, 4353, 4356, 4359, 4369, 4387–94, 4414–21, 4438, 4492, 4533, 4559, 4635, 4639–43, 4667, 4676, 4680–84, 4704, 4733, 4753, 4775, 4779–85, 4789–90, 4801–12, 4814, 4822, 4871, 4887, 4896–97, 4944, 4948–54, 4959. This

concern makes sense. While the immediate effect of a transaction's identification as a listed transaction or transaction of interest is the same (requiring disclosure), additional consequences may attach to the former. A listed transaction is subject to a higher failure-to-disclose penalty, I.R.C. § 6707A(b)(2), and a longer statute of limitations, I.R.C. § 6501(c)(10). And a listed transaction ultimately disallowed on its merits will be subject to an additional penalty, without the need for the IRS to prove additional facts. I.R.C. § 6662A(b)(2)(A).

### a.   The listed transaction thresholds are reasonable.

In response to those comments, Treasury significantly altered the listed transaction thresholds. Final Rule at 3,541. The Final Rule lowered the listed transaction loss ratio from 65% to 30%. *Compare* Final Rule at 3,542, *with* NPRM at 21,557. That ratio is calculated over ten years—twice the time considered under Notice 2016-66. *Compare* Final Rule at 3,541, *with* Notice 2016-66 at 10. And the Final Rule changed the role of the financing factor from the disjunctive "or" to the conjunctive "and." *See* Final Rule at 3,541, 3,546.

To set an appropriate loss ratio threshold for the listed transaction, Treasury calculated the average loss ratio of an insurance company that was sustained by the Tax Court despite its low ratios. *Id.* at 3,541 (discussing *R.V.I. Guar. v. Comm'r*, 145 T.C. 209 (2015)). The average of that company's loss ratios over five ten-year periods came to 32%, so Treasury set the listed transaction loss ratio below that, at 30%. *Id.*; *accord* AR 11290–98 (comments submitted in response to Notice 2016-66 encouraging Treasury to use the loss ratio of the company sustained by the Tax Court in *R.V.I.*).

Plaintiffs suggest that a 30% loss ratio must be too high because the IRS once conceded that a micro-captive with a loss ratio of 14% provided genuine insurance. *See* D.E. 59 at 28 (discussing *Puglisi v. Comm'r*, 2021 WL 7162530 (T.C. Oct. 29, 2021)). That is wrong. If the IRS concedes a case—drops its challenge to a taxpayer's treatment of a tax item—it is true that,

as a practical matter, the taxpayer will enjoy the tax benefit it claimed. But as a *legal* matter, the IRS dropping its challenge to a taxpayer's position does not require—and often does not include—a concession that the taxpayer's position is proper. Though, as the Final Rule explains, § 6103 prevents Treasury from discussing the non-public details of any particular case, public documents show *Puglisi* contained no such concession. *Puglisi*, 2021 WL 7162530. When the IRS moved for entry of decision, the taxpayer urged the Tax Court to reject the Commissioner's concession precisely because it contained no "resolution on the merits." *Id.* at *1.

Regardless, the Final Rule would not be unreasonable even if Treasury promulgated it knowing it would impose a disclosure requirement on one known-to-be-legitimate captive. For a disclosure requirement—particularly one implicating no constitutional interest—Treasury can draw a *reasonably* overinclusive line. *Cf. Chamber of Com. of U.S. v. U.S. SEC*, 85 F.4th 760, 768–72 (5th Cir. 2023) (rejecting overbreadth challenge to disclosure requirement before finding it arbitrary and capricious on other grounds).

### b. The transaction of interest thresholds are reasonable.

Though Treasury received significantly fewer comments on the thresholds for transactions of interest, Treasury also adjusted those metrics. The Final Rule lowered the transaction of interest loss ratio from 65% to 60%. Final Rule at 3,542. And, as with listed transactions, the ratio is calculated over (up to) ten years, which is increased from the five-year period used in Notice 2016-66 and the nine-year period proposed in the NPRM. *Id.* at 3,543.

To arrive at the 60% threshold for the transaction of interest, Treasury started from publicly available data from the National Association of Insurance Commissioners ("NAIC"), which include the average annual loss ratios generally applicable to all non-life insurers. Final Rule at 3,542; AR 5731–9814. Treasury reviewed the available data and determined that the lowest modified loss ratio supported by industry-wide data is 67%. Final Rule at 3,542. Thus, it

set the threshold for transactions of interest below that average, at 60%.[12] *Id.*

Plaintiffs argue that the NAIC data is inappropriate because it includes lines of coverage captives do not typically offer, skewing the industry-wide loss ratios higher. D.E. 59 at 30–31. But Treasury acknowledged the limitations of the data, and, as appropriate, made reasonable adjustments to account for those limitations before using it to set the 60% loss ratio.

For instance, Treasury noted that the NAIC data includes several lines of coverage that § 831(b) captives are unlikely to cover, so Treasury removed those lines of coverage and re-ran the numbers. Final Rule at 3,542. Treasury observed that the NAIC averages are calculated annually, so low frequency risks are less likely to be accounted for, which justified a downward adjustment of the thresholds. *Id.* And Treasury acknowledged that the NAIC data reflects greater risk diversification and geographic diversity than the typical § 831(b) captive but explained that no better data was available. *Id.* Treasury did not—and does not—contend that the NAIC data provides perfect benchmarks, only that it knew of no *better* data to work from.

Treasury also solicited suggestions for alternate, publicly available datasets from which more precise lines could be drawn. *E.g.*, NPRM at 21,560. One commenter suggested AM Best Company's dataset because it groups insurance companies by size. AR 5002. But that comment explained the AM Best data had its own problems, because the small insurance companies offer coverages that have "vastly different claims characteristics than micro-captives." *Id.*

---

[12] Plaintiffs emphasize that the Final Rule does not "cite any case invalidating a micro-captive with anywhere near a 30% or 60% loss ratio." D.E. 59 at 27–28. But the Final Rule does not rely on the cases Plaintiffs cite to explain how it selected the 30% and 60% thresholds. As discussed above, Treasury reviewed the cases Plaintiffs cite to determine § 831(b) captives could be used for improper tax avoidance and to identify a low loss ratio over time and related-party financing as common characteristics of captives held to be tax avoidant. But to draw the lines, it relied on *R.V.I.* and NAIC data. The Court must review the Final Rule on the rationale Treasury provided. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

Nevertheless, Treasury reviewed the comment and considered use of the data, but ultimately agreed, concluding that the lines of coverage offered by the small insurers included in the AM Best dataset were skewed toward "personal automobile liability and homeowner's liability," which "micro-captives are not generally permitted to cover." Final Rule at 3,542. The NAIC data, "conversely, represents industry averages generally applicable to all nonlife insurers." *Id.* And the NAIC data, unlike the AM Best data, is publicly available, includes historical data, and delineates separate lines of coverage that could be removed as appropriate. *Cf. id.* Treasury did not receive any other comments suggesting alternate, publicly available data. *Id.*

The APA does not require Treasury to work with perfect data. *See Prometheus Radio Project*, 592 U.S. at 425–27. It is sufficient for the agency to "acknowledge[] the gaps in the data," "ask[] for data on the issue," and, if nothing better is uncovered, "rel[y] on the data it ha[s]." *Id.* at 425. Treasury acknowledged the limitations of the NAIC data then explained why it still represented the best numbers publicly available. "In short," Treasury's reliance on the NAIC data to set the 60% loss ratio threshold "was reasonable and reasonably explained for purposes of the APA's deferential arbitrary-and-capricious standard." *Id.* at 426.

Finally, Plaintiffs claim the 60% threshold is too close to the 67% industry average. D.E. 59 at 32. On this point, Plaintiffs simply disagree with Treasury's policy choice. Treasury reasonably concluded that when the other relevant criteria are satisfied, the arrangements with modified loss ratios below the industry average deserve a second look.

### C.  Were the Court to identify a defect in the Final Rule, it should consider supplemental briefing on remedy, which should be tailored to the defect.

The Final Rule is reasonable, reasonably explained, and within Treasury's authority to issue. But if the Court disagrees, any remedy should be tailored to the defect identified. In that circumstance, the Court should consider supplemental briefing on remedy.

If the Court agrees Treasury can require disclosure of certain § 831(b) captives but finds the Final Rule's explanations insufficient or its record inadequate, the Court should remand the Final Rule to Treasury to remedy the defect—*without* vacating it.[13] *See Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022) ("Remand without vacatur of the agency action is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." (internal quotations omitted)). Treasury must comply with the APA, but a correctable error should not further hamstring Treasury's efforts to identify and, where appropriate, challenge potentially tax avoidant micro-captive transactions.

Additionally, the Final Rule contains two regulations, which, depending on the defect, may be severable. *See Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1144 (D.C. Cir. 2022). If, for instance, the Court found the transaction of interest criteria unreasonable, that may justify a remedy against Treas. Reg. § 1.6011-11, but not Treas. Reg. § 1.6011-10.

If the Court were inclined to vacate the Final Rule, the scope of that vacatur should be no broader than necessary to grant SRA—the only Plaintiff with standing, *see* D.E. 21 at 17–20—complete relief, *see Gill v. Whitford*, 585 U.S. 48, 73 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). The burden should rest with SRA to specifically identify the entities to whom relief must extend to provide it complete relief. *Cf. Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 375 (5th Cir. 2022) (explaining that, when determining if a party should receive relief from a court order, the "burden of proving entitlement to vacatur rests with the party seeking relief").

---

[13] Whether the APA even permits vacatur remains an open question. *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 693 (2023) (Gorsuch, J., concurring in the judgment) ("The reasons the government offers [to question whether the APA authorizes vacatur] are plenty and serious enough to warrant careful consideration."); *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring).

Finally, in no event should this Court order injunctive relief. An injunction may not issue unless it would have a "meaningful practical effect independent of" other remedies. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). If the Court were to vacate the Final Rule as to SRA, an injunction against enforcement would have no meaningful, practical effect.

In their motion for summary judgment—though not in their Complaint—Plaintiffs seek not just a prohibitory injunction against enforcement, but also an affirmative, mandatory injunction requiring the Government "to destroy or return all materials provided in response to the Final Rule." D.E. 59 at 40. Plaintiffs lack standing to seek such relief, particularly as to nonparties. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562–63 (2025). Plaintiffs claim similar relief was ordered by the district court in *CIC Services*, D.E. 59 at 41, but fail to acknowledge that the *CIC* district court *vacated* its return-of-document injunction on reconsideration, *see* 2022 WL 2078036, at \*2–3 (E.D. Tenn. June 2, 2022) ("CIC does not have any basis to seek affirmative injunctive relief requiring the IRS to return documents to nonparty taxpayers and material advisors.").[14] The district court explained that "CIC has not identified, and the Court's independent research does not reveal, any case in which a court has compelled an agency to take affirmative action that extends to nonparties in connection with setting aside a legislative rule under 5 U.S.C. § 706(2)." *Id.* at \*3.

## V.     Conclusion.

Congress explicitly delegated authority to Treasury to identify reportable transactions. Treasury exercised that authority and reasonably designated micro-captive transactions bearing certain criteria for reporting. Treasury has complied with the APA.

---

[14] The Government voluntarily returned CIC's original, paper-filed Form 8918 to simplify the analysis. The district court did not order the IRS to expunge the data extracted from that Form from its systems or otherwise limit the Government's ability to use the information collected.

Dated: January 30, 2026                     Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Assistant Attorney General

                                            JOSHUA WU
                                            Deputy Assistant Attorney General
                                            Tax Litigation Branch

                                            */s/ Moira E. Goodwin*
                                            MOIRA E. GOODWIN
                                            DC Bar No. 1780293
                                            S.D. Tex. No. 3924157
                                            ADAM S. DOMITZ
                                            NY Bar No. 6213896
                                            S.D. Tex. No. 3926145
                                            Trial Attorneys
                                            Tax Litigation Branch
                                            Civil Division, Department of Justice
                                            P.O. Box 227
                                            Washington, D.C. 20044
                                            202-718-7056 (phone)
                                            202-514-6866 (fax)
                                            moira.e.goodwin@usdoj.gov
                                            adam.s.domitz@usdoj.gov

                                            *Counsel for Defendants*